## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SUSQUEHANNA RADIO LLC | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| JACOB KEMP and DANIEL MCDOWELL | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT

Plaintiff Susquehanna Radio LLC ("Susquehanna") files this Verified Original Complaint (the "Complaint") against its former employees Daniel McDowell ("McDowell") and Jacob Kemp ("Kemp") (together, the "Defendants"). In support of its Complaint, Susquehanna shows as follows:

### I.     NATURE OF THE CASE

Susquehanna brings this action seeking emergency injunctive relief and damages to halt and prevent Defendants' continuous, flagrant breaches of contract and misappropriation of Susquehanna's intellectual property rights.

From February 2020 through until June 2023, on weekdays between 12:00 p.m. – 3:00 p.m., Defendants co-hosted the radio broadcast "The Hang Zone" on sports radio 96.7fm / 1310am ("The Ticket"), which is owned by Susquehanna and broadcast in the Dallas, Texas area. The Hang Zone was a talk show covering general news with an emphasis on Dallas- and Texas-area sports teams. Aside from listening live on The Ticket's radio station, listeners could access The Hang Zone segments on demand on theticket.com and thehangzone.com. Further, The Ticket also uploaded The Hang Zone content on multiple podcast platforms (including Spotify). At all times, Defendants' employment was governed by employment contracts (the "McDowell Agreement"

and the "Kemp Agreement," respectively, and together, the "Agreements"). Each of the Agreements contain, *inter alia*, confidentiality, non-solicitation, and non-competition provisions. The latter specifically restricts Defendants from engaging "in any activities the same or essentially the same as" Defendants' employment with Susquehanna – namely, similar to hosting The Hang Zone – for a six-month period following termination of their employment.

Defendants terminated their employment with Susquehanna on July 14, 2023. Prior to this and in direct violation of their non-solicitation and non-compete agreements and **while still employed by Susquehanna**, Defendants began recording an identical show (hosted on the internet as a podcast) called "The Dumb Zone," which follows the same program format as The Hang Zone, focused on a male audience and on Dallas-area sports. Within mere days after leaving their employment at Susquehanna, Defendants broadcasted The Dumb Zone on patreon.com/thedumbzone for $6.90 per month to the same listeners who used to tune into The Ticket. In addition to following the same programming structure, Defendants talked at length on The Dumb Zone about their contract negotiations with The Ticket,[1] mocked Susquehanna's cease-and-desist (offering instead to "cease-and-cist"), threatened to release conversations Defendants illicitly recorded with Susquehanna executives containing confidential information, criticized Susquehanna's hiring and programming decisions, and actively disparaged Susquehanna employees.

In addition to openly and brazenly violating their non-competition and non-disparagement obligations, Defendants proceeded to steal Susquehanna's intellectual property, rebranding The Hang Zone's social media accounts owned by Susquehanna. For instance, Defendants

---

[1] Of note and in breach of the anti-disparagement clause in Section 6.3 of the Kemp Agreement, Defendant Kemp has **falsely** claimed on The Dumb Zone that Susquehanna did not increase his pay from when he was a producer to when he became a host for The Hang Zone. Not only does the Kemp Agreement provide for yearly raises to base salary, but Defendant Kemp's total compensation more than doubled between 2019 and 2022.

commandeered the Twitter account "@thehangzone" – which has nearly 22,000 followers and operated as a Susquehanna account since 2011 – and changed it to "@dumbzone69" which it now uses to promote The Dumb Zone.  For the YouTube channel owned by The Ticket, in addition to changing the name, Defendants altered The Hang Zone's logo, blacked out "Hang", and superimposed "Dumb" as shown below:

 

Defendants then redirected The Hang Zone's website (thehangzone.com) to a webpage promoting their Patreon and aforementioned rebranded social media accounts.  For instance, below is the difference between thehangzone.com from July 31, 2023 to August 1, 2023:

 

Accordingly, by starting The Dumb Zone while still employed by Susquehanna and operating The Dumb Zone immediately after the termination of their employment from Susquehanna, Defendants are in violation of the non-compete, non-solicitation, and non-

disparagement provisions of their respective Agreements.  Moreover, Defendants are actively misappropriating The Ticket's social media platforms to cause confusion and re-direct The Ticket's fans and listeners to The Dumb Zone and are violating their fiduciary duties to Susquehanna while infringing upon its intellectual property.  In their most recent affront, Defendants have begun soliciting Susquehanna's sponsors and customers to advertise on The Dumb Zone in patent and willful violation of their Agreements.

Emergency injunctive relief is now needed to stop Defendants' continued violation of their Agreements, as well as to stop Defendants' threatened and actual misappropriation of Susquehanna's confidential, trade secret information, and interfering with Susquehanna's business activities.  Time is of the essence because each weekday, Defendants are uploading The Dumb Zone podcast, which directly competes with The Ticket's programming, disparages Susquehanna and its employees, and misappropriates its intellectual property by using Susquehanna's confidential information and trade secrets.  Accordingly, Susquehanna has already suffered and, without a temporary restraining order and preliminary injunction, will continue to suffer substantial irreparable harm to its business as a result of Defendants' actions.

## II.  **PARTIES**

1.      Plaintiff Susquehanna Radio, LLC, f/k/a Susquehanna Radio Corp., is a limited liability company organized and existing under the laws of Delaware and whose members are all Delaware citizens.  Susquehanna Media LLC is the sole member of Susquehanna Radio LLC and is a Delaware citizen.  Susquehanna Pfaltzgraff LLC is the sole member of Susquehanna Media LLC and is a Delaware citizen.  CMP Susquehanna LLC is the sole member of Susquehanna Pfaltzgraff LLC and is a Delaware citizen.  CMP Susquehanna Radio Holdings LLC is the sole member of CMP Susquehanna LLC and is a Delaware citizen.  Cumulus Radio LLC is the sole member of CMP Susquehanna Radio Holdings LLC and is a Delaware citizen.  Cumulus

4

Intermediate Holdings LLC is the sole member of Cumulus Radio LLC and is a Delaware citizen. Cumulus Media New Holdings Inc. is the sole member of Cumulus Intermediate Holdings LLC and is incorporated under the laws of Delaware with its principal place of business in Atlanta, Georgia.

2.      Defendant Daniel McDowell is an individual residing in the State of Texas who may be served at his domicile at 961 Thousand Oaks Ct, Southlake, Texas 76092, or wherever else he may be found.

3.      Defendant Jacob Kemp is an individual residing in the State of Texas who may served at his domicile at 905 E Worth St, Grapevine, Texas 76051, or wherever else he may be found.

### III.      <u>VENUE AND JURISDICTION</u>

4.      Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1331 because it involves claims that arise under federal law.  This Court also separately has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 by virtue of the parties' diversity of citizenship and the value of these claims, including damages, lost revenue, existing and future advertising, and lost goodwill, which exceed $75,000.00, exclusive of interest and cost.  This Court has supplemental jurisdiction over Susquehanna's state law claims under 28 U.S.C. § 1367.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants reside in Tarrant County, which is within the jurisdiction of the United States District Court for the Northern District of Texas.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because Defendants' Agreements and employment with Susquehanna were performed in Dallas County, which is within the jurisdiction of the United States District Court for the Northern District of Texas, and broadcast to the surrounding area.  Additionally, the acts giving rise to the causes of action asserted against

Defendants herein occurred within the jurisdiction of the United States District Court for the Northern District of Texas.

### IV.    STATEMENT OF FACTS

**A.    THE HANG ZONE'S INCEPTION AND DEFENDANTS' AGREEMENTS**

6.    McDowell began working for The Ticket in 1999, and Kemp began in 2009.  In February of 2020, Defendants began co-hosting The Hang Zone on weekdays in the 12:00 p.m. – 3:00 p.m. timeslot.

7.    Defendants' work for The Ticket and employment with Susquehanna was wholly governed by the Agreements.

8.    McDowell executed the McDowell Agreement (attached hereto as Exhibit A) on June 13, 2018, which was set to expire on June 22, 2023.  The McDowell Agreement includes the following relevant provisions:

(Section 1.1) "Company Business" means the operation, promotion, and marketing of commercial radio stations.

(Section 1.3) "Competing Business" means any person (including Employee) or entity **carrying on a business that is the same or essentially the same as the Company Business.** (emphasis added).

(Section 1.4) "Confidential Information" means all information that: (i) the Company tries to keep secret and (ii) has commercial value to the Company or is of such a nature that its unauthorized disclosure would be detrimental to the Company's interest, including, for instance, the Company's information concerning price and discount arrangements with sponsors/ customers, information concerning sponsors'/customers' particular needs, preferences, and interests (and how the Company uses such information to maintain a competitive advantage), marketing plans, business strategies, promotion plans, financial information, forecasts, and personnel information.

(Section 2.4) **Social Media Platforms.** During the Employment Period, the Employee, as directed by the Company, shall use and operate the designated Company owned social media platforms in furtherance of the Job Duties hereunder

6

for the sole and exclusive benefit of the Company. In all cases Employee shall not use broadcast tools or content, or the Station's promotional tools, including but not limited to, Company owned and controlled social media platforms to promote and further the Employee's separate and independent controlled social media platforms, unless approved in writing by the Company.

(Section 3.1) During the Employment Period, Employee will not negotiate, allow any person or entity to negotiate on Employee's behalf, or enter into any oral or written agreement for Employee's services, give or accept an option for Employee's service, enter into employment of, perform services for, or grant or receive future rights of any kind to provide Employee's services to or from any person or entity whatsoever including without limitation services to be performed after the Employment Period except as provided for below.

(Section 6.1) Employee agrees that all Confidential Information is confidential to and the exclusive property of the Company.

(Section 6.2) During Employee's employment by the Company, and for 12 months after termination of such employment, Employee shall not, directly or indirectly, within the United States disclose any Confidential Information to any person or entity, or use or allow others to use through Employee any Confidential Information, except as necessary for performance of Employee's Job Duties.

(Section 7) **AGREEMENT NOT TO COMPETE.**  While employed by the Company, and for six (6) months following termination of such employment, **Employee shall not, directly or indirectly, engage in any activities the same or essentially the same as Employee's Job Duties for any Competing Business** located or selling advertising within, or broadcasting to, the Business Area. Employee acknowledges that in the event Employee's employment terminates for any reason, Employee will be able to earn a livelihood without violating the foregoing restrictions and that Employee's ability to earn a livelihood without violating such restrictions is a material condition to employment with the Company. Employee further agrees that during the pendency of any litigation to enforce this Section 7, including all appeals, the non-compete period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved. (emphasis added).

(Section 8) **AGREEMENT NOT TO SOLICIT SPONSORS / CUSTOMERS.** During Employee's employment by the Company and for six (6) months following termination of such employment, Employee shall not, directly or indirectly, for any

Competing Business, solicit, for the purpose of selling advertising time, any sponsor / customer of the Company with which Employee had Contact during the six (6) months preceding the termination of Employee's employment. For purposes of this Section 8, "Contact" means any interaction between Employee and a sponsor/customer which took place in an effort to establish or further the business relationship between the Company and the sponsor/customer. Employee further agrees that during the pendency of any litigation to enforce this Section 8, including all appeals, the non-solicitation period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.

(Section 9) **AGREEMENT NOT TO SOLICIT EMPLOYEES.** During Employee's employment by the Company and for six (6) months following termination of such employment, Employee shall not, directly or indirectly, solicit for employment by a Competing Business any of the Company's then-current sales, programming, managerial, or on-air employees with whom Employee dealt while employed. Employee further agrees that during the pendency of any litigation to enforce this Section 9, including all appeals, the non-solicitation period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.

(Section 11) **INJUNCTIVE RELIEF.** Employee agrees that the provisions of Sections 6, 7, 8, and 9 of this Agreement are reasonable and necessary to protect the Company's property and business, and that Employee's breach of any of those provisions may cause the Company to suffer irreparable loss and damage. Accordingly, Employee agrees that if Employee breaches or threatens to breach any of those provisions, **the Company shall be entitled to immediate injunctive relief to enforce this Agreement, money damages for whatever harm such breach causes the Company, and whatever other remedies are available**. (emphasis added).

(Section 15.1) With respect to each and every program, announcement, event and promotion in connection with which Employee renders services hereunder, the titles and content thereof (including every format, idea, theme, script, characteristic, element thereof), and with respect to all materials created or developed by Employee pursuant to this Agreement (whether by Employee acting alone or in conjunction with other persons) (collectively "Material"), **Employee agrees and acknowledges that the Company, its successors and assigns are the sole and exclusive owner of such Material, that all rights, title, and interest in such Material are vested in the Company for all uses and purposes throughout the world.** (emphasis added).

(<u>Section 16.1</u>) Employee agrees and acknowledges that Employee shall indemnify and hold harmless the Company . . . from and against any and all claims, debts, damages, demands, obligations, costs and expenses arising out of or resulting from (i) the enforcement by the Company of any right, privilege or option hereby granted to it . . . (v) the breach by Employee of any representations, warranties or provisions of this Agreement.

9.      Kemp executed the Kemp Agreement (attached hereto as Exhibit B) on April 1, 2022, which was set to expire on March 31, 2024.  Kemp exercised an early termination option contained in the Kemp Agreement on December 19, 2022, but continued his employment with Susquehanna thereafter (subject to the survival of several provisions of the Kemp Agreement). The Kemp Agreement contains substantially the same relevant contractual requirements as the McDowell Agreement identified above, with the following different or additional relevant provisions:

(<u>Section 1.1</u>) "Company Business" means the operation, promotion, and marketing of commercial radio stations **and other audio platforms, including podcasting**. (emphasis added).

(<u>Section 1.3</u>) "Competing Business" means any person (including Employee) or entity carrying on a business that is the same or essentially the same as the Company Business.  **Competing Business shall include, without limitation, all commercial audio outlets, such as radio stations, radio networks, television stations, cable operators, podcasters, Internet/streamed radio and Internet/streamed programs/programming and other current and future audio platforms**. (emphasis added).

(<u>Section 6.3</u>) During Employee's employment by the Company and at any time thereafter, Employee agrees not to disparage or encourage or induce others to disparage the Company, any of its respective employees that were employed during Employee's employment with the Company or any of its respective past and present, officers, directors, products, or services (the "Company Parties").  For purposes of this Section 6.3, the term "disparage" includes, without limitation . . . any public statement, that in each case is intended to, or can be reasonably expected to, damage any of the Company Parties.

(Section 21) **ATTORNEYS' FEES.**  Employee covenants and agrees to pay all costs, expenses and/or charges, including reasonable attorneys' fees, incurred by the Company in enforcing any of the provisions hereof.

10.    Additionally, through Section 2.2 of their respective Agreements, Defendants agreed to abide by all written polices of Susquehanna.  Page 90 of the Cumulus Employee Handbook, which applies to Susquehanna employees, addresses unauthorized recordings, and states:

> **PROHIBITION OF UNAUTHORIZED RECORDING** Cumulus Media prohibits any sort of non-authorized video or audio recording of the workplace by its employees.  This includes but is not limited to, recording conversations with or involving Cumulus Media employees, customers, potential customers, vendors or members of the general public, without written consent by each party to the conversation. This prohibition also includes disseminating such materials even if the employee was not the individual who recorded the conversation.  Management employees who are authorized by Corporate Legal are permitted to make video and/or audio recordings consistent with Company business interests and in compliance with applicable laws.  Any employee who is found to have engaged or assisted in any unauthorized recording will be subject to appropriate disciplinary action, up to and including dismissal from employment.  Further, to the extent such recording violates applicable criminal and/or civil law, Cumulus Media may assist with prosecution or enforcement of all rights under such laws.

**B.    THE HANG ZONE'S PROGRAMMING AND DEFENDANTS' RECEIPT OF CONFIDENTIAL INFORMATION**

11.    The Hang Zone followed the same general daily structure, including an opening segment called the "Open", followed by news and sports segments, and concluded with a segment called "Why Today Doesn't Suck", where Defendants discuss events that happened on that day in history.  While topics included general news and events, The Hang Zone was primarily focused on professional sports, with an emphasis on the Dallas, Texas area, and could most generally be described as "guy talk".

12.     The Ticket also provided segments from The Hang Zone for on demand streaming on theticket.com, which was also available on thehangzone.com.   In addition, Susquehanna uploaded content from The Hang Zone in podcast form on three different The Hang Zone podcast channels (including Spotify), which included segments on "The Ticket Top 10," The Hang Zone Weekly Wrap Up on "Sportsradio 96.7 and 1310 The Ticket," and Why Today Doesn't Suck segments on "WTDS."

13.     During their employment with Susquehanna and as co-hosts of The Hang Zone, Defendants were exposed to and continuously provided non-public and proprietary Confidential Information (as defined by Section 1.4 of the Agreements).   Examples of the types of Susquehanna's Confidential Information provided to Defendants include but are not limited to:

- Weekly show meetings where Defendants and Susquehanna employees discussed content strategy, ratings strategies, and tactics on how to best contend with competitors;

- All Staff meetings several times a year where Defendants and Susquehanna employees discussed confidential long-term programming strategies and tactics from a station level, focusing on best practices, ways to compete with competition, and shore up weaknesses internally against said competitors;

- Formal and informal discussions with Defendants regarding various policies, practices, and procedures regarding on-air production and content, social media content and strategy, and programming policies in the event of breaking news, etc.;

- Internal discussions with Defendants regarding highly confidential marketing plans and tactics, including brainstorming meetings to craft future programming and promotions ideas for The Ticket; and

- Consistent discussions and meetings with sales representatives and sales managers regarding potential client relationships.

C.    **DEFENDANTS PLAN TO BREACH AGREEMENTS DURING CONTRACT NEGOTIATIONS**

14.    With Kemp exercising early termination of the Kemp Agreement in December of 2022 and the McDowell Agreement set to expire on June 22, 2023, the Parties began negotiations for new contracts wherein Defendants would continue to host The Hang Zone in the 12:00 p.m. – 3:00 p.m. timeslot on The Ticket.

15.    While the Parties were able agree on most terms – **including compensation** for hosting The Hang Zone – Defendants represented they wanted to engage in other independent media pursuits simultaneously with their employment with Susquehanna, specifically starting their own independent podcast.  During these discussions, Defendants gave no indication that they were simultaneously recording a competing podcast, nor that they had any intent to start a competing podcast or otherwise violate their restrictive covenants.

16.    Because Susquehanna already produced podcasts, including those hosted by The Ticket and including ones uploaded daily which used The Hang Zone branding and content, Susquehanna could not agree to Defendants' requests because it would directly compete with Susquehanna's podcasts and violate the non-competition provisions in the Agreements. Susquehanna offered Defendants a podcast which they could host independent of The Hang Zone branding on Susquehanna's podcast network with possible revenue sharing options, but Defendants declined.

17.    Instead, during these contract negotiations and while still employed by Susquehanna, Defendants began making plans to end their employment with Susquehanna and start their own independent podcast.

18.     Moreover, in bad faith and in violation of Susquehanna policies and Defendants' employment Agreements, Defendants **secretly recorded conversations with Susquehanna employees** during contract negotiations to use as content on a future show.   After leaving Susquehanna, Defendants stated publicly that they intended to release these recordings.   Indeed, Defendants bragged in a YouTube uploaded on July 20, 2023: "The first thing that we're gonna put out there content-wise is the full content of every single phone call we've had with the company . . . we're just gonna [sic] release all of that," and further acknowledged there were "probably some legal issues there."[2]

19.     In the midst of negotiations and while still employed by Susquehanna, Defendants recorded multiple podcasts which they intend to release "soon."[3]

20.     Defendants' final day of employment with Susquehanna was July 14, 2023.

**D.   DEFENDANTS PUBLICIZE THE DUMB ZONE, STEAL INTELLECTUAL PROPERTY, AND MOCK AND DISPARAGE SUSQUEHANNA**

21.     After leaving Susquehanna, Defendants immediately began re-branding all The Hang Zone websites and social media platforms to "The Dumb Zone".   Although operated by Defendants during their employment, these accounts and platforms were wholly owned by Susquehanna.   They include, without limitation, thedumbzone.com, a Twitter account with nearly 22,000 followers, and a YouTube account – which Defendants admitted publicly on an episode of The Dumb Zone.[4]

22.     Defendants uploaded a video titled "Dan and Jake Ticket goodbye" on The Dumb Zone YouTube channel on July 20, 2023, again stating they had recorded two podcasts while still

---

[2] The Dumb Zone, *Dan and Jake Ticket goodbye*, YouTube (July 20, 2023), https://youtu.be/F7RcRO2v_cY?t=833.

[3] *Id*; The Dumb Zone, *The Dumb Zone 7-24-23,* YouTube (July 25, 2023), https://youtu.be/hSFR8zaEMWY?t=385.

[4] The Dumb Zone, *The Dumb Zone 7-27-23*, Patreon (July 27, 2023), https://www.patreon.com/posts/dumb-zone-7-27-86772024.

employed by Susquehanna, and again stating they had recorded conversations during negotiations which they intended to release.  As of August 2, 2023, this video has 51,000 views.

23.     Defendants then started releasing podcast episodes on July 24, 2023 called "The Dumb Zone" – a phrase which Defendants routinely used on air while hosting The Hang Zone.

24.     The Dumb Zone is substantially identical to The Hang Zone, with an introductory segment called the "open", followed by general news and sports news, and includes the Why Today Doesn't Suck segment – which Defendants now call "Today in History".

25.     Defendants are recording and uploading The Dumb Zone from Defendant McDowell's residence, which is within the "Business Area" as defined by the Agreements.

26.     The Dumb Zone is accessible from within the Business Area on patreon.com/TheDumbZone.   In direct violation of the Agreements, Defendants have been uploading daily episodes since July 24, 2023, with one free episode per week (which is also uploaded to the YouTube channel along with clips from the paid episodes), and listeners can pay $6.90 per month for access to each upload.  As of August 3, 2023, The Dumb Zone has nearly 4,000 subscribers generating monthly revenue in excess of $25,000.

27.     Defendants have redirected the Susquehanna-owned website address "thehangzone.com" to their personal Patreon account.

28.     Susquehanna sent each Defendant a cease-and-desist letter (the "Cease-and-Desist Letters) on July 25, 2023, reiterating Defendants' obligations under their respective Agreements. Instead of following the unambiguous restrictions in the Agreements, Defendants continued to upload The Dumb Zone episodes.

29.     Even more egregiously and representing it as a piece of "listener feedback," in their July 27, 2023 episode, Defendants read language directly from the Cease-and-Desist Letters,[5] laughing at the title, and instead told listeners that the first thing they did was respond "well what if we cease and cist . . . like can we work something out on that front." [6]

30.     Defendants uploaded again July 31, 2023, with a 30-minute segment titled "Why we left The Ticket," where Defendants hosted guest Akaash Singh ("Singh")."[7]

31.     Defendant Kemp allowed Singh to represent that Defendant Kemp's pay did not increase from when he was a producer to when he began hosting The Dumb Zone, intending to disparage Susquehanna.  This statement was in fact false, as Defendant Kemp's pay, in fact, doubled during the time frame when he started hosting.  Defendants then purported to quote a specific Susquehanna employee (whose name Defendants bleeped from the episode) who allegedly said, "you think you can make that much podcasting?"[8]

32.     Defendants uploaded an episode of The Dumb Zone again on August 1, 2023, discussing and criticizing The Ticket's updated lineup, on-air personalities, and hiring decisions, and Defendants again discussed the Cease and Desist Letters.

33.     Defendants uploaded an episode of The Dumb Zone again on August 2, 2023, where Defendant Kemp stated, "I might bag on the company a little bit now that I've been told that that's possibly okay."[9]

---

[5] *Id.*

[6] Defendant Kemp also joked that the address on the cease-and-desist letter was directed at his old address and that it may have been sent there to the new owner instead of his present address.

[7] The Dumb Zone, *The Dumb Zone 7-31-23*, Patreon (July 31, 2023), https://www.patreon.com/posts/dumb-zone-with-7-86919643.

[8] *Id.*

[9] The Dumb Zone, *The Dumb Zone 8-2-23*, Patreon (August 2, 2023), https://www.patreon.com/posts/dumb-zone-8-2-23-87098488.

34.     Defendant Kemp also made a guest appearance on the podcast "The Mom Game" on August 3, 2023, where he and the hosts repeatedly mocked the Cease and Desist Letters, discussed his contract negotiations with Susquehanna (confirming Defendants' decision to leave was non-monetary but based on Defendants desire to start an independent podcast), and stated that Defendants may begin hosting a live streamed broadcast in the near future.[10]

35.     In direct violation of the non-solicitation provisions in their Agreements, specifically not to "solicit, for the purpose of selling advertising time, any sponsor / customer" of Susquehanna, Defendants have contacted Susquehanna's customers and sponsors to sponsor The Dumb Zone.

## V.     CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT

*(Non-Compete Provision, Non-Solicitation Provisions, Confidentiality Provision, and Unauthorized Recording Provisions – Against Defendant McDowell and Defendant Kemp)*

36.     Susquehanna repeats and alleges each and every allegation made in the foregoing paragraphs.

37.     As a condition of their employment and in exchange for receipt of and access to Susquehanna's Confidential Information, Defendants executed the Agreements which each contain non-competition, non-solicitation, and confidentiality provisions.

38.     The Agreements are valid contracts under Texas law and the non-competition provision is enforceable.  Susquehanna performed its obligations under the Agreements at all relevant times.

---

[10] The Mom Game, *Highway to the Dumb Zone*, The Mom Game Pod (August 3, 2023), https://www.themomgamepod.com/podcast-1/episode/79692161/highway-to-the-dumb-zone

39.     As described above, Defendants recorded conversations with Susquehanna employees and executives during contract negotiations.  These actions constitute breach of Section 2.2 of Defendants' Agreements, which make Page 90 of the Cumulus Employee Handbook titled "Prohibition of Unauthorized Recording" contractually binding upon Defendants.

40.     As described above, Defendants were routinely exposed to Susquehanna's Confidential Information during their employment which they are bound to keep confidential for the sole benefit of Susquehanna.  Instead, Defendants have used Susquehanna's Confidential Information in starting The Dumb Zone, have already disclosed Confidential Information on The Dumb Zone, and recorded Susquehanna's Confidential Information (in violation of the Cumulus Employee Handbook) which Defendants represent they will disclose to the public.  These actions constitute breaches of Defendants' confidentiality provisions contained in Section 6 of their Agreements.

41.     As described above and during their employment with Susquehanna, Defendants began recording podcasts to support their future venture – The Dumb Zone – which directly competes with The Ticket's programming, including its on-air, on demand, and podcast content. Immediately following termination of their employment and within the six-month window of their non-compete agreement, Defendants have and are continuing to record and upload The Dumb Zone.  These actions constitute breaches of Defendants' non-competition provisions contained in Section 7 of their Agreements.

42.     As described above, after starting The Dumb Zone and within six months of termination of their employment, Defendants solicited Susquehanna's sponsors and customers to advertise on The Dumb Zone.  These actions constitute a breach of Defendants' non-solicitation provisions contained in Section 9 of their Agreements.

43.     As described above and during their employment, Defendants solicited one another to form The Dumb Zone podcast, which is in direct competition to The Ticket's programming, including its on-air, on demand, and podcast content.  These actions constitute a breach of Defendants' non-solicitation provisions contained in Section 9 of their Agreements.

44.     As a proximate result of Defendants' violations of their contractual obligations, Susquehanna has been and will continue to be irreparably damaged and injured.  Susquehanna has no adequate remedy at law for Defendants' actions because the damages Susquehanna has suffered, and will continue to suffer (including damage to Susquehanna's business reputation, divulgence of its Confidential Information, and customer goodwill) are incapable of exact calculation.  Susquehanna is entitled to injunctive relief restraining such conduct and all other legal and equitable relief.

45.     As a consequence of Defendants' breaches of their Agreements, Susquehanna has been required to retain the services of the undersigned counsel.  Pursuant to Texas Civil Practices and Remedies Code Section 38.001 *et seq*., Susquehanna is entitled to its reasonable attorney's fees incurred in the prosecution of this matter and through all appeals.

## COUNT II – BREACH OF CONTRACT

*(Non-Disparagement Provision – Against Defendant Kemp)*

46.     Susquehanna repeats and alleges each and every allegation made in the foregoing paragraphs.

47.     In Section 6.3 of the Kemp Agreement, Defendant Kemp agreed not to "disparage or encourage or induce others to disparage the Company, any of its respective employees that were employed during Employee's employment with the Company or any of its respective past and present, officers, directors, products, or services."

48.     As detailed above, Defendant Kemp has personally disparaged, and encouraged Defendant McDowell and Singh to disparage, Susquehanna – including making false statements that Defendant Kemp's pay was not increased from when he was a producer to when he began co-hosting The Hang Zone (when, in fact, his pay more than doubled between 2019 and 2022).

49.     Further, each episode of The Hang Zone has included lengthy discussion of The Ticket, its programming, hiring decisions, policies and procedures.  In Defendants' August 2, 2023 episode of The Dumb Zone, Defendant Kemp even stated, "I might bag on the company a little bit now that I've been told that that's possibly okay."

50.     These actions constitute a breach of Defendant Kemp's non-disparagement provision in the Kemp Agreement.

51.     As a proximate result of Defendant Kemp's violation of his contractual obligations, Susquehanna has been and will continue to be irreparably damaged and injured.  Susquehanna has no adequate remedy at law for Defendants' actions because the damages Susquehanna has suffered and will continue to suffer (including damage to Susquehanna's business reputation and customer goodwill) are incapable of exact calculation.  Susquehanna is entitled to injunctive relief restraining such conduct and all other legal and equitable relief.

52.     As a consequence of Defendant Kemp's breach of the Kemp Agreement, Susquehanna has been required to retain the services of the undersigned counsel. Pursuant to Texas Civil Practices and Remedies Code Section 38.001 *et seq*., Susquehanna is entitled to its reasonable attorney's fees incurred in the prosecution of this matter and through all appeals.

### COUNT III – CONVERSION

*(Against Defendant McDowell and Defendant Kemp)*

53.     Susquehanna repeats and alleges each and every allegation made in the foregoing paragraphs.

54.     The Agreements make clear that Susquehanna owns all property and intellectual property used or created by Defendants during their employment.  Specifically, Section 15.1 states:

> With respect to **each and every program, announcement, event and promotion in connection with which Employee renders services hereunder, the titles and content thereof (including every format, idea, theme, script, characteristic, element thereof)**, and with respect to all materials created or developed by Employee pursuant to this Agreement (whether by Employee acting alone or in conjunction with other persons) (collectively "Material"), Employee agrees and acknowledges that **the Company, its successors and assigns are the sole and exclusive owner of such Material**, that all rights, title, and interest in such Material are vested in the Company for all uses and purposes throughout the world.

(Emphasis added).

55.     Accordingly, Susquehanna owns the intellectual property rights to "The Hang Zone", including the name and The Hang Zone's show format.

56.     Susquehanna similarly owns all social media accounts for The Hang Zone, including the website thehangzone.com, its Twitter account, and YouTube account.

57.     Further, by creating The Dumb Zone while employed by Susquehanna, Susquehanna owns The Dumb Zone name, show, and all episodes which have been released.

58.     By commandeering these social media accounts which are the sole and exclusive property of Susquehanna and by continuing to produce and upload episodes of The Dumb Zone, Defendants are wrongfully exercising dominion and control over Susquehanna's property.

59.     Defendants' conversion exercise of dominion and control over Susquehanna's property is outrageous and malicious, and constitutes otherwise reprehensible conduct.

60.     As a result of Defendants' conversion, Susquehanna is entitled to injunctive relief requiring the return of Susquehanna's property, along with all available legal and equitable remedies, including disgorgement of any revenue derived Defendants from The Dumb Zone, and punitive damages.

## COUNT IV – BREACH OF FIDUCIARY DUTY

*(Against Defendant McDowell and Defendant Kemp)*

61.     Susquehanna repeats and alleges each and every allegation made in the foregoing paragraphs.

62.     By virtue of their employment with Susquehanna and receipt of Confidential Information in positions of seniority at Susquehanna, Defendants owed Susquehanna certain fiduciary duties.

63.     By soliciting one another and beginning to record podcasts while still employed by Susquehanna, subsequently starting The Dumb Zone in direct competition to The Ticket and Susquehanna, Defendants have breached their fiduciary duties to Susquehanna.

64.     Further, by misappropriating Defendants' Confidential Information and trade secrets to form The Dumb Zone in direct competition to Susquehanna and its on-air program The Ticket, Defendants have breached their fiduciary duties to Susquehanna.

65.     Defendants' breaches of their fiduciary duties are outrageous and malicious, and constitute otherwise reprehensible conduct.

66.     As a result of Defendants' breach, Susquehanna is entitled to all available legal and equitable relief, including disgorgement of any revenue derived from The Dumb Zone, and punitive damages.

## COUNT V – VIOLATION OF LANHAM ACT

*(Trademark Infringement and Unfair Competition – Against Defendant McDowell and Defendant Kemp)*

67.     Susquehanna repeats and alleges each and every allegation made in the foregoing paragraphs.

68.     Susquehanna owns the intellectual property rights to "The Hang Zone", including the mark, name, show format, and content.  The Hang Zone is inherently distinctive and/or has

acquired distinctiveness through secondary meaning.  As Defendants routinely referred to themselves as "The Dumb Zone" while hosting The Hang Zone, Susquehanna also owns the intellectual property rights to The Dumb Zone name.

69.     Defendants have started the podcast "The Dumb Zone," which mark, format, and content are substantially identical to the mark, format, and content of The Hang Zone, and have redirected all of The Hang Zone social media accounts to The Dumb Zone.

70.     Defendants have willfully created a false or misleading representation of fact in their use of the name "The Dumb Zone," the program's formatting, and the social media directing to The Dumb Zone, which is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of The Dumb Zone with The Hang Zone and/or The Ticket.

71.     Defendants are therefore engaging in unfair competition and trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq*.

72.     As a result of Defendants' trademark infringement and unfair competition, Susquehanna is entitled to injunctive relief prohibiting Defendants from infringing Susquehanna's trademarks and engaging in unfair competition, along with all available legal and equitable relief, including disgorgement of any revenue derived from The Dumb Zone.

### COUNT VI – ATTORNEYS' FEES

*(Against Defendant McDowell and Defendant Kemp)*

73.     Susquehanna repeats and alleges each and every allegation made in the foregoing paragraphs.

74.     In Section 16.1 of each of the Agreements, Defendants agreed to "indemnify and hold harmless the Company . . . from and against any and all claims, debts, damages, demands, obligations, costs and expenses arising out of or resulting from (i) the enforcement by the Company

of any right, privilege or option hereby granted to it . . . (v) the breach by Employee of any representations, warranties or provisions of this Agreement."

75.     In Section 21 of the Kemp Agreement, Defendant Kemp agreed "to pay all costs, expenses and/or charges, including reasonable attorneys' fees, incurred by the Company in enforcing any of the provisions hereof."

76.     Susquehanna has incurred and continues to incur attorneys' fees in enforcing its rights as detailed herein enforcing its contractual rights.

77.     Susquehanna is therefore entitled to an award of its reasonable attorneys' fees and costs incurred due to Defendants' various breaches of contractual and statutory obligations as authorized by the Agreements, § 38.01 et seq. of the Texas Civil Practices and Remedies Code, and all applicable laws.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff Susquehanna seeks judgment be entered in its favor and against Defendants and that Susquehanna be granted the relief requested in its Application for Injunctive Relief, attorneys' fees and costs, and such other equitable relief to which it may show itself justly entitled.

Dated: August 4, 2023                    Respectfully submitted,

**BAKER & HOSTETLER LLP**

By:/s/ L. David Anderson
L. David Anderson
State Bar No. 00796126
Kendall Viator
State Bar No. 24131733
2850 North Harwood Street, Suite 1100
Dallas, Texas 75201-2640
Telephone: (214) 210-1200
Facsimile: (214) 210-1201
danderson@bakerlaw.com

kviator@bakerlaw.com


**WARGO, FRENCH & SINGER LLP**
David Pernini (*Pro Hac Vice forthcoming*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1520 (telephone)
(404) 853-1521 (facsimile)
dpernini@wfslaw.com
K. Tyler Dysart (*Pro Hac Vice forthcoming*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1565 (telephone)
(404) 853-1566 (facsimile)
tdysart@wfslaw.com


*ATTORNEYS FOR PLAINTIFF*
*SUSQUEHANNA RADIO LLC*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| SUSQUEHANNA RADIO LLC | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION NO.** _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| JACOB KEMP and DANIEL MCDOWELL | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFICATION OF PLAINTIFF'S ORIGINAL COMPLAINT

I, Dan Bennet, declare under penalty of perjury under the laws of the United States of America that I am the representative of Plaintiff Susquehanna Radio LLC in connection with the above-styled action, that I have read the foregoing complaint and know the factual contents contained therein are true and correct to the best of my knowledge.

I hereby verify that the foregoing is true and correct under penalty of perjury under the laws of the United States of America, on this 4th day of August, 2023.

Dan Bennet