# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of the 1st day of April, 2022 (the "Effective Date"), by and between Susquehanna Radio LLC (the "Company"), and Jake Kemp (the "Employee") (collectively the "Parties" and individually a "Party").

WHEREAS the Company wants to employ Employee, and Employee wants to accept such employment and come work with the Company;

WHEREAS Employee and the Company agree that the approval, acceptance, and goodwill developed by the Company's radio announcers with the Company's listening audience and customers/sponsors is a valuable asset of the Company's business, and essential to the Company's success in its highly competitive market;

WHEREAS Employee will develop such approval, acceptance, and goodwill for the Company and at the Company's expense;

WHEREAS Employee and the Company agree that the Company's confidential business information is also a valuable asset of the Company's business, and essential to the Company's competitive success;

WHEREAS Employee will have access to the Company's confidential business information;

WHEREAS the Company would suffer irreparable harm if Employee were to misuse the approval, acceptance, and goodwill that Employee develops on the Company's behalf, or the confidential information that Employee obtains while in the Company's employ, to compete unfairly against the Company;

WHEREAS Employee will gain relationships with other Company employees and knowledge of the Company's relationships with other employees, which knowledge could be misused to disrupt the Company's operations if Employee were to solicit such other employees for employment by a competitor of the Company; and

WHEREAS the Company has agreed to provide Employee additional consideration for entering into this Agreement, including continued access to the Company's trade secrets and confidential information as it is developed by the Company.

NOW THEREFORE in consideration of the mutual covenants and obligations contained herein, and for other good and valuable consideration, the sufficiency of which the parties hereby acknowledge, Employee and the Company agree as follows:

1. **DEFINITIONS.** For construing this Agreement, including all exhibits and attachments, the following definitions shall apply.

   1.1 "Company Business" means the operation, promotion, and marketing of commercial radio stations and other audio platforms, including podcasting.

**1.2** "Business Area" means the Dallas-Fort Worth, TX Designated Market Area as defined by Nielsen Audio. Employee and the Company agree that Employee has carried out or will carry out the Company Business throughout the Business Area by broadcasting programming and advertising heard throughout the Business Area, by soliciting sponsors/customers from throughout the Business Area, and/or by organizing or conducting promotional events throughout the Business Area.

**1.3** "Competing Business" means any person (including Employee) or entity carrying on a business that is the same or essentially the same as the Company Business. Competing Business shall include, without limitation, all commercial audio outlets, such as radio stations, radio networks, television stations, cable operators, podcasters, Internet/streamed radio and Internet/streamed programs/programming and other current and future audio platforms.

**1.4** "Confidential Information" means all information that: (i) the Company tries to keep secret and (ii) has commercial value to the Company or is of such a nature that its unauthorized disclosure would be detrimental to the Company's interest, including, for instance, the Company's information concerning price and discount arrangements with sponsors/customers, information concerning sponsors'/customers' particular needs, preferences, and interests (and how the Company uses such information to maintain a competitive advantage), marketing plans, business strategies, promotion plans, financial information, forecasts, and personnel information. Confidential Information does not include information that (i) is in or enters the public domain other than by breach of this Agreement or (ii) is known or becomes known to Employee from a source other than the Company provided that the source does not make the information known to the Employee in violation of a contractual or other legal duty owed to the Company.

**1.5** "Job Duties" means the following: Employee is employed in the position of On-Air Personality for the Company's radio stations KTCK-AM and KTCK-FM (the "Station(s)") and Employee agrees to perform the customary duties of this position, including the following non-exclusive duties, as determined and directed by the Company from time to time: performing on-air shifts on the Stations; working on show preparation and production, including preparing and delivering live and recorded commercials, liners, audio and video Endorsements (as defined below), cooperating with Company to create podcasts of Employee's on-air shifts and/or to visually record or stream such air shifts for distribution (as may be determined by Company in its sole discretion), and other programming requirements; performing other duties as may be required to program, operate and run the Stations and be adequately prepared for on-air and off-air duties; making appearances at customer-related and charitable events and performing remotes; engaging in social media activities, posting social media content, including on behalf of (and with regard to the promotion of) Company clients, and completing other social media duties related to Station promotions and events, the Station's website and the programs with regard to which the Employee provides Services, all as directed by the Company, and other duties related to the Stations' website; performing all duties and technical operations required of on-air personalities at the Stations and/or by the Federal Communications Commission ("FCC") regulations. In addition, Employee shall render all artistic, creative, and professional services for the Company and for the Stations, including, without limitation, for the production of programming on behalf of the Company and the Stations. Without limiting the generality of the foregoing, Employee shall be reasonably available to attend staff meetings and production

conferences and be available for public and private personal appearances, interviews, publicity photographs, and promotional appearances, all as directed by Company management. Employee agrees and acknowledges that the Company retains sole discretion to change the scope and extent of Employee's duties at any time, in writing or otherwise.

2.      **EMPLOYEE'S SERVICES AND DUTIES.**

2.1      **Services.**  Upon and subject to the terms, conditions and other provisions of this Agreement, the Company shall employ Employee during the Employment Period as an On-Air Personality for the Stations, with an on-air shift Monday-Friday 12:00 p.m. to 3:00 p.m., or as otherwise determined and directed by the Company. Employee will have an opportunity to co-host Cowboys' and Mavericks' postgame shows. Employee shall commence Employee's services hereunder by reporting to the Operations Manager, the Market Manager, and/or to another person designated by the Company in the Company's sole discretion and shall faithfully perform the Job Duties identified in Section 1.5 above at the Station's studio or another location designated by the Company. In addition, Employee shall perform such reasonable duties and responsibilities related to the Job Duties as may from time to time be duly authorized or directed by the Company. The Company has the right, subject to Employee's consent (not to be unreasonably withheld, conditioned or delayed) and as long as Employee's broadcast partner Dan McDowell continues his employment with the Company, to assign Employee to a designated on-air shift, to change the date, time, and/or duration of such air shift or to assign Employee to perform services pursuant to the Agreement for another Employer-owned radio station. Employee agrees that Employee has been assigned and will carry out these Job Duties on behalf of the Company. Nothing in this Agreement shall be deemed to obligate the Company to use the Employee's services or to broadcast any program upon which the services have been performed. The Company shall have fulfilled its obligation hereunder by payment to the Employee of the Base Salary as required by this Agreement.

2.2      **Employee Commitments.**  Employee agrees to comply with all written policies of the Company throughout the Employment Period. Employee further agrees that neither Employee nor members of Employee's immediate family will accept any money, merchandise, service or other item of value from any other person or company in exchange for the inclusion of any "plugs," endorsement or other matter in any broadcast by a Company station, except with written consent of Company following Employee's full disclosure of the facts. Employee also acknowledges and understands Sections 317 and 508 of the Communications Act and the FCC's Rules governing "payola" and sponsorship identification, and is aware of Employee's own personal responsibilities and criminal liabilities thereunder; and Employee commits to carefully comply with those laws during the life of this Agreement. Employee further agrees that Employee will not retain or acquire any outside economic interest, which in Company's reasonable judgment in any material way could compromise faithful and "best efforts" performance of Employee's duties or influence presentation of any broadcast matter; and that Employee will provide written disclosure of any economic interests to the Company that might be considered as having such an effect.

2.3      **Sole Employment.**  During the Employment Period, Employee shall devote Employee's full business time, energy, ability, attention and skill to Employee's employment hereunder. Employee agrees that, during the Employment Period, Employee will

not provide services as an employee, consultant, independent contractor or otherwise to any individual or entity, or otherwise conduct business on Employee's own behalf, without the written consent of the Company.

Employee acknowledges that the Company operates a website on which it streams the broadcasts of the Station as well as video and other Station-related content, and Employee is not entitled to any additional compensation as a result. Employee agrees not to own, operate, or maintain, either directly or indirectly, any website, social media platform, which may include, but is not limited to a narrative or video based blog, feed, podcast or any type of on-demand or live streaming platform currently in existence or which may come into existence during the Employment Period, except as expressly approved in writing by the Company.

2.4    **Social Media Platforms.** During the Employment Period, the Employee, as directed by the Company, shall use and operate the designated Company owned social media platforms in furtherance of the Job Duties hereunder for the sole and exclusive benefit of the Company. In all cases Employee shall not use broadcast tools or content, or the Station's promotional tools, including but not limited to, Company owned and controlled social media platforms to promote and further the Employee's separate and independent controlled social media platforms, unless approved in writing by the Company.

3.    **TERM.** The term of Employee's employment by the Company under this Agreement (the "Employment Period") shall commence on April 1, 2022 and shall continue until March 31, 2024, unless earlier terminated pursuant to Section 5 below. At the end of the first year of the Employment Period, the Employee may elect to terminate the Agreement by providing at least ninety (90) days written notification to the Company (by January 1, 2023) of the Employee's intent to exercise the option to terminate the Agreement. In the event Employee continues to provide services to the Company beyond the end of the Employment Period, then such continued employment shall be on an "at-will" basis and may be terminated by either party at any time for any reason, and all terms and conditions set forth in this Agreement shall continue to remain in full force and effect and shall be binding on both Employee and the Company until such time as Employee's employment with the Company is terminated.

***Exclusive Negotiations and Right to Match.*** Five percent (5%) of the Base Salary received under this Agreement is provided to Employee in exchange for Employee agreeing to be bound by Sections 3.1, 3.2, 3.3, 6, 7, 8 and 9 set forth below. Employee acknowledges that such five percent (5%) of Employee's Base Salary is valuable and sufficient consideration to Employee in exchange for Employee agreeing to be bound by Sections 3.1, 3.2, 3.3, 6, 7, 8 and 9 hereof.

3.1    During the Employment Period, Employee will not negotiate, allow any person or entity to negotiate on Employee's behalf, or enter into any oral or written agreement for Employee's services, give or accept an option for Employee's service, enter into employment of, perform services for, or grant or receive future rights of any kind to provide Employee's services to or from any person or entity whatsoever including without limitation services to be performed after the Employment Period except as provided for below.

3.2    Employee agrees that commencing at least six (6) months prior to termination of the Employment Period (or any renewal thereof), Employee will engage in

4

exclusive good faith negotiations with Company for the continued employment of Employee on mutually agreeable terms. Said negotiations will be exclusive as to the Company and Employee until thirty (30) days prior to the termination of the Employment Period. Thirty (30) days prior to the termination of the Employment Period, Employee shall be free to negotiate with entities other than Company for employment after the Employment Period has ended and upon expiration of the non-compete (Section 7).

    **3.3** During the last thirty (30) days of the Employment Period and for a period of six (6) months after the termination of the Employment Period, Employee shall not enter into the employment of, perform services for, enter into any oral or written agreement for services, or give or accept an option for services or grant or receive future rights of any kind to provide services to or from any person or entity engaged in a Competing Business, unless and until Employee has first promptly disclosed the terms thereof to Company and offered in writing to enter into an employment agreement with the Company on terms which are substantially similar to those of any bona fide offer which Employee has received or option or rights which Employee intends to grant or accept. Company shall have fifteen (15) business days after actual receipt of such notice in which to notify Employee of its acceptance or rejection of such offer. If Company so notifies Employee that Company accepts such offer, the parties hereto shall be bound to enter into an agreement on substantially similar terms and conditions. In the event that there are aspects of the third party offer or option that include the provision of services in addition to the Job Duties as detailed in Section 1.5 above, the offer shall be apportioned by you and the offeror to identify an offer only for the Job Duties and the monetary terms associated therewith. It is that apportioned offer that will be presented to us and will be the offer or option we will have the right to grant or accept. For purposes of this Section, "substantially similar terms and conditions" shall include only duration of employment and terms that provide financial compensation (i.e. salary, bonuses, benefits and other economic incentives reducible to cash or cash equivalents) and shall not include the type or format of the station or the program, whether it is produced and/or broadcast by a network or a local station, whether broadcast on AM or FM, or via broadcasting services.

    **4.    COMPENSATION AND OTHER BENEFITS.** Employee acknowledges and agrees that Employee's right to compensation under this Agreement terminates at the end of the Employment Period, except as provided otherwise in this Agreement. As compensation in full for the services to be rendered by Employee hereunder, the Company shall pay to Employee the following compensation during the Employment Period:

    **4.1    Salary.** Employee will be paid $⬛⬛⬛⬛ gross per annum, less all legally required and previously authorized deductions, payable semi-monthly or on such other payment schedule as shall be applied to all similarly situated employees, for work performed during the regular preceding pay period ("Base Salary"). Commencing as of April 1, 2023, Employee's Base Salary will increase to $⬛⬛⬛⬛ gross per annum, less all legally required and previously authorized deductions.

    **4.2    Ratings Bonus.** During the Employment Period, Employee is eligible to earn a ratings bonus ("Ratings Bonus") subject to the conditions set forth in Appendix A to this Agreement. The Ratings Bonus, if earned, will be paid within a reasonable time after the determination is made that the Employee is eligible to receive such bonus compensation. To be

eligible to earn a Ratings Bonus, Employee must achieve the conditions set forth in <u>Appendix A</u> and be employed by the Company for the duration of the applicable Bonus Period, as defined in <u>Appendix A</u>, as no pro rata bonuses are earned or paid.

    **4.3**  **Remote Broadcast and Live Appearance Fee.** Employee will be paid $▮ for each remote broadcast and/or live appearance fully performed by Employee during the Employment Period.

    **4.4**  **Guaranteed Endorsements.** Employee is guaranteed a minimum of $▮ per month in live-read/endorsement income (less all legally required and previously authorized deductions) during the Employment Period.  In the event Employee's gross live-read/endorsement income during the Employment Period is less than $▮ per month, Company will pay to Employee the difference (less legally required and previously authorized deductions).  A new recorded Endorsement within an on-demand type product that uses repurposed audio from a live broadcast shall be paid at the rate of ▮% of the going market rate for live audio Endorsement.

Any commercial mention made by Employee expressing such Employee's public approval or support to a particular Company client or a client's particular service or product in exchange for the payment to Company of some form of consideration (payment or trade), whether it be only audio, only video (or a combination of audio and video), occurs live or recorded, or can otherwise be accessed later or on an on-demand basis, shall be considered an "Endorsement" for purposes of this Agreement.

    **4.5**  **Vacation.** Employee shall be entitled to four (4) weeks (twenty (20) business days) of paid vacation during each full calendar year of Employee's employment hereunder, which shall accrue monthly on a pro rata basis. At year-end, any accrued but unused vacation may not be rolled into the next calendar year and will be forfeited, unless otherwise required by law.

    **4.6**  **Cowboys and Mavericks Postgame Show Compensation.** Employee will be compensated at the rate of $▮ for each Cowboys and or Mavericks Postgame Show that Employee performs.

    **4.7**  **Benefits.** Employee is entitled to participate in the benefit plans and programs generally available to its other similarly situated employees, provided that Employee meets all eligibility requirements under those plans and programs.  Employee is subject to the terms and conditions of the plans and programs, including, without limitation, the Company's right to amend or terminate the plans at any time and without advance notice to the participants.

    **4.8**  **Business Expenses.** Employee will be reimbursed for ordinary, necessary and reasonable expenses incurred in the course of performing Employee's duties and obligations with respect to the business of the Company, including expenses for pre-authorized entertainment and travel.  The Company shall promptly reimburse Employee for all such expenses paid by Employee on behalf of the Company upon the presentation by Employee of an itemized request for reimbursement of expenditures on Company-approved forms and supported by documentation.

5.     **TERMINATION.**

      **5.1**     **Death or Disability.** Upon the death of Employee, this Agreement shall automatically terminate and all rights of Employee and Employee's heirs, executors and administrators to compensation and other benefits under this Agreement shall cease.

The Company may, at its option, terminate this Agreement upon written notice to Employee if Employee, because of physical or mental incapacity or disability, fails to perform the essential functions of Employee's position hereunder for a continuous period of ninety (90) days or any one hundred twenty (120) days within any twelve-month period. In the event of any dispute regarding the existence of Employee's incapacity hereunder, the matter shall be resolved by the determination of a physician to be selected by the Company. Employee agrees to submit to appropriate medical examinations for purposes of such determination.

If Employee is terminated by reason of Employee's death or disability, Employee shall be entitled to receive any Base Salary to which Employee is entitled for work performed through the Date of Termination and not previously paid to Employee. Aside from the provisions of this section, the Company shall have no further obligations to Employee after termination.

      **5.2**     **The Company's Right to Terminate.** The Company may terminate this Agreement at any time upon ninety (90) day' notice to Employee; provided; however, that, alternatively, the Company may terminate this Agreement immediately and offer Employee pay in lieu of notice, subject to Employee's execution of a release agreement in favor of the Company. In the event that Employee does not execute such release, Employee's employment shall terminate immediately and no payment in lieu of notice shall be made to Employee. Notwithstanding this provision, the Company may at any time terminate Employee immediately without notice or pay in lieu of notice for: (i) deceit, dishonesty or wrongful appropriation for personal use or benefit of Company property or money; (ii) continued disregard of directions by senior management of the Company after notice or Employee's insubordination to Employee's supervisors; (iii) continued violations of Company policies or procedures after notice, a material violation of Company policies or procedures, or Employee's refusal, after notice, to comply with the Company's standards of good taste; (iv) excessive unexcused absences from work; (v) breach by Employee of this Agreement; (vi) continued inattention to or sub-performance of Employee's duties or obligations as defined in this Agreement after written notice; (vii) assault or battery; (viii) conduct involving moral turpitude, including an arrest or conviction of Employee or a no-contest plea by Employee for a crime of moral turpitude or a felony, or Employee's guilty plea to a lesser-included offense or crime in exchange for withdrawal of a felony indictment, felony charge by information, or a charged crime involving moral turpitude, whether the charge arises under the laws of the United States or any other state within the United States, or any crime that reflects adversely upon Employee or Employee's character; (ix) any action or conduct by Employee that causes public discredit to Employee or to the Company or may be reasonably likely to jeopardize a FCC license of any broadcast station owned by the Company; (x) violation of any FCC rule or regulation, or any state or federal law; and/or (xi) if Employee has not met all requirements for employment by the Company prior to the commencement of the Employment Period, including vaccination for COVID-19. Aside from the provisions in this section, the Company shall have no further obligations to Employee after termination.

5.3    **Employee's Right to Terminate for Breach**. In the event that Employee seeks to terminate this Agreement alleging breach of this Agreement by the Company, Employee may not terminate this Agreement due to Company's breach unless written notice of such breach is given by Employee to the Company, and Company fails to cure such breach within thirty (30) days of receipt of such written notice from Employee. Submission of such written notice to the Company shall be no later than twenty (20) business days after the event or events triggering the notice were known or reasonably should have been known by Employee.

5.4    **Payments and Return of Property Upon Termination.** In the event that employment terminates for any reason, Employee shall promptly return to the Company within three (3) business days of termination all property of the Company or Station then in Employee's custody, possession or control. Upon termination of Employee's employment for any reason, the Company shall pay Employee any and all unpaid salary and accrued but unused vacation owed to Employee through the date of termination with the Company on the next regularly scheduled payroll. Employee agrees and consents to the Company deducting from Employee's final paycheck any used but unearned vacation and any receivables or other amounts owed by Employee to the Company (such as, amounts owed for personal use of company mail service, cell phones and/or car, reimbursement of moving expenses, etc.) and the approximate current market value of any Company property still in the possession of the Employee that has not been returned to the Company.

## 6.    PROTECTION OF CONFIDENTIAL INFORMATION.

6.1    Employee agrees that all Confidential Information is confidential to and the exclusive property of the Company. Upon request by the Company, and in any event upon termination of Employee's employment with the Company for any reason, Employee shall promptly deliver to the Company all property belonging to the Company, including all Confidential Information then in Employee's possession, custody, or control.

6.2    During Employee's employment by the Company, and for twelve (12) months after termination of such employment, Employee shall not, directly or indirectly, within the United States disclose any Confidential Information to any person or entity, or use or allow others to use through Employee any Confidential Information, except as necessary for performance of Employee's Job Duties.

6.3    During Employee's employment by the Company and at any time thereafter, Employee agrees not to disparage or encourage or induce others to disparage the Company, any of its respective employees that were employed during Employee's employment with the Company or any of its respective past and present, officers, directors, products, or services (the "Company Parties"). For purposes of this Section 6.3, the term "disparage" includes, without limitation, comments, or statements to the press or to any individual or entity with whom the Company has a business relationship (including, without limitation, any vendor, supplier, customer, or distributor), or any public statement, that in each case is intended to, or can be reasonably expected to, damage any of the Company Parties. Notwithstanding the foregoing, nothing in this Section 6.3 shall prevent Employee from making any truthful statement to the extent, but only to the extent (i) necessary with respect to any litigation, arbitration, or mediation involving this Agreement, including, but not limited to, the enforcement

8

of this Agreement, in the forum in which such litigation, arbitration or mediation properly takes place or (ii) required by law, legal process, or by any court, arbitrator, mediator or administrative or legislative body (including any committee thereof) with apparent jurisdiction over Employee.

7.     **AGREEMENT NOT TO COMPETE.**  While employed by the Company, and for six (6) months following termination of such employment, Employee shall not, directly or indirectly, engage in any activities the same or essentially the same as Employee's Job Duties for any Competing Business located or selling advertising within, or broadcasting to, the Business Area.  Employee acknowledges that in the event Employee's employment terminates for any reason, Employee will be able to earn a livelihood without violating the foregoing restrictions and that Employee's ability to earn a livelihood without violating such restrictions is a material condition to employment with the Company.  Employee further agrees that during the pendency of any litigation to enforce this Section 7, including all appeals, the non-compete period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.

8.     **AGREEMENT NOT TO SOLICIT SPONSORS/CUSTOMERS.**  During Employee's employment by the Company and for twelve (12) months following termination of such employment, Employee shall not, directly or indirectly, for any Competing Business, solicit, receive or accept business from, for the purpose of selling advertising time, any sponsor/ customer of the Company with which Employee had Contact during the twelve (12) months preceding the termination of Employee's employment.  For purposes of this Section 8, "Contact" means any interaction between Employee and a sponsor/customer which took place in an effort to establish or further the business relationship between the Company and the sponsor/customer. Employee further agrees that during the pendency of any litigation to enforce this Section 8, including all appeals, the non-solicitation period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.

9.     **AGREEMENT NOT TO SOLICIT EMPLOYEES.**  During Employee's employment by the Company and for twelve (12) months following termination of such employment, Employee shall not, directly or indirectly, solicit for employment by a Competing Business any of the Company's then-current sales, programming, managerial, or on-air employees with whom Employee dealt while employed.  Employee further agrees that during the pendency of any litigation to enforce this Section 9, including all appeals, the non-solicitation period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.

10.    **NO LIMITATION OF RIGHTS.**  Nothing in this Agreement shall limit or prejudice any rights of the Company under Texas law or any other law.

11.    **INJUNCTIVE RELIEF.**  Employee agrees that the provisions of Sections 6, 7, 8, and 9 of this Agreement are reasonable and necessary to protect the Company's property and business, and that Employee's breach of any of those provisions may cause the Company to suffer irreparable loss and damage.  Accordingly, Employee agrees that if Employee breaches or threatens to breach any of those provisions, the Company shall be entitled to immediate injunctive relief, without the necessity of posting a bond, to enforce this Agreement, money damages for whatever harm such breach causes the Company, and whatever other remedies are

available.

12.    **EMPLOYEE REPRESENTATIONS AND WARRANTIES.** Employee warrants, represents, and covenants with the Company that the execution, delivery, and performance of this Agreement by Employee does not conflict with, violate any provision of, or constitute a default under any agreement, judgment, award or decree to which Employee is a party or by which Employee is bound including, but not limited to, any implied or express agreement with any of Employee's prior employers. In performing duties for the Company under this Agreement, Employee will not use or disclose any trade secrets that Employee learned from employment with any prior employer, and Employee will not use any files, documents, or other property belonging to a former employer, except as permitted in writing by such prior employer. Before using or disclosing such trade secrets, files, documents or other property, Employee will provide a copy of the written permission to the Company. Employee also represents that this Agreement and all sums payable to Employee hereunder are not and will not be subject to any claim against the Company or Station by any broker, agent, representative or any other person or party, whether or not the Company or Station has actual or constructive knowledge of such claim. Employee shall hold the Company harmless from any and all claims for fees or commissions by any agent or representative of Employee.

13.    **MOTOR VEHICLES.** As a condition of employment by the Company, Employee will be subject to a background check of Employee's driving record through the appropriate Department of Motor Vehicles, and such background check must be satisfactory to the Company in its sole and complete discretion. Continued employment under this Agreement will be subject to Employee's maintaining a satisfactory driving record, and the Company may conduct further checks on driving records during the term of this Agreement. Employee agrees to review the Company's automobile policy, attached as <u>Appendix B</u> and comply with all of its provisions. Violation of the automobile policy may result in termination.

14.    **ADVERTISING AND PUBLICITY.** Employee grants the Company the right to record and use Employee's name, voice, likeness, and biographical material for the purpose of advertising, promoting, distributing, and publicizing the Company and any program with regard to which Employee provides services (including, without limitation, through the distribution of podcasts), as well as its stations and services, and the products and services of advertisers. Employee agrees that Employee shall not use or authorize the use of Employee's name, professional name, nickname, recorded voice, biographical material, performances, portrait, picture or likeness to advertise, promote, distribute, or publicize in any manner, any institution, product, or service for any person or entity, including on Employee's own behalf, other than the Company or its affiliated entities without obtaining the prior express written consent of the Company. Employee shall not authorize or release any advertising or promotional matter or any other publicity in any form without the Company's prior express written approval.

15.    **PROPERTY RIGHTS.**

15.1    With respect to each and every program, announcement, event and promotion in connection with which Employee renders services hereunder, the titles and content thereof (including every format, idea, theme, script, characteristic, element thereof), and with respect to all materials created or developed by Employee pursuant to this Agreement (whether

by Employee acting alone or in conjunction with other persons) (collectively "Material"), Employee agrees and acknowledges that the Company, its successors and assigns are the sole and exclusive owner of such Material and that all such Material shall be deemed a "work for hire," that all rights, title, and interest in such Material are vested in the Company for all uses and purposes throughout the world in perpetuity. To the extent that any Material is not deemed "work for hire" (including but not limited to any of the rights identified in Section 2 and/or Section 14, above) Employee hereby assigns all of the Employee's rights in such Material to the Company and waives any moral rights the Employee may have in such Material. Employee shall claim no right, title, interest, powers, privilege, control or property of any kind whatsoever to or in such Material. Employee represents and warrants that all creations, literary, musical and artistic materials and intellectual properties furnished by Employee hereunder shall be Employee's own original creation except for materials in the public domain or materials that Employee is fully licensed to use, and that all materials furnished by Employee and the use thereof by the Company, Station or its designees will not infringe upon or violate any rights of any kind whatsoever of any individual or entity. At no time during the Employment Period or thereafter shall Employee, directly or indirectly, render any service on or in connection with any radio program that is identified by any name or title confusingly similar to the name or title of a program on or in connection with which Employee has rendered services for the Company or Station. Notwithstanding the foregoing, the Company shall have no control over the use by Employee of Employee's real name or any other intellectual property owned by Employee after termination or expiration of this Agreement. All titles, forms and methods of expression, and material, work and ideas conceived, created or executed by Employee in connection with Employee's services hereunder shall be subject to the foregoing provisions of this Section. Employee shall execute such further and additional instruments as the Company may reasonably require to effectuate the purpose of this Section and to vest in the Company all such property and ownership rights in and to the Material.

        **15.2**    It is understood and agreed that in the exercise of the rights granted to the Company hereunder, the Company or its designees may, at their election, at any time and from time to time, exploit any and all rights granted to the Company hereunder, and the programs and recordings thereof produced pursuant hereto (including, without limitation, podcasts), and all content created under this Agreement that is contained on Employee's social media platforms or on the Station's designated social media platforms, in any manner and by any means, including, but not limited to, by way of radio broadcasting, an on-demand type platform, or other medium or format now known or hereinafter created. For the purpose of this Agreement, the terms "recording" and "recordings" as used herein shall mean and include any recording or recordings made, whether audio, visual or a combination of the two, including Endorsements, (whether before, during or after a broadcast transmission) by tape, wire, film, disc, digital media, or any other similar or dissimilar methods of recording audio and/or video portions of programs and social media platforms, whether now known or hereafter developed. All recordings of all such content and programs and all rights therein, as between Employee on the one hand, and the Company on the other, shall be the sole, exclusive and absolute property of the Company for any and all purposes whatsoever.

        **15.3**    Without in any way limiting the Company's rights as expressed elsewhere herein, it is expressly understood that the programs, including any Endorsements, may be recorded, broadcast, rebroadcast, syndicated, or streamed over Station, the Internet or other radio

stations, whether or not licensed directly or indirectly to the Company or its affiliated entities, as the Company shall from time to time elect and on a sustaining and/or commercially sponsored basis by any method now or hereafter known by such sponsor or sponsors as the Company may select or authorize in the Company's sole discretion and/or on any other financial basis, whether now known or hereafter developed. It is understood and agreed that the rights granted to the Company by this Agreement include the broadest possible right to cut, edit, change, add to, or subtract from the materials created hereunder and the programs that include Employee's services (including, without limitation, podcasts), and to combine one program with another or with other programs, and Employee hereby waives any and all legal or economic rights to object or challenge same. During Employee's employment with the Company and thereafter, the Company shall retain the right to sell, syndicate or license for broadcast, rebroadcast or for exploitation by any other means the programs in which Employee appears or in which Employee's voice, sobriquet, biography, recorded performances, picture, portrait, caricature or likeness is utilized without additional compensation to Employee.

      **15.4**    The terms of this Section 15 shall survive any termination or expiration of this Agreement.

## 16.    INDEMNIFICATION.

      **16.1**    Employee agrees and acknowledges that Employee shall indemnify and hold harmless the Company, its parent and affiliated entities, any stations or systems over which the programs are broadcast and/or distributed, their shareholders, officers, directors, agents, employees, sponsors, successors and assigns from and against any and all claims, debts, damages, demands, obligations, costs and expenses arising out of or resulting from (i) the making or enforcement by the Company of any right, privilege or option hereby granted to it, (ii) any performance or utterance (ad lib or otherwise) by Employee that is broadcast on any station of the Company or made while Employee is performing services for the Company, (iii) any unauthorized act of Employee, (iv) the use of any material furnished by Employee hereunder, (v) any act or omission of Employee prior to the date of this Agreement or (vi) the breach by Employee of any representations, warranties or provisions of this Agreement. The Company shall have the right to assume the defense of and control the disposition of any such claim or litigation, whether by compromise, settlement or other resolution, and Employee shall fully cooperate with requests of the Company to such end. The Company or Station's approval of any material furnished by Employee shall not constitute a waiver of Employee's indemnity with respect thereto. Employee shall notify the Company promptly of any litigation or claim to which any indemnity hereunder may apply. The expiration or termination of this Agreement shall not affect the continuing obligations of Employee as indemnitor.

      **16.2**    The Company will at all times indemnify and hold harmless Employee from and against any and all claims, damages, liabilities, costs and expenses, including, without limitation, reasonable counsel fees, arising out of (i) the use of any materials or services furnished by  the Company in connection with the production, rehearsal or broadcast of any of the programs or (ii) the breach by the Company of any representations, warranties or provisions of this Agreement; provided, however, that Employee shall promptly notify the Company of any claim or litigation to which the indemnity set forth in this sentence applies; and provided further, that at the Company's option, the Company may assume the defense of any such claim or

litigation, to which the indemnity set forth in this sentence applies, and Employee shall fully cooperate with requests of the Company to such end, in which event the Company's obligations with respect thereto shall be limited to the payment of any judgment or settlement approved by the Company in connection therewith. The expiration or termination of this Agreement shall not affect the continuing obligations of the Company as indemnitor.

17.     **PARTIES IN INTEREST; ASSIGNMENT.** The Company may assign this Agreement or any interest therein, by operation of law or otherwise, to: (i) its parent company or any affiliate or subsidiary of its parent company, or (ii) any entity that acquires (A) all or substantially all of the assets the Company or any station for which Employee performs services, or (B) the intellectual property/format of any station for which Employee performs services, each by reason of a merger, acquisition, swap, transfer or other business reorganization.    Except as stated herein, nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties and their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement.

18.     **NOTICES.** All notices and other communications required to be given in writing under this Agreement shall be deemed given when delivered personally or by overnight courier to the following address of the other party hereto, or such other address for such party as shall be specified by notice given pursuant this Section:

|                        |                                      |
|------------------------|--------------------------------------|
| If to the Company:     | Susquehanna Radio LLC                |
|                        | West Victory Plaza                   |
|                        | 3090 Olive Street, Suite 400         |
|                        | Dallas, TX 75219                     |
|                        | Attn: Market Manager                 |
|                        |                                      |
| With a copy to:        | Cumulus Media Inc.                   |
|                        | 780 Johnson Ferry Road               |
|                        | Fifth Floor                          |
|                        | Atlanta, GA 30342                    |
|                        | Attn: Legal Department               |
|                        |                                      |
| If to Employee:        | Jake Kemp                            |
|                        | c/o Susquehanna Radio LLC            |
|                        | West Victory Plaza                   |
|                        | 3090 Olive Street, Suite 400         |
|                        | Dallas, TX 75219                     |

19.     **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to principles of conflicts of laws.

20.     **SEVERABILITY AND REFORMATION.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, unenforceable or illegal in any respect under applicable law or rule in any jurisdiction, such invalidity, unenforceability or illegality shall not affect the validity, legality, or enforceability of any other

provision of this Agreement, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, unenforceable or illegal provision had never been contained herein.  Moreover, if the scope of any restriction contained in this Agreement is found to be too broad in time, geographic scope or in any other regard to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by law and Employee hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding to enforce such restriction.

**21.     ATTORNEYS' FEES.**  Employee covenants and agrees to pay all costs, expenses and/or charges, including reasonable attorneys' fees, incurred by the Company in enforcing any of the provisions hereof.

**22.     SURVIVABILITY.**  Employee acknowledges and agrees that Employee is bound by the provisions set forth Sections 3.3, 6, 7, 8, 9 herein for so long as Employee remains employed by the Company regardless of when this Agreement expires or is terminated. Employee further acknowledges and agrees that, after Employee's employment with the Company is terminated either by Employee or the Company, Employee will remain bound by the provisions set forth Sections 3.3, 6, 7, 8, 9 herein for the specific post-employment periods set forth in those respective provisions and that the termination or expiration of this specific Agreement does not trigger the commencement of the post-employment periods set forth Sections 3.3, 6, 7, 8, 9 herein.  Such post-employment periods shall commence at the time that Employee's employment is terminated, not when this Agreement expires or is terminated. Sections 10, 11, 14, 15, 16, 19, 20, 21 and this Section 22 shall also survive the expiration or earlier termination of this Agreement.

**23.     ENTIRE UNDERSTANDING; AMENDMENTS.**  This Agreement, as well as any attachments or exhibits, constitutes the entire agreement and understanding between the parties with respect to the employment of Employee by the Company, and supersedes all prior agreements, representations and understandings, both written and oral, between the parties with respect to the subject matter hereof.  This Agreement may not be modified or changed except by written instrument signed by both parties.

**24.     FULL UNDERSTANDING.**  Employee represents and agrees that Employee fully understands Employee's right to discuss all aspects of this Agreement with Employee's private attorney, and that to the extent, if any, that Employee desired, Employee utilized this right.  Employee further represents and agrees that: (i) Employee has carefully read and fully understands all of the provisions of this Agreement; (ii) Employee is competent to execute this Agreement; (iii) Employee's agreement to execute this Agreement has not been obtained by any duress and that Employee freely and voluntarily enters into it; and (iv) Employee has read this document in its entirety and fully understands the meaning, intent and consequences of this document.

COMPANY                                        EMPLOYEE

Susquehanna Radio LLC                          Jake Kemp

By: _____

Name: _Daniel J Bennett_

Title: _Regional VP Dallas Houston_

**APPENDIX A**
**QUARTERLY BONUS**
**BONUS COMPENSATION**

In addition to the compensation provided by the Company to Employee pursuant to Section 4 of the Employment Agreement that is attached to this Appendix, effective with the 2022 Spring Quarterly Bonus Period, Employee shall receive from the Company quarterly bonus compensation ("Bonus"), in Employee's capacity as an On-Air Personality for radio station KTCK-AM and KTCK-FM (the "Station") based upon the Nielsen Audio Reports ("Nielsen Reports") for the Dallas-Fort Worth Metro Survey Area for the Ratings Bonus according to the following schedule:

"Quarterly Bonus Period" will be as follows: (i) the Nielsen Reports for January, February, and March shall be used to calculate the Bonus for the Winter Quarterly Bonus Period; (ii) the Nielsen Reports for April, May and June shall be used to calculate the Bonus for the Spring Quarterly Bonus Period; (iii) the Nielsen Reports for July, August, and September shall be used to calculate the Bonus for the Summer Quarterly Bonus Period; and (iv) the Nielsen Reports for October, November, and December shall be used to calculate the Bonus for the Fall Quarterly Bonus Period. The Nielsen Reports for any "Holiday" period shall not apply to or affect the calculation of Employee's Bonus hereunder.

"Average Quarterly Hour ("AQH") Share" will be determined as follows: (i) the Company shall add the Monthly AQH Share for the Station in Target Demographic for the three (3) consecutive months that comprise the applicable Quarterly Bonus Period to determine the Combined Monthly AQH Share; (ii) the Company shall then divide the Combined Monthly AQH Share by three (3) to achieve the AQH Share; and (iii) the Company shall use the AQH Share to determine the ranking and the Bonus.

"Average Quarterly Hour ("AQH") Rating" will be determined as follows: (i) the Company shall add the Monthly AQH Rating for the Station in Target Demographic for the three (3) consecutive months that comprise the applicable Quarterly Bonus Period to determine the Combined Monthly AQH Rating; (ii) the Company shall then divide the Combined Monthly AQH Rating by three (3) to achieve the Average Quarterly Rating; and (iii) the Company shall use the Average Quarterly Hour Rating to determine the ranking and the Bonus.

"On-Air Target Demographic" shall mean Men 25-54, Monday-Friday, 12pm-3pm.

Based upon the foregoing, Employee shall be entitled to Bonus compensation as follows:

1.    **Ratings Bonus:** Employee is eligible to receive a quarterly Ratings Bonus based on the Target Demographic(s) listed below as follows:

***On-Air Bonus based on AQH Share and AQH Rating ranking in the On-Air Target Demographic:***

| Average Quarterly Hour Share/Rating | Quarterly Bonus |
|---|---|
| #1 share and 0.6+ rating | $█████ |

16

#2 share and 0.6+ rating $

The total potential Bonus that Employee may earn in any given Quarterly Bonus Period is, collectively, $██████

The Company shall have the right, in its sole discretion, to change or terminate the bonus methodology described herein, any and all of which changes shall become effective immediately. Employee and Company recognize that the availability and feasibility of using Nielsen in its current form may change during the term of this Agreement. In the event Nielsen changes the metrics/labels referenced in their reports, the closest available metrics/labels shall be substituted. In the event the Company, in its sole discretion, decides to use services other than Nielsen, the metrics/labels available from the new vendors that are closest in nature to the metrics described above shall be substituted into this Agreement. In the event that Company ceases to use Nielsen and reports similar to those described herein are not otherwise available to Company, the parties agree to use commercially reasonable efforts to develop objective metrics upon which to judge Employee's performance of Employee's job duties for purposes of determining whether the Bonuses described herein are earned by Employee.

## APPENDIX B
## CUMULUS MEDIA INC. MOTOR VEHICLE POLICY

Cumulus's Motor Vehicle Policy (applicable to Cumulus Media Inc. and its subsidiaries and affiliates, collectively, "Cumulus") addresses various risk management concerns.  As both Cumulus and the individual employee can be held legally responsible for accidents which occur on company time, our insurance carrier requires us to have a policy in place that incorporates a review of motor vehicle records, and a procedure for investigating accidents.  This Policy applies to new employees, all employees who come to work for Cumulus as part of a station acquisition, and all existing employees.  It covers both those drivers who operate a company car as well as those who operate their own car on company business, *i.e.*, sales people.  *Only employees who receive express authorization to drive on behalf of Cumulus pursuant to this Policy are authorized to do so.*

### *Driving Eligibility*

In order to be considered for authorization to drive on behalf of Cumulus, new hires must execute the Acknowledgment and Consent to Motor Vehicle Record Check form (see below).  For existing employees, a motor vehicle report ("MVR") will be run on an annual basis by the Business Manager.

Several factors will be considered before an employee will be authorized to drive on behalf of Cumulus, such as whether or not the employee's job function requires operating a Cumulus vehicle, the employee's job performance, and the occasional business needs that may necessitate an employee driving a Cumulus vehicle.  Additionally, Cumulus will comply with all state and local laws in granting authorization to drive Cumulus vehicles or drive on behalf of Cumulus.  Restrictions on driving Cumulus vehicles and/or driving on Cumulus business may apply to employees and interns under the age of 21.

Each matter will be considered on a case-by-case basis, and will consist of a review of the individual's record over the past 36 months.  Any individual who wishes to drive for Cumulus must be in possession of a current, valid driver's license.  If an employee has allowed his/her license to expire, he/she must renew the license and provide proof of that renewal to the local Business Manager before privileges to drive on Cumulus business will be granted.  If an individual is on a restricted license, *i.e.*, a work permit, due to traffic violations, DUI convictions, etc., that person's driving privileges will be reviewed closely.

### *Driver Criteria*

Anyone who has received a citation in one of the following areas within the preceding 36-month period prior to an MVR check will likely be <u>denied driving privileges</u>.  Similarly, an employee who receives citations in one or more of these areas during the course of his/her employment will most likely have his/her driving privileges revoked.  This applies whether the citations are received during business hours or on personal time:

      (ii)     License suspension;
      (iii)    Driving after revocation or suspension of license;
      (iv)    Knowingly leaving the scene of an accident;
      (v)     Evading a police officer;

(vi)     Driving while intoxicated or impaired (i.e., DWI, DUI, OWI, OUI);
(vii)    Reckless driving or drag racing;
(viii)   Multiple speeding tickets (more than two large tickets for 20 mph or more over
         the speed limit or more than four moderate tickets for 10 to 19 mph over the speed
         limit);
(ix)     More than one accident where the employee was at fault;
(x)      Three or more moving violations (e.g., improper lane change, failure to yield,
         running red lights or stop signs);
(xi)     Independent evidence of violations deemed satisfactory by the Business Manager,
         Human Resources, and senior management; or,
(xii)    Any combination of the above.

Employees may be placed on <u>6 months probation</u> as a result of one or more of the following
occurrences during the preceding 36-month period.  During the probationary period, the Business
Manager will run an MVR on these employees on a monthly basis.  If a satisfactory driving
record is not maintained by the employee during this probation period, driving privileges may be
revoked:

(i)      One accident where the employee was at fault;
(ii)     Two moving violations;
(iii)    One moving violation and two non-moving violations (e.g., illegal parking and
         vehicle defects);
(iv)     Three non-moving violations.

Employees who are authorized to drive on behalf of Cumulus must review the Safety Policy and
Accident Procedures outlined below.  Cumulus employees will be expected to adhere to these
standards.  Any questions regarding any part of the Motor Vehicle Policy should be directed to
the Business Manager.

### *<u>Safety Policy</u>*

<u>Company Owned Vehicles</u>
Only authorized employees will be allowed to drive Company vehicles.  *Employees' children
and spouses are not allowed to drive company vehicles.*  Only employees who have the
appropriate commercial driver's license and who are qualified by the state and federal DOT, as
required, will be permitted to operate a commercial van or truck.

<u>Personal Vehicles on Company Business</u>
Employees who drive their personal cars on company business are required to maintain: auto
liability insurance; current state vehicle inspections where required; and safe operating
conditions.  All necessary documentation must be provided to the Business Manager at the time
of initial employment with Cumulus as well as on an annual basis during employment.

Corporate non-owned auto insurance coverage only covers liability on the corporation for
damage to a third party automobile or personal injury while the automobile is being used by the
employee for Company business.  Damage to employee-owned personal vehicles, as well as
injury to family members, friends, etc. will not be covered by the corporate coverage and is,
therefore, the sole responsibility of the employee.

<u>General Safety Rules</u>
Employees must:
1.  Safety belts must be worn at all times while in the vehicle.
2.  Cellular telephone usage must be kept to a <u>minimum</u> while the vehicle is in motion.
3.  Outgoing calls may be placed only when the vehicle is safely parked.

Employees are <u>not</u> permitted to:
1.  Pick up hitchhikers.
2.  Accept payment for carrying passengers or materials.
3.  Use any radar detector, laser detector or similar device.

<u>Company and Personal Property</u>
Employees are responsible for company property such as computers, work papers and equipment that they keep in their vehicles.  Cumulus will not reimburse the employee for stolen personal property.

### *Accident Procedures*

**Employees must to take the following actions when there are injuries to persons and/or damage to other vehicles or property.  Please keep a copy of these procedures in your vehicle for reference in the event of an accident.**

1.  If possible, move the vehicle to a safe location out of the way of traffic.  Call for medical attention if anyone is hurt.  Call the police to investigate the cause of the accident.
2.  Secure the names and addresses of driver and occupants of any vehicles involved, their operator's license numbers, insurance company name and policy numbers, as well as the names and addresses of injured persons and witnesses.  **Do not discuss fault with, or sign anything for, anyone except Cumulus' Business Manager or the investigating police officer.**

3.  Immediately notify your supervisor.  Also contact the Business Manager for instructions on how to report the claim to our insurance company.

4.  Obtain a copy of the police report once it is ready and forward to your Business Manager.

**When there is theft of, or damage to, your personal vehicle only:**

1.  If you did <u>not</u> witness the damage to the vehicle, please notify the local police department immediately.
2.  Notify the Business Manager.
3.  Do not arrange for repairs to the vehicle until you have received authorization from your insurance company.
4.  Send a copy of the police report, along with a memo outlining any additional information, to the Business Manager.

## ACKNOWLEDGEMENT OF POLICY RECEIPT

I hereby acknowledge that I have been given a copy of the Cumulus Motor Vehicle Policy, which includes a safety policy and accident reporting provisions.  I have reviewed and understand what my obligations are under the policies and I agree to adhere to the requirements set forth in it.

Witness

Employee Signature

Printed Name

Date

## ACKNOWLEDGEMENT AND
## CONSENT TO MOTOR VEHICLE RECORD CHECK

Cumulus Media Inc. requires that all employees whose duties require driving a car submit to a check of their driving record to ensure that they hold a valid driver's license and that they do not pose any unnecessary risks in operating a car.  Both offers of employment, and continued employment, for those positions that require driving, are contingent upon a satisfactory driving record.

As such, Cumulus intends to obtain a copy of your motor vehicle record.  This information will be used only for insurance purposes.  The record will be used to evaluate your eligibility for driving in the course of Company business.  The Company may seek updated records through the course of employment.

Please sign and date below to acknowledge that you have reviewed this disclosure and consent to allow Cumulus to obtain a copy of your motor vehicle report during the application process, along with subsequent motor vehicle record checks, should you be employed in a position in which driving is required.

Signature of Applicant

Jake Kemp
Printed Name of Applicant

19724150
License Number

4.7.22.
Date

08·05·85.
Date of Birth

TX
License State