**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SUSQUEHANNA RADIO LLC | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION NO. 3:23-CV-01746-S** |
| | ) | |
| vs. | ) | |
| | ) | |
| JACOB KEMP and DANIEL MCDOWELL | ) | |
| | ) | |
| Defendants. | ) | |

<u>**PLAINTIFF'S RENEWED EMERGENCY APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND REQUEST FOR PRELIMINARY INJUNCTION**</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Susquehanna Radio LLC ("Susquehanna" or "Plaintiff") files this Renewed Application for Temporary Restraining Order and Request for Preliminary Injunction (the "Motion") to enjoin Defendants Jacob Kemp ("Kemp") and Daniel McDowell ("McDowell") (collectively, the "Defendants") from continuing to breach their non-competition, non-solicitation, and non-disparagement obligations to Susquehanna, and to enjoin Defendants' continued conversion of Susquehanna's property.

Susquehanna's renewed Motion comes in light of the Court's denial of Susquehanna's prior Application for Temporary Restraining Order and Request for Preliminary Injunction (ECF No. 5). Susquehanna clarifies herein that it is not seeking *ex parte* relief pursuant to Fed. R. Civ. P. 65(b)(1)(B), but has served notice of the prior motion (ECF No. 5) and the instant Motion (ECF No. 9) on Defendants' counsel of record via email and overnight delivery. *See,* Declaration of L. David Anderson, attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference. Hence, Defendants and their counsel have notice of Plaintiff's Verified Complaint (ECF No. 1) and this Motion, and Susquehanna seeks a Temporary Restraining Order as requested herein with or without a hearing before the Court.

1

**Table of Contents**

I.   INTRODUCTION .................................................................................................... 4

II.   STATEMENT OF FACTS ..................................................................................... 6

  A.  Defendants' Agreements ..................................................................................... 6

  B.  The Hang Zone's Inception.................................................................................. 9

  C.  Defendants Plan to Breach Agreements During Contract Negotiations ........................... 10

  D.  The Dumb Zone is a Carbon Copy of The Hang Zone ..................................... 12

  E.  Defendants Continue to Violate Their Noncompetes, Mock Susquehanna, and Solicit Susquehanna's Advertisers ................................................................................ 13

III.   ARGUMENT AND CITATION TO AUTHORITY ............................................ 14

  A.  Susquehanna Has a Substantial Likelihood of Succeeding on the Merits. ........................ 15

    *1.*  Susquehanna is Likely to Succeed on the Merits of its Breach of Contract Claims ...... 15

    *2.*  Susquehanna is Likely to Succeed on the Merits of its Conversion Claims ................. 21

  B.  Susquehanna will Suffer Irreparable Harm if a TRO is Not Entered. ............................... 23

  C.  The Injury Faced by Susquehanna Outweighs any Injury to Defendants ......................... 24

  D.  Granting Injunctive Relief will Not Adversely Affect the Public Interest ......................... 25

IV.   CONCLUSION .................................................................................................... 25

## **Table of Authorities**

### **Cases**

*Accruent, LLC v. Short,* No. 1:17-CV-858-RP, 2018 WL 297614 (W.D. Tex. Jan. 4, 2018) ............. 18

*AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856 (E.D. Tex. 2018) ......................... 26

*Am. Exp. Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688 (N.D. Tex. 1996) ...................................... 17, 26

*Burke v. Cumulus Media, Inc.*, No. 16-CV-11220, 2016 WL 3855181 (E.D. Mich. July 15, 2016)
........................................................................................................................................... 20

*Daily Instruments Corp. v. Heidt,* 998 F. Supp. 2d 553 (S.D. Tex. 2014) .............................................. 24

*Equine Sports Med. & Surgery Weatherford Div., PLLC v. Tipton*, No. 02-19-00346-CV, 2020 WL
6165414 (Tex. App. Oct. 22, 2020) ..................................................................................... 25

*Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) ............................................... 15

*Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Cap. Variable*, 527 S.W.3d 492
(Tex. App. 2017) .................................................................................................................. 24

*Humana, Inc. v. Jacobson*, 804 F.2d 1390 (5th Cir. 1986) .................................................................... 24

*Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573 (5th Cir. 2015) .............................................................. 16

*Impact Fire Servs., LLC v. Osborne*, No. 619CV00176ADAJCM, 2019 WL 5026884 (W.D. Tex. Aug.
29, 2019) ............................................................................................................................... 19

*In re CTLI, LLC,* 528 B.R. 359 (Bankr. S.D. Tex. 2015) ...................................................................... 22

*Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996) .................................................................. 27

*Le-Vel Brands, LLC v. Bland,* No. 3:19-CV-00154-L, 2019 WL 4753041 (N.D. Tex. Sept. 30, 2019) .. 18

*Marsh USA, Inc. v. Cook*, 354 S.W.3d 764 (Tex. 2011) .................................................................... 16, 17

*McGuire-Sobrino v. TX Cannalliance LLC*, No. 05-19-01261-CV, 2020 WL 4581649 (Tex. App.
Aug. 10, 2020) ..................................................................................................................... 22

*McKissock, LLC v. Martin,* 267 F. Supp. 3d 841 (W.D. Tex. 2016) ........................................ 18, 24, 25

*Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682 (W.D. Tex. 2019) ........................................................ 26

*TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742 (S.D. Tex. 2009) ................... 16, 18

*U.S. Risk, LLC v. Hagger*, No. 3:20-CV-538-N, 2023 WL 146248 (N.D. Tex. Jan. 10, 2023) ............. 17

*Vais Arms, Inc v Vais*, 383 F3d 287, 296, n. 20 (5th Cir. 2004) ......................................................... 18

*W.E. Stephens Mfg. Co. v. Goldberg*, 225 S.W.3d 77 (Tex. App. 2005) ................................ 22, 23

### **Statutes**

TEX. BUS. & COMM. CODE § 15.50(a) ............................................................................................ 16, 17

I.      **INTRODUCTION**

This matter involves Defendants' blatant breaches of their employment agreements with Susquehanna.  Susquehanna owns "The Ticket" – a radio station and producer of sports talk show content.  From February 2020 through June 2023, Defendants, as employees of Susquehanna, co-hosted the "The Hang Zone," a radio show on The Ticket which covered general news with an emphasis on Dallas and Texas area sports teams.  The Hang Zone was available to Susquehanna's listeners not only through live radio broadcast, but also through live internet streaming and through multiple podcast platforms.  At all material times, Defendants' employment was governed by enforceable employment contracts, which, to protect Susquehanna's goodwill and confidential information, contain reasonable non-competition and non-solicitation provisions restricting Defendants from certain activities during employment and certain post-termination activities.

On or around July 14, 2023, Defendants announced they were terminating their employment with Susquehanna.  Days later, Defendants began broadcasting an internet podcast called "The Dumb Zone," which was a carbon copy and continuation of Susquehanna's The Hang Zone, and which was expressly designed to compete with Susquehanna and to exploit the goodwill and notoriety of The Hang Zone.  Remarkably, on The Dumb Zone broadcasts, Defendants bragged that they recorded the shows while still employed by Susquehanna.  Even more egregiously, Defendants pasted over The Hang Zone's logo to use for The Dumb Zone:

 

Moreover, Defendants have stolen Susquehanna's social media accounts.  For instance, Susquehanna owns a Twitter account "@thehangzone" which was formerly used to promote The Hang Zone.  Defendants simply re-named it to "@dumbzone69" and later to "@thedumbzone," thereby taking the more than 22,000 followers of Susquehanna's account:



Defendants similarly commandeered The Hang Zone's YouTube and Facebook pages and followers, simply re-titling the pages to "The Dumb Zone."  Defendants then redirected The Hang Zone's website (thehangzone.com) to a webpage promoting their Patreon account and aforementioned rebranded social media accounts.  Just last week, Defendants began soliciting Susquehanna's advertisers in violation of their non-solicitation agreements.

Defendants have done all of this, as made clear by their own words, with the sole intent of unfairly competing with Susquehanna and stealing its goodwill, listeners, and advertisers.  They are fully aware of the content of their employment contracts and the restrictions contained therein but refuse to comply with them despite Susquehanna's demands.  Instead, Defendants have talked at length on The Dumb Zone about their contract negotiations with Susquehanna, mocked Susquehanna's cease-and-desist letters, threatened to release recorded conversations with

4890-9545-9190.2

Susquehanna executives containing confidential information, criticized Susquehanna's hiring and programming decisions, and actively disparaged Susquehanna employees. Even more, immediately after Susquehanna filed its Verified Original Complaint (the "Complaint") (ECF 1) on Friday, August 4, 2023, Defendants uploaded a video on Sunday, August 7, 2023, stating publicly that they would **not** stop uploading The Dumb Zone. Defendant Kemp even mocked the Complaint itself by listing his name as "Kemp et al" in the video.

Defendants' actions demonstrate their clear disregard for and contempt of their ongoing contractual obligations to Susquehanna. Susquehanna requires immediate emergency injunctive relief to stop Defendants' continued violation of their employment agreements, as well as to stop Defendants' threatened and actual misappropriation of Susquehanna's property and interference with Susquehanna's business activities. Time is of the essence because each weekday, Defendants are uploading The Dumb Zone podcast, which directly competes with The Ticket's programming, disparages Susquehanna and its employees, and misappropriates its intellectual property. Accordingly, Susquehanna has already suffered and, unless this Court provides an emergency temporary restraining order and thereafter a preliminary injunction, will continue to suffer substantial irreparable harm to its business as a result of Defendants' actions.

## II.     STATEMENT OF FACTS

### A.    DEFENDANTS' AGREEMENTS

McDowell and Kemp began working for The Ticket in 1999 and 2013, respectively. (Complaint ("Compl."), ¶ 6.) Defendants' employment with Susquehanna was governed by employment contracts (the "McDowell Agreement" and the "Kemp Agreement," respectively, and together, the "Agreements"). (*Id.*, ¶ 7-8.)

6

McDowell executed the McDowell Agreement on June 13, 2018, which includes the following relevant provisions:

(Section 1.1) "Company Business" means the operation, promotion, and marketing of commercial radio stations.

(Section 1.3) "Competing Business" means any person (including Employee) or entity **carrying on a business that is the same or essentially the same as the Company Business**. (emphasis added).

(Section 2.4) **Social Media Platforms.** During the Employment Period, the Employee, as directed by the Company, shall use and operate the designated Company owned social media platforms in furtherance of the Job Duties hereunder for the sole and exclusive benefit of the Company. In all cases Employee shall not use broadcast tools or content, or the Station's promotional tools, including but not limited to, Company owned and controlled social media platforms to promote and further the Employee's separate and independent controlled social media platforms, unless approved in writing by the Company.

(Section 7) **AGREEMENT NOT TO COMPETE**.  While employed by the Company, and for six (6) months following termination of such employment, **Employee shall not, directly or indirectly, engage in any activities the same or essentially the same as Employee's Job Duties for any Competing Business** located or selling advertising within, or broadcasting to, the Business Area. Employee acknowledges that in the event Employee's employment terminates for any reason, Employee will be able to earn a livelihood without violating the foregoing restrictions and that Employee's ability to earn a livelihood without violating such restrictions is a material condition to employment with the Company. Employee further agrees that during the pendency of any litigation to enforce this Section 7, including all appeals, the non-compete period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.  (emphasis added).

(Section 8) **AGREEMENT NOT TO SOLICIT SPONSORS / CUSTOMERS.** During Employee's employment by the Company and for six (6) months following termination of such employment, Employee shall not, directly or indirectly, for any Competing Business, solicit, for the purpose of selling advertising time, any sponsor / customer of the Company with which Employee had Contact during the

7

six (6) months preceding the termination of Employee's employment. For purposes of this Section 8, "Contact" means any interaction between Employee and a sponsor/customer which took place in an effort to establish or further the business relationship between the Company and the sponsor/customer. Employee further agrees that during the pendency of any litigation to enforce this Section 8, including all appeals, the non-solicitation period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.

(Section 11) **INJUNCTIVE RELIEF.** Employee agrees that the provisions of Sections 6, 7, 8, and 9 of this Agreement are reasonable and necessary to protect the Company's property and business, and that Employee's breach of any of those provisions may cause the Company to suffer irreparable loss and damage. Accordingly, Employee agrees that if Employee breaches or threatens to breach any of those provisions, **the Company shall be entitled to immediate injunctive relief to enforce this Agreement, money damages for whatever harm such breach causes the Company, and whatever other remedies are available**.  (emphasis added).

(Section 15.1) With respect to each and every program, announcement, event and promotion in connection with which Employee renders services hereunder, the titles and content thereof (including every format, idea, theme, script, characteristic, element thereof), and with respect to all materials created or developed by Employee pursuant to this Agreement (whether by Employee acting alone or in conjunction with other persons) (collectively "Material"), **Employee agrees and acknowledges that the Company, its successors and assigns are the sole and exclusive owner of such Material, that all rights, title, and interest in such Material are vested in the Company for all uses and purposes throughout the world**. (emphasis added).

(*Id.*, ¶ 8.) While the term of the McDowell Agreement was set to end on June 22, 2023, McDowell continued his employment with Susquehanna until July 14, 2023, subject to the survival of these provisions.

8

Kemp executed the Kemp Agreement on April 1, 2022, which was set to expire on March 31, 2024.  (*Id.*, ¶ 9.)[1]  The Kemp Agreement contains substantially the same relevant contractual requirements as the McDowell Agreement identified above, with the following different or additional relevant provisions:

> (Section 1.1) "Company Business" means the operation, promotion, and marketing of commercial radio stations **and other audio platforms, including podcasting**. (emphasis added).

> (Section 1.3) "Competing Business" means any person (including Employee) or entity carrying on a business that is the same or essentially the same as the Company Business.  **Competing Business shall include, without limitation, all commercial audio outlets, such as radio stations, radio networks, television stations, cable operators, podcasters, Internet/streamed radio and Internet/streamed programs/programming and other current and future audio platforms**. (emphasis added).

> (Section 6.3) During Employee's employment by the Company and at any time thereafter, Employee agrees not to disparage or encourage or induce others to disparage the Company, any of its respective employees that were employed during Employee's employment with the Company or any of its respective past and present, officers, directors, products, or services (the "Company Parties").  For purposes of this Section 6.3, the term "disparage" includes, without limitation . . . any public statement, that in each case is intended to, or can be reasonably expected to, damage any of the Company Parties.

(*Id.*)

## B.    THE HANG ZONE'S INCEPTION

In February of 2020, Susquehanna began broadcasting The Hang Zone on The Ticket on weekdays in the 12:00 p.m. – 3:00 p.m. timeslot, with Defendants as the co-hosts.  (*Id.*, ¶ 9.)  The

---

[1] Kemp exercised an early termination option contained in the Kemp Agreement on December 19, 2022 but continued his employment with Susquehanna thereafter (subject to the survival of several provisions of the Kemp Agreement).  (Id.)

Hang Zone's structure included an opening segment called the "Open," followed by news and sports segments, and concluded by a segment called "Why Today Doesn't Suck", where Defendants discuss events that happened on that day in history.  (*Id*., ¶ 11.)  While topics included general news and events, The Hang Zone's target audience was men ages 25 to 45, primarily focused on professional sports with an emphasis on the Dallas, Texas area.  (*Id*.)  While listeners could tune in from their cars or home radios, listeners could also stream The Hang Zone live via The Ticket's app from anywhere around the world with an internet connection.  (*Id*., ¶ 12.)

The Ticket uploads segments from its on-air shows for on-demand streaming on theticket.com, (including segments from The Hang Zone, which were also available on thehangzone.com).  (*Id*.)  In addition, content from The Ticket is uploaded to The Ticket's YouTube channel and in podcast form on three different The Ticket podcast channels (available on The Ticket app, Apple Podcasts, and Spotify).  (*Id*.)  Content from The Hang Zone appeared on each channel, including segments on "The Ticket Top 10," The Hang Zone Weekly Wrap Up on "Sportsradio 96.7 and 1310 The Ticket," and Why Today Doesn't Suck segments on "WTDS." (*Id*.)

## C.   DEFENDANTS PLAN TO BREACH THE AGREEMENTS DURING CONTRACT NEGOTIATIONS

With Kemp exercising early termination of the Kemp Agreement in December of 2022 and the McDowell Agreement set to expire on June 22, 2023, the Parties began negotiations for new contracts wherein Defendants would continue to host The Hang Zone.  (*Id*.)  While the Parties were able agree on most terms – including compensation – Defendants represented they wanted to engage in other independent media pursuits simultaneously with their employment with Susquehanna, specifically starting their own independent podcast.  (*Id*., ¶ 15.)

10

Because Susquehanna already produced podcasts of The Hang Zone which were uploaded daily and which used The Hang Zone branding and content, Susquehanna could not agree to Defendants' requests because it would directly compete with Susquehanna's podcasts and violate the non-competition provisions in the Agreements.  (*Id*., ¶ 16.)  Susquehanna offered Defendants a podcast which they could host independent of The Hang Zone branding on Susquehanna's podcast network with possible revenue sharing options, but Defendants declined.  (*Id.*)

Unknown to Susquehanna, during these contract negotiations and while still employed by Susquehanna, Defendants began making plans to end their employment with Susquehanna and start their own independent podcast.  (*Id*., ¶ 17.)  This included creating and recording the competing podcast "The Dumb Zone" while still being paid by Susquehanna.  (*Id.*)  Moreover, in bad faith and in violation of Susquehanna's policies and Defendants' employment Agreements, Defendants secretly recorded conversations with Susquehanna employees during contract negotiations to use as content on a future show.  (*Id*., ¶ 18.)  After leaving Susquehanna, Defendants stated publicly that they intended to release these recordings.  (*Id.*)  Indeed, Defendants bragged in a YouTube video uploaded on July 20, 2023 that "the first thing that we're gonna put out there content-wise is the full content of every single phone call we've had with the company . . . we're just gonna release all of that," and further acknowledged there were "probably some legal issues there."[2]  (*Id.*)  In the midst of negotiations and while still employed by Susquehanna, Defendants

---

[2]  The Dumb Zone, *Dan and Jake Ticket goodbye*, YouTube (July 20, 2023), https://youtu.be/F7RcRO2v_cY?t=833.

recorded multiple podcasts which they intend to release "soon."[3]  (*Id.,* ¶ 19.)  Defendants' final

day of employment with Susquehanna was July 14, 2023.  (*Id.,* ¶ 20.)

**D.     THE DUMB ZONE IS A CARBON COPY OF THE HANG ZONE**

Despite their employment with Susquehanna coming to a close, Defendants continued

doing *the exact show* that they were doing before – just ever-so-slightly changing the title from

"The Hang Zone" to "The Dumb Zone."  The Dumb Zone is identical to The Hang Zone in all

respects, with an introductory segment called the "Open", followed by general news and sports

talk with a focus on Dallas, Texas area sports, and a Why Today Doesn't Suck segment – which

Defendants now call "Today in History".[4]  (*Id.,* ¶ 24.)  Defendants picked up right where they left

off.   In line with doing the exact same show, Defendants immediately began re-branding all of

The Hang Zone's social media platforms – which while operated by Defendants during their

employment were wholly owned by Susquehanna – to "The Dumb Zone".  (*Id.,* ¶ 21.)  These

included a Twitter account with nearly 22,000 followers, a YouTube account, and Facebook

account, which Defendants admitted publicly on an episode of The Dumb Zone.[5]  (*Id.*)

Defendants have redirected the website address "thehangzone.com" to their Patreon, where

they have uploaded daily episodes of The Dumb Zone (a phrase which Defendants routinely used

---

[3]   The   Dumb   Zone,   *The   Dumb   Zone   7-24-23,*   YouTube   (July   25,   2023),
https://youtu.be/hSFR8zaEMWY?t=385.

[4] In the August 4, 2023 episode of The Dumb Zone, Defendant McDowell accidentally referred to
The Ticket segment "Why Today Doesn't Suck" instead of their re-branded segment "Today in
History," and quickly corrected himself, showing that the two segments are identical.  The Dumb
Zone, *The Dumb Zone 8-4-23*, Patreon (August 4, 2023), https://www.patreon.com/posts/dumb-
zone-8-4-23-87205470.

[5]   The   Dumb   Zone,   *The   Dumb   Zone   7-27-23*,   Patreon   (July   27,   2023),
https://www.patreon.com/posts/dumb-zone-7-27-86772024.

4890-9545-9190.2

on air while hosting The Hang Zone) since July 24, 2023, with one free episode per week (which is also uploaded to the YouTube channel along with clips from the paid episodes), and listeners can pay $6.90 per month for access to each upload.  (*Id.,* ¶ 26.)  Accordingly, Defendants are not just trying to make a new show that competes with The Ticket – they are trying to compete with The Ticket by moving the exact same show they were doing for the Ticket under a new roof.

**E.**   **DEFENDANTS CONTINUE TO VIOLATE THEIR NONCOMPETES, MOCK SUSQUEHANNA, AND SOLICIT SUSQUEHANNA'S ADVERTISERS**

Susquehanna sent each Defendant a cease-and-desist letter (the "Cease-and-Desist Letters") on July 25, 2023, reiterating Defendants' obligations under their respective Agreements. (*Id.,* ¶ 28.)  Instead of following the unambiguous restrictions in the Agreements, Defendants continued to upload The Dumb Zone.  (*Id.,* ¶ 30.)  Even more egregiously and representing it as a piece of "listener feedback," in their July 27, 2023 episode, Defendants read language directly from the Cease-and-Desist Letters,[6] laughing at the title, and instead told listeners that the first thing they did was respond "well what if we cease and cist . . . like can we work something out on that front."  (*Id.,* ¶ 29.)

On July 31, 2023, Defendants released a 30-minute segment of The Dumb Zone titled "Why we left The Ticket," where Defendants hosted guest Akaash Singh ("Singh").[7]  (*Id.,* ¶ 30.) Defendant Kemp allowed Singh to represent that Defendant Kemp's pay did not increase from when he was a producer to when he began hosting The Dumb Zone (when his pay, in fact, **doubled** in that time frame).  (*Id.,* ¶ 31.)  Gaining hundreds of subscribers to their Patreon per day,

---

[6] *Id.*

[7]   The Dumb Zone, *The Dumb Zone 7-31-23*, Patreon (July 31, 2023), https://www.patreon.com/posts/dumb-zone-with-7-86919643.

Defendants uploaded an episode of The Dumb Zone **again** on August 1, 2023, discussing and criticizing The Ticket's updated lineup, on-air personalities, and hiring decisions. (*Id.,* ¶ 32.) Defendants again discussed the Cease and Desist Letters.  (*Id.*)  Defendants uploaded an episode of The Dumb Zone **again** on August 2, 2023, where Defendant Kemp stated, "I might bag on the company a little bit now that I've been told that that's possibly okay."[8]  (*Id.,* ¶ 33).

Defendant Kemp also made a guest appearance on the podcast "The Mom Game" on August 3, 2023, where he and the hosts repeatedly mocked the Cease and Desist Letters, discussed his contract negotiations with Susquehanna (confirming Defendants' decision to leave was non-monetary but based on Defendants desire to start an independent podcast), and stated that Defendants may begin hosting a live streamed broadcast in the near future.[9]  (*Id.,* ¶ 34.) Defendants uploaded **again** on August 4, 2023, talking at length about The Ticket and their business plans moving forward.[10]

In their most recent act of blatant violation of their Agreements and in direct violation of the non-solicitation provisions therein, specifically not to "solicit, for the purpose of selling advertising time, any sponsor / customer" of Susquehanna, Defendants have contacted Susquehanna's customers and sponsors to sponsor The Dumb Zone.  (*Id.,* ¶ 35.)

### III.    ARGUMENT AND CITATION TO AUTHORITY

---

[8]    The Dumb Zone, *The Dumb Zone 8-2-23*, Patreon (August 2, 2023), https://www.patreon.com/posts/dumb-zone-8-2-23-87098488.

[9] The Mom Game, *Highway to the Dumb Zone*, The Mom Game Pod (August 3, 2023), https://www.themomgamepod.com/podcast-1/episode/79692161/highway-to-the-dumb-zone.

[10]    The Dumb Zone, *The Dumb Zone 8-4-23*, Patreon (August 4, 2023), https://www.patreon.com/posts/dumb-zone-8-4-23-87205470.

To secure a temporary restraining order or a preliminary injunction, Susquehanna as the movant must show: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 676 (N.D. Tex. 2016). Susquehanna readily meets each of these elements.

A.   **SUSQUEHANNA HAS A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS.**

As demonstrated below, Susquehanna has a substantial likelihood of success on the merits, as Defendants are in breach of their enforceable non-competition and non-solicitation provisions, Defendant Kemp is in breach of his anti-disparagement provision, and further, that Defendants are actively converting Susquehanna's property.

    *1.*    **Susquehanna is Likely to Succeed on the Merits of its Breach of Contract Claims**

    *a.*    *The Agreements are Enforceable*

Under Texas law, non-competition and non-solicitation clauses are governed by Section 15.50(a) of the Texas Business and Commerce Code which provides, in pertinent part:

> a covenant not to compete is enforceable if [(1)] it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made [and (2)] to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise.

TEX. BUS. & COMM. CODE § 15.50(a); *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 769 (Tex. 2011).

To be ancillary to an "otherwise enforceable agreement," a restrictive covenant must be part and parcel of an agreement that contains an exchange of promises beyond the non-compete itself and which support the

15

non-compete. *Id.* at 771. The Texas Supreme Court has held that "consideration for a noncompete that is reasonably related to an interest worthy or protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus." *Id.* at 775; *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742 (S.D. Tex. 2009). The Texas Supreme Court defined business goodwill as:

> the advantages of benefits which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, **in consequence of the general public patronage and encouragement which it receives from constant and habitual customers on account of its local position, common celebrity, or reputation for skill, or influence**[.]"

*Marsh USA*, 354 S.W.3d at 778 (emphasis added).

Here, the Agreements are otherwise enforceable outside of the non-competition and non-solicitation clauses, as they are contracts for employment in exchange for salary that are non-illusory. *See Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 584 (5th Cir. 2015) (mutually enforceable employment agreements constitute sufficient consideration). Further, Susquehanna can readily establish that it has protectable interests pursuant to the Agreements, which the non-competition and non-solicitation clauses are ancillary to and designed to protect.

As set forth in its Complaint, Susquehanna provided Defendants with Susquehanna's confidential and proprietary information in the course of Defendants' employment, built up years of goodwill for The Ticket's name and trademarks which Susquehanna allowed Defendants to use, promoted Defendants' individual notoriety and credibility, provided substantial training to Defendants, and provided a substantial customer base and audience for Defendants. (*Id.*, ¶ 13); *See Am. Exp. Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 692 (N.D. Tex. 1996) (finding non-competition clause ancillary to enforceable agreement where plaintiff "incurred large expenses in establishing years of goodwill for the American Express name and trademarks which Plaintiff allowed Defendant to use," where plaintiff's established name "gave Defendant credibility," where Plaintiff "provided lengthy and expensive training," and where plaintiff

provided defendant "a substantial customer base."). Moreover, Defendants seek to profit from the "general public patronage and encouragement which [they] received from constant and habitual customers" as a result of being a host on Susquehanna's "The Hang Zone" since 2020. *See Marsh USA*, 354 S.W.3d at 778. Accordingly, the non-solicitation and non-competition clauses are ancillary to an otherwise enforceable agreement. *Id.* at 771.

Next, "the Court must determine whether the restrictions are reasonable under Texas law." *U.S. Risk, LLC v. Hagger*, No. 3:20-CV-538-N, 2023 WL 146248, at *4 (N.D. Tex. Jan. 10, 2023). Susquehanna must then show that the Agreements' "limitations on time, geographic area, and scope of activity are reasonable." *See* TEX. BUS. & COMM. CODE §§ 15.50(a), 15.51(c). With respect to the duration of a non-competition or non-solicitation covenant, Texas courts have generally upheld non-compete periods ranging from two to five years as reasonable." *Le-Vel Brands, LLC v. Bland*, No. 3:19-CV-00154-L, 2019 WL 4753041, at *7 (N.D. Tex. Sept. 30, 2019). Here, the Agreements' short, six-month non-competition and twelve-month non-solicitation restrictions are undoubtedly reasonable. (*Compl.*, ¶ 8-9.)

In addition, "[a] reasonable geographic restriction is generally considered to be the territory in which the employee worked for the employer." *TransPerfect Translations Inc.*, 594 F.Supp.2d at 754. "Texas courts have upheld nationwide geographic limitations in non-compete agreements *when it has been clearly established that the business is national in character*." *Vais Arms, Inc v Vais*, 383 F3d 287, 296, n. 20 (5th Cir. 2004) (emphasis added); *See also McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 857 (W.D. Tex. 2016) (finding nationwide restriction in non-compete agreement was reasonable given employer's national customer base). Here, the non-competition provision prohibits Defendants from working for a Competing Business (as defined in the Agreements) "located or selling advertising within, or broadcasting to, the Business Area" – defined as the Dallas-Fort Worth area where The Ticket was

17

broadcasted.  (*Compl.*, ¶ 8.)  As the Agreements restrict Defendants only from working in or providing content to the area where Defendants' work for Susquehanna was broadcast, the geographic restriction is reasonable.

The Agreements are also reasonable with respect to the scope of activities being restrained because they only limit Defendants from performing services that are "the same or essentially the same" as the services provided to Susquehanna.  *See, e.g., Accruent, LLC v. Short,* No. 1:17-CV-858-RP, 2018 WL 297614, at *5 (W.D. Tex. Jan. 4, 2018) (upholding noncompete relating to all of employer's activities as it did not "impose a greater restraint than is necessary" to protect the employer's legitimate business interest).  Likewise, the non-solicitation provisions are reasonable because they are only limited to those sponsors and advertisers who Defendants "had contact during the twelve (12) months preceding the termination of [Defendants'] employment."  *See Impact Fire Servs., LLC v. Osborne*, No. 619CV00176ADAJCM, 2019 WL 5026884, at *2 (W.D. Tex. Aug. 29, 2019) ("a covenant that only excludes an employee from areas or customers he or she worked with is reasonable and enforceable.").  Because the Agreements are reasonable in terms of temporal, geographic, and scope of restrictions, they are enforceable as a matter of law.

b.      <u>Defendants are Breaching Their Non-Competition Agreements.</u>

Defendants are actively breaching the non-competition clauses in their Agreements by recording and uploading The Dumb Zone, which is the exact same show and targets the exact same audience as The Hang Zone.  Indeed, given The Dumb Zone's hijacking of The Hang Zone's website, logo, social media platforms, logo, and show format, it is apparent that the sole purpose of The Dumb Zone is to entirely replace The Hang Zone and unfairly compete with The Ticket.   The non-competition clauses state Defendants "shall not, directly or indirectly, engage in any activities the same or essentially the same as Employee's Job Duties for any Competing Business located or selling advertising

18

within, or broadcasting to, the Business Area."  As set forth above, the Agreements define "Competing Business" as any person or entity carrying on a business that is the same or essentially the same as the "Company Business," likewise defined clearly in the Agreements.

Here, the Company Business undoubtedly covers podcasting and internet streaming. Susquehanna broadcasts The Ticket live on its app, which allows for instant internet streaming from anywhere in the world, and further, uploads segments and content from its shows – including The Hang Zone – to YouTube and in podcast form on multiple different mediums, which are available on The Ticket's various websites, Apple podcasts, and Spotify.  (*Id.,* ¶ 11-12.) Accordingly, the operation of a "commercial radio station" includes providing content to listeners online that is instantly available anywhere at any time through the internet on a listener's phone or computer. *See Burke v. Cumulus Media, Inc.*, No. 16-CV-11220, 2016 WL 3855181, at *12 (E.D. Mich. July 15, 2016) (finding technical differences "between internet and radio broadcasts are irrelevant for the purpose of considering whether" the broadcasts are competitive, and to "hold otherwise would be to elevate form over substance and ignore the economic realities of an industry that is increasingly shifting to the internet medium.").  Defendants recording and uploading The Dumb Zone is the *epitome* of a Competing Business, as it is the same or essentially the same as the recording and broadcasting of The Hang Zone.  The Dumb Zone is broadcast on the internet in essentially the same manner as The Hang Zone (via podcast format), available on YouTube just as The Ticket's shows are, and available for on demand streaming directly from an app on listeners' phones.  Accordingly, Defendants are "carrying on a business that is the same or essentially the same as the Company Business."

Not only are Defendants carrying on a business that is the same or essentially the same as Susquehanna's Company Business, but they are doing so in an identical capacity as their "Job

4890-9545-9190.2

Duties" and employment with Susquehanna (hosting a sports-oriented talk show) and making such business available for and directed at the exact same "Business Area" in the Dallas – Fort Worth area.  Further, Defendants are recording and uploading from Defendant McDowell's residence that is within the Business Area.  (*Id.*, ¶ 25.)  Thus, by uploading and continuing to upload The Dumb Zone, Defendants are in active, daily violation of their non-competition agreements, and Susquehanna has a strong likelihood of success on its breach of contract claim.

c. <u>*Defendants are Breaching their Non-Solicitation Agreements*</u>

Defendants are actively breaching their non-solicitation agreements.  As stated above, Section 8 of the Agreements prohibit Defendants from soliciting "for the purpose of selling advertising time, any sponsor / customer of the Company with which Employee had Contact during the six (6) months preceding the termination of Employee's employment."   (*Id.,* ¶ 8-9.) Defendants have already contacted at least one sponsor / customer of Susquehanna for the purpose of selling advertising or sponsoring The Dumb Zone with whom they had contact with in the prior six months of their employment.  (*Id.,* ¶ 35.)  Accordingly, Susquehanna has a strong likelihood of success on its claim that Defendants are breaching their non-solicitation agreements.

d. <u>*Defendant Kemp is Breaching his Non-Disparagement Agreement*</u>

Almost daily, Defendant Kemp is actively violating his non-disparagement obligations[11] by publicly criticizing Susquehanna, The Ticket, and its Employees – not only on The Dumb Zone, but by appearing on other podcasts (including "The Mom Game"), and on his personal Twitter account.   (*Id.,* ¶ 29-34.)   Section 6.3 of the Kemp Agreement states, "During Employee's employment by the Company and at any time thereafter, Employee agrees not to disparage or

---

[11] While Section 6.3 of the Kemp Agreement contains a non-disparagement clause, the McDowell Agreement does not contain a non-disparagement clause.

20

encourage or induce others to disparage the Company." (*Id.,* ¶ 9.)  In direct contravention of this provision, Defendant Kemp has falsely stated he did not get any pay raises, has criticized the Ticket's lineup and hiring decisions and employee pay, and has mocked the Cease and Desist Letters. (*Id.,* ¶ 29-34.)  Susquehanna has a strong likelihood of success on the fact that Defendant Kemp is violating the non-disparagement provision of the Kemp Agreement.

**2.    Susquehanna is Likely to Succeed on the Merits of its Conversion Claims**

Susquehanna is likely to succeed on its conversion claim.  Under Texas law, conversion is "the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *W.E. Stephens Mfg. Co. v. Goldberg*, 225 S.W.3d 77, 81 (Tex. App. 2005).  Thus, Susquehanna must show that it (1) owned or had legal possession of the property or entitlement to possession, (2) that Defendants unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, Susquehanna's rights as an owner; (3) Susquehanna demanded return of the property; and (4) Defendants refused to return the property. *Id.*

Here, the website thehangzone.com and the social media accounts used to promote The Hang Zone – including the Twitter, YouTube, and Facebook accounts – undoubtedly constitute "Material" owned by Susquehanna under the Agreements.  (*Compl.*, ¶ 8); *See also In re CTLI, LLC,* 528 B.R. 359, 366–67 (Bankr. S.D. Tex. 2015) (finding that "business social media accounts are property interests");  *McGuire-Sobrino v. TX Cannalliance LLC*, No. 05-19-01261-CV, 2020 WL 4581649, at *4 (Tex. App. Aug. 10, 2020) (finding likelihood of success on conversion claim for issuance of TRO, ordering return of commandeered website and social media accounts).  These accounts are "materials created or developed" in relation to The Hang Zone – a "program" which

21

Defendants rendered service to under their Agreements.  By redirecting The Hang Zone's website and re-branding The Hang Zone's social media accounts, Defendants are exercising "dominion and control over the personal property" of Susquehanna to Susquehanna's exclusion.  *W.E. Stephens Mfg. Co.*, 225 S.W.3d at 81.  Defendants are therefore converting Susquehanna's property.

Further, Susquehanna owns every "format, idea, theme, script, characteristic, [and] element thereof" relating to The Hang Zone.  (*Compl.*, ¶ 8.)  Not only is The Dumb Zone identical to The Hang Zone in "format, idea, theme, script, [and] characteristic" by following the same show structure, content, and use of identical segments as The Hang Zone,[12] but Defendants coined and frequently used the phrase "the dumb zone" while hosting The Hang Zone and while employed for Susquehanna.  (*Id.,* ¶ 21-24).  Moreover, Defendants developed and began recording The Dumb Zone while employed for Susquehanna.  (*Id.*).  Accordingly, The Dumb Zone podcast itself, and consequently, each podcast episode released to date, constitutes "Material" under the Agreements.  By exercising "dominion and control over" this Material to Susquehanna's exclusion, Defendants are converting Susquehanna's property.  *W.E. Stephens Mfg. Co.*, 225 S.W.3d at 81.

Susquehanna has demanded the return of its property, to no avail.  In the Cease and Desist Letters, Susquehanna specifically directed Defendants to stop uploading or promoting The Dumb Zone or take any actions inconsistent with Susquehanna's rights pursuant to Defendants' Agreements.  (*Id.*, ¶ 28).  Defendants not only refused, but publicly mocked Susquehanna's

---

[12] In the August 4, 2023 episode of The Dumb Zone, Defendant McDowell accidentally referred to The Ticket segment "Why Today Doesn't Suck" instead of their re-branded segment "Today in History," and quickly corrected himself, clearly showing that the two shows are identical.  The Dumb Zone, *The Dumb Zone 8-4-23*, Patreon (August 4, 2023), https://www.patreon.com/posts/dumb-zone-8-4-23-87205470.

demand.  (*Id.*, ¶ 29).  Accordingly, all elements for conversion have been met under Texas law, and Susquehanna has a strong likelihood of success on its conversion claim.

**B.      SUSQUEHANNA WILL SUFFER IRREPARABLE HARM IF A TRO IS NOT ENTERED.**

To demonstrate threat of an irreparable injury, Susquehanna must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."  *McKissock,* 267 F. Supp. 3d at 858 (quoting *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)).  "In Texas, injury resulting from the breach of non-compete is the epitome of irreparable injury, so enforcement appears to be the rule rather than the exception."  *Id.*  Moreover, "[t]he use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm."  *Id.* (quoting *TransPerfect Translations*, 594 F. Supp. 2d at 757); *see also Daily Instruments Corp. v. Heidt,* 998 F. Supp. 2d 553, 569-70 (S.D. Tex. 2014) (finding clear and convincing threat of irreparable harm where employee had been using former employer's confidential, proprietary and/or trade secret information to unlawfully to compete against the employer).  Furthermore, conversion of property which leads to non-monetary harms constitutes irreparable injury for purposes of a temporary injunction under Texas law.  *See Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Cap. Variable*, 527 S.W.3d 492, 500 (Tex. App. 2017).  Defendants acknowledged as much in their Agreements, Sections 11 of which respectively state:

> **INJUNCTIVE RELIEF.** Employee agrees that the provisions of Sections 6, 7, 8, and 9 of this Agreement are reasonable and necessary to protect the Company's property and business, and that Employee's breach of any of those provisions may cause the Company to suffer irreparable loss and damage. Accordingly, Employee agrees that if Employee breaches or threatens to breach any of those provisions, **the Company shall be entitled to immediate injunctive relief to enforce this Agreement, money damages for whatever harm such breach causes the Company, and whatever other remedies are available**.  (emphasis added).

*See Equine Sports Med. & Surgery Weatherford Div., PLLC v. Tipton*, No. 02-19-00346-CV, 2020 WL 6165414, at *7 (Tex. App. Oct. 22, 2020) (acknowledgment of irreparable harm in employment contract may constitute "evidence of irreparable harm.").

Defendants' recording and uploading of The Dumb Zone, solicitation of The Ticket's sponsors, and public disparagement of Susquehanna and its employees in violation of their restrictive covenants creates an immediate threat of irreparable harm which cannot be financially quantified.[13]   Further, Defendants' continued conversion of Susquehanna's property to damage The Ticket's image and goodwill by commandeering The Ticket's customer base cannot be adequately remedied by monetary damages. Accordingly, there is "a significant threat of injury from the impending action" which is imminent and which "money damages would not fully repair." *McKissock,* 267 F. Supp. 3d at 858.  Thus, a temporary restraining order and preliminary injunction should issue.

## C.    THE INJURY FACED BY SUSQUEHANNA OUTWEIGHS ANY INJURY TO DEFENDANTS

Defendants' breaches of their non-competition, non-solicitation, and non-disparagement obligations as well as their continued conversion of Susquehanna's property has already resulted in, and is continuing to cause, substantial harm to Susquehanna's business operations, competitiveness in the market, customer goodwill, and competitive use and value of its converted property.  Defendants' breach of their employee non-solicitation obligations is similarly causing substantial harm to Susquehanna's sales and business development workforce, business operations, and competitiveness in the marketplace through loss or complications to its relationship with sponsors.  The irreparable harm to Susquehanna's business operations and competitiveness in the market outweighs any harm the Defendants would suffer if they are

---

[13] Indeed, Susquehanna is continuously receiving feedback from listeners and advertisers (both in internet fora and direct correspondence) that they are leaving The Ticket because of The Dumb Zone and Defendants' false statements and disparagement of Susquehanna.

4890-9545-9190.2

allowed to continue breaching their contractual obligations owed to Susquehanna.  *See Am. Exp. Fin. Advisors, Inc.,* 955 F.Supp. at 693 (hardships to a signatory to a non-compete from the preliminary injunction do not outweigh those to the company if the signatory were allowed to violate his non-compete and work with former clients for the period covered in the agreement).  Moreover, Defendants acknowledged and agreed in Section 8 of their Agreements that they would "be able to earn a livelihood without violating" their noncompetition obligations.  (*Compl.*, ¶ 8.)  Accordingly, the imminent injuries faced by Susquehanna outweigh any faced by Defendants.

D.    **GRANTING INJUNCTIVE RELIEF WILL NOT ADVERSELY AFFECT THE PUBLIC INTEREST**

Finally, granting injunctive relief will not adversely affect, but rather further, the public interest. "[T]he undoubted tendency of the law has been to recognize and enforce higher standards of commercial morality in the business world."  *AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856, 874 (E.D. Tex. 2018).  Accordingly, courts within the Fifth Circuit and Texas have regularly granted injunctive relief in order to uphold and enforce restrictive covenants and to protect confidential information and trade secrets.  *See, e.g., Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 706 (W.D. Tex. 2019) (preliminary injunction enforcing restrictive covenants is in the public interest).  Here, Defendants have repeatedly mocked the enforceability of contracts on the air, thus openly challenging the sanctity of contractual obligations in Texas.   Therefore, requiring Defendants to uphold their contractual obligations and cease uploading The Dumb Zone and return Susquehanna's intellectual property will further the public interest.

IV.   **CONCLUSION**

Plaintiff respectfully requests that a TRO be immediately issued to both enjoin Defendants from continuing to violate their non-competition, non-solicitation, and non-disparagement obligations in their Agreements, and to enjoin Defendants' conversion of Susquehanna's property by returning Susquehanna's property.  This includes prohibiting Defendants from:

25

4890-9545-9190.2

(1) continuing to violate their Agreements with Susquehanna by broadcasting or otherwise distributing competing or potentially competing content including, but not limited to, broadcasting or otherwise distributing The Dumb Zone, that can be accessed in the Business Area;

(2) continuing to violate their Agreements with Susquehanna by soliciting Susquehanna's customers and advertisers;

(3) continuing (specifically Defendant Kemp) to disparage Susquehanna and its past and present employees, officers, directors, products, and services; and

(4) continuing to convert Susquehanna's property by requiring Defendants to return control to Susquehanna of thedumbzone.com, the social media accounts that Defendants unlawfully converted from Susquehanna (including the Twitter, YouTube, and Facebook accounts), and the Patreon account for The Dumb Zone.

Additionally, Susquehanna requests that, pursuant to the Agreements, Defendants' restrictive covenants be tolled during the pendency of this litigation. Susquehanna further respectfully requests that its request for preliminary injunction be set for hearing and that, after such hearing, a preliminary injunction as requested be issued against Defendants.

Finally, given Susquehanna's likelihood of success on its claims and the lack of any cognizable harm to Defendants (especially since Defendants' sole source of revenue from The Dumb Zone (its Patreon subscriptions) will continue regardless of whether episodes are uploaded), Susquehanna requests that the Court forego or require only a nominal bond or security pursuant to Fed. R. Civ. P. 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (noting that a District Court "may elect to require no security at all" prior to issuing a Rule 65 temporary restraining order or preliminary injunction).

Dated: August 9, 2023                       Respectfully submitted,

**BAKER & HOSTETLER LLP**

By:*/s/ L. David Anderson*
L. David Anderson
State Bar No. 00796126
Kendall Viator
State Bar No. 24131733
2850 North Harwood Street, Suite 1100
Dallas, Texas 75201-2640
Telephone: (214) 210-1200
Facsimile: (214) 210-1201
danderson@bakerlaw.com
kviator@bakerlaw.com

**WARGO, FRENCH & SINGER LLP**
David Pernini (*Pro Hac Vice forthcoming*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1520 (telephone)
(404) 853-1521 (facsimile)
dpernini@wfslaw.com
K. Tyler Dysart (*Pro Hac Vice forthcoming*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1565 (telephone)
(404) 853-1566 (facsimile)
tdysart@wfslaw.com

***ATTORNEYS FOR PLAINTIFF***
***SUSQUEHANNA RADIO LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2023, the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties indicated on the electronic filing receipt and is being served on Defendant's counsel of record by a manner authorized by Federal Rules of Civil Procedure 5 (b)(2).

*/s/ L. David Anderson*
L. David Anderson

4890-9545-9190.2