**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SUSQUEHANNA RADIO LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 3:23-CV-01746-S** |
| | § | |
| **JACOB KEMP and DANIEL MCDOWELL,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANTS' AMENDED RESPONSE IN OPPOSITION TO PLAINTIFF'S ORIGINAL AND RENEWED APPLICATIONS FOR INJUNCTIVE RELIEF

**Philip Kingston**
Texas Bar No. 24010159
Sheils Winnubst PC
1701 N. Collins, 1100 Atrium II
Richardson, Texas 75080
(214) 642-1707
philip@sheilswinnubst.com

**Matthew Bruenig**
District of Columbia Bar No. 1045571
124 4th St.
Stamford, Connecticut 06905
(857) 540-1205
matthewbruenig@gmail.com

**ATTORNEYS FOR DEFENDANTS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ............................................................................... iv

I.     Introduction ........................................................................................... 1

II.    Objections to Plaintiff's Evidence ...................................................... 4

III.   Factual Background ............................................................................... 5

IV.    Summary of Argument ........................................................................ 13

V.     Argument and Authorities .................................................................. 15

       A.   This Court currently lacks subject-matter jurisdiction over the non-
            compete and non-disparagement claims due to *Garmon* preemption
            and the NLRB's exclusive jurisdiction. ...................................... 15

            1.   Unfair Labor Practices Generally ................................... 15

            2.   *Garmon* Preemption Generally ..................................... 17

            3.   The non-compete provisions are subject to *Garmon*
                 preemption. ...................................................................... 18

            4.   The non-disparagement provision is subject to *Garmon*
                 preemption. ...................................................................... 19

            5.   Fifth Circuit precedent mandates that this Court respect the
                 Board's exclusive jurisdiction while Defendants' claims are
                 pending. ............................................................................ 21

       B.   Standard for Injunctive Relief ...................................................... 23

       C.   Plaintiff cannot show a substantial likelihood of success on the
            merits ............................................................................................ 24

            1.   Plaintiff cannot establish a substantial likelihood of success
                 on its non-compete claims. ............................................ 24

                 a.   Dan's noncompete does not apply to Defendants'
                      podcast because it does not involve the same "Job
                      Duties" and is not a "Competing Business" under
                      the agreement. ....................................................... 25

                 b.   The non-compete agreement in Jacob Kemp's
                      contract is overly broad in scope and constitutes an

impermissible industry-wide exclusion from subsequent employment.................................................31

    c.    Waiver ........................................................................33

2.    Plaintiff cannot show a substantial likelihood of success on the merits of its customer non-solicitation claim because there is no evidence that Dan and Jake are or have ever solicited any of Plaintiff's advertisers.........................................33

3.    Plaintiff cannot show a substantial likelihood of success on the merits of its non-disparagement claim. ................................33

    a.    The statements are not disparaging..............................34

    b.    All the allegedly disparaging statements are protected by the litigation privilege. ..............................34

    c.    Injunctive relief prohibiting future disparaging statements would constitute an unconstitutional prior restraint on free speech...................................36

4.    Plaintiff cannot show a substantial likelihood of success on the merits of its conversion claims..........................................36

D.    Plaintiff did not and cannot show it will suffer irreparable harm. .........................38

E.    Balancing of the respective harms favors Defendants and disfavors injunctive relief. ................................................................................41

F.    Granting injunctive relief would thwart public interest. ........................................42

VI.    Conclusion ........................................................................................................43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied Aviation Svc. Co. of New Jersey, Inc.*,
   248 NLRB 229 (1980) .................................................................................19

*Alscott, Inc. v. Sealer*,
   Civil Action No. 3:22-CV-00844-L, 2022 U.S. Dist. LEXIS 193896 (N.D.
   Tex. Oct. 25, 2022) (Lindsay, J.) ...........................................................41

*Am. Telnet, Inc. v. GTE Corp.*,
   No. 3:99-CV-0280, 1999 U.S. Dist. LEXIS 5781 (N.D. Tex. Apr. 16, 1999) .................40, 41

*Apogee Telecom, Inc. v. Univ. Video Servs.*,
   2018 U.S. Dist. LEXIS 228322 (W.D. Tex. 2018)................................................35

*Apple Barrel Productions, Inc. v. Beard*,
   730 F.2d 384 (5th Cir. 1984) ...............................................................42

*N.L.R.B. v. Arkema, Inc.*,
   710 F.3d 308 (5th Cir. 2013) ...............................................................22

*Beardmore v. Jacobsen*,
   131 F. Supp. 3d 656 (S.D. Tex. 2015) .......................................................38

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018).....................................................................25

*Blue Yonder Grp. v. Kinaxis Inc.*,
   Civil Action No. 3:20-CV-3636-K, 2021 U.S. Dist. LEXIS 194786 .....................................41

*Burke v. Cumulus Media, Inc.*,
   No. 16-cv-11220, 2016 U.S. Dist. LEXIS 91880 (E.D. Mich. 2016)......................................25

*Carson v. Dynegy, Inc.*,
   344 F.3d 446 (5th Cir. 2003) ...............................................................38

*NLRB v. Circle Bindery*,
   536 F.2d 447 (1st Cir. 1976)................................................................20

*Cisco Sys. v. Mushkin, Inc.*,
   Civil Action No. 3:20-CV-2588-K, 2021 U.S. Dist. LEXIS 150699 (N.D. Tex.
   2021) ....................................................................................36

*Clark v. Prichard*,
   812 F.2d 991 (5th Cir.1987) ...............................................................24

*Conlay v. Baylor Coll. of Med.*,
    Civ. Action No. H-08-1038, 2010 WL 774162 (S.D. Tex. Mar. 3, 2010)................................39

*Dig. Generation, Inc. v. Boring*,
    869 F. Supp. 2d 761 (N.D. Tex. 2012) (Lindsay, J.) ................................................40

*Dish Network, L.L.C. v. NLRB*,
    731 F. App'x 368 (5th Cir. 2018) ................................................................22

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)................................................................................40

*Dresser-Rand Co. v. Virtual Automation Inc.*,
    361 F.3d 831 (5th Cir. 2004) ....................................................................39

*NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*,
    346 U.S. 464 (1953)................................................................................20

*Emarco, Inc.*,
    284 NLRB 832 (1987) ............................................................................20

*Express One International, Inc. v. Steinbeck*,
    53 S.W.3d 895 (Tex. App.—Dallas 2001, no pet.)..........................................38, 39

*Finlan v. City of Dallas*,
    88 F. Supp. 779 (N.D. Tex. 1995) ..............................................................42

*Flex Frac Logistics, L.L.C. v. N.L.R.B.*,
    746 F.3d 205 (5th Cir. 2014) ....................................................................22

*Fromhold v. Insight Glob., LLC*,
    Civil Action No. 3:23-CV-0048-X, 2023 U.S. Dist. LEXIS 45878 (N.D. Tex.
    Feb. 23, 2023) (Starr, J.)..........................................................................41

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*,
    143 S. Ct. 1404 (2023)............................................................................18

*Gonannies, Inc. v. Goupair.com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) ........................................................24

*Hacienda De Salud-Espanola*,
    317 NLRB 962 (1995) ............................................................................20

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*,
    476 U.S. 380 (1986)................................................................................18

*James v. Brown*,
    637 S.W.2d 914 (Tex. 1982) ....................................................................35

*John R. Ray & Sons, Inc. v. Stroman*,
   923 S.W.2d 80 (Tex. App.—Houston [14th Dist.] 1996, writ denied)..............................25, 32

*Kelly v. Golden*,
   352 F.3d 344 (8th Cir. 2004) ................................................................................................36

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*,
   328 F.3d 192 (5th Cir. 2003) ................................................................................................24

*In re Lipsky*,
   460 S.W.3d 579 (Tex. 2015).................................................................................................38

*LogistiCare Sols., Inc. v. N.L.R.B*,
   866 F.3d 715 (5th Cir. 2017) ................................................................................................22

*Lowes Home Centers, L.L.C. v. N.L.R.B.*,
   850 F. App'x 886 (5th Cir. 2021) .........................................................................................22

*Lutheran Heritage Village–Livonia*,
   343 NLRB 646 (2004) ..........................................................................................................22

*Mannatech, Inc. v. Wellness Quest, LLC*,
   Civ. Action No. 3:14-CV-2497-K, 2014 WL 11515729 (N.D. Tex. Nov. 4,
   2014) (Kinkeade, J.)..............................................................................................................39

*Marquis Software Sols., Inc. v. Robb*,
   No. 3:20-CV-0372-B, 2020 U.S. Dist. LEXIS 33385 (N.D. Tex. 2020) ..........................29, 30

*Marsh United States, Inc. v. Cook*,
   354 S.W.3d 764 (Tex. 2011)(Willett, J. concurring) .........................................................3, 33

*McGowan & Co. v. Bogan*,
   93 F. Supp. 3d 624 (S.D. Tex. 2015) ....................................................................................35

*Mclaren Macomb*,
   372 NLRB No. 58, slip op. (Feb. 21, 2023)......................................................................20, 21

*Medlin v. Palmer*,
   874 F.2d 1085 (5th Cir. 1989) ..............................................................................................24

*Millennium Rests. Grp., Inc. v. City of Dallas*,
   181 F. Supp. 2d 659 (N.D. Tex. 2001) (Fish, J.) ..................................................................40

*Miss. Power & Light Co. v. United Gas Pipeline*,
   760 F.2d 618 (5th Cir. 1985) ................................................................................................24

*Montgomery v. Browder*,
   930 S.W.2d 772 (Tex. App.—Amarillo 1996), (1997).........................................................37

*Neles–Jamesbury, Inc. v. Bill's Valves,*
    974 F. Supp. 979 (S.D.Tex.1997) ........................................................................38

*Odeneal v. Wofford,*
    668 S.W.2d 819 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) ..................................36

*Peat Marwick Main & Co. v. Haass,*
    818 S.W.2d 381 (Tex.1991).......................................................................25, 32, 33

*Pebble Beach Co. v. Tour 18 I, Ltd.,*
    942 F. Supp. 1513 (S.D. Tex.1996) .....................................................................39

*Pizza Hut LLC v. Pandya,*
    2019 U.S. Dist. LEXIS 230073 (E.D. Tex. Nov. 26, 2019) ..................................37

*Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs,*
    692 F.3d 343 (5th Cir. 2012) ...............................................................................24

*Rain v. Rolls-Royce Corp.,*
    626 F.3d 372, 377-78 (7th Cir. 2010) ..................................................................36

*Reagan v. Guardian Life Ins. Co.,*
    140 Tex. 105 (Tex. 1942) ..............................................................................35, 36

*Rehak Creative Servs. v. Witt,*
    404 S.W.3d 716 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) .................38

*Reno v. Aclu,*
    521 U.S. 844 (1997)..............................................................................27, 30, 31

*Richboro Community Mental Health Council,*
    242 NLRB 1267 (1979) ........................................................................................20

*Sable Commc'ns of Cal. v. FCC,*
    492 U.S. 115 (1989)..............................................................................................27

*Sampson v. Murray,*
    415 U.S. 61 (1974)................................................................................................40

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon,*
    359 U.S. 236 (1959)........................................................................................17, 18

*Simmonds Equip., LLC v. GGR Intern., Inc.,*
    126 F. Supp. 3d 855 (S.D. Tex. 2015) ..................................................................38

*Spear Mktg., Inc. v. BancorpSouth Bank,*
    791 F.3d 586 (5th Cir. 2015) ...............................................................................38

*St. Jude Med. S.C., Inc. v. Janssen-Counotte*,
  2014 U.S. Dist. LEXIS 173835, at *40 (W.D. Tex. 2014)....................................35

*Stacy v. JPMorgan Chase Bank, N.A.*,
  No. 3:19-cv-446-M-BN (N.D. Tex. 2020)..............................................................25

*Stericycle, Inc*.,
  372 NLRB No. 113, slip op. (Aug. 2, 2023).....................................................21, 23

*Stonecoat of Tex., LLC v. Procal Stone Design, LLC*,
  Civil Action No. 4:17CV303, 2019 U.S. Dist. LEXIS 156005 (E.D. Tex.
  2019) ................................................................................................................28, 32

*T-Mobile USA, Inc. v. N.L.R.B.*,
  865 F.3d 265 (5th Cir. 2017) ...............................................................................22

*The Boeing Co.*,
  365 NLRB No. 154 (Dec. 14, 2017) ......................................................................22

*Tory v. Cochran*,
  544 U.S. 734 (2005)...............................................................................................37

*Transperfect Translations, Inc. v. Leslie*,
  594 F. Supp. 2d 742 (S.D. Tex. 2009) ...................................................................24

*Valley Hospital Med. Center, Inc.*,
  351 NLRB 1250 (2007) .....................................................................................19, 20

*Vartech Sys. v. Hayden*,
  951 So. 247. (La. App. 1st Cir. 2006)..................................................................33

*Waisath v. Lack's Stores*,
  474 S.W.2d 444 (Tex. 1971)...................................................................................38

*Wicked Hot Vapors, LLC v. Vaporpro, LLC*,
  2013 U.S. Dist. LEXIS 196251 (E.D. Tex. 2013) .................................................35

*Wright v. Sport Supply Grp., Inc.*,
  137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.) ...................................25, 32

**Statutes**

29 U.S.C. §§ 151-166 (Suppl. 2 1934) (NLRA)..................................................... *passim*

29 U.S.C. § 157 .......................................................................................................... *passim*

29 U.S.C. § 158(a)(1)................................................................................................. *passim*

29 U.S.C. § 160(a) ..............................................................................................................16

TEX. BUS. & COM. CODE §§ 15.01-15.22 (Texas Free Enterprise and Antitrust Act) ...................................................................................................................2, 3

TEX. BUS. & COM. CODE § 15.50 ...............................................................................2, 3, 33

**Rules**

Rule 12(b)(1) .................................................................................................................15

**Regulations**

29 C.F.R. § 101.2 ..........................................................................................................16

29 C.F.R. § 101.4 ..........................................................................................................16

29 C.F.R. § 101.8 .....................................................................................................16, 17

29 C.F.R. §§ 101.10-101.11 ..........................................................................................16

29 C.F.R. § 101.12 ........................................................................................................17

29 C.F.R. § 101.12(a) ....................................................................................................17

29 C.F.R. § 101.12(b) ....................................................................................................17

47 C.F.R. 73.1001 *et seq.* .............................................................................................30

47 C.F.R. 73.3555 ..........................................................................................................30

**Other Authorities**

https://bobsturm.substack.com/; .............................................................................12, 34

https://sports.yahoo.com/report-ex-espn-host-rachel-nichols-to-join-richard-
    sherman-as-undisputed-co-host-alongside-skip-bayless-184253339.html ...............11, 34

https://twitter.com/ATXdiehard/status/1689338973548605441?s=20 (posted Aug.
    9, 2023) ....................................................................................................................10

https://www.dropbox.com/scl/fi/6iprq2hizum1h0e4l46sx/Fwd_-Email-Showing-
    that-Ticjet-Management-is-Aware-of-
    USave.it.pdf?rlkey=ml16e5mt595n5365if1jkhoz1&dl=0 .........................................12

https://www.dropbox.com/scl/fi/6v5ctiq7zugvelhntjvvw/7-20-1-we-part-on-good-
    terms.mp3?rlkey=0315abdyfll5lgapnwjvqscu9&dl=0 ...............................................9

https://www.dropbox.com/scl/fi/98z609mz5n9yscrqsjg99/8-1-1-opinion-of-new-
    lineup.mp3?rlkey=bbri1wtkhrm0vq0u54n9k08qj&dl=0 ...........................................9

https://www.dropbox.com/scl/fi/cd0quwd0tgi7visj1x0yy/7-20-2-keep-listening-
to-the-ticket.mp3?rlkey=4aqkk8v3t2516js23a33cawk0&dl=0 ...................................9

https://www.dropbox.com/scl/fi/ldlmpdx75468ckor8pjwu/7-20-3-all-parties-will-
be-fine.mp3?rlkey=8qm9yzot8d93bxxbjy3oaw5qb&dl=0..........................................9

https://www.dropbox.com/scl/fi/r5sutl6wna6iyjarfrqdg/7-20-0-Dan-and-Jake-
Ticket-goodbye-FULL.mp3?rlkey=xvivlosymu4eo5k9rdfvwmqzu&dl=0 .............................9

https://www.patreon.com/itsjustbanter ....................................................12, 34

https://www.theunticket.com/ ...................................................................12

https://www.twitch.tv/actualgordonkeith.................................................12, 34

https://www.youtube.com/@TheDumbZone ...........................................................7

# I.

# <u>INTRODUCTION</u>

Defendants Jacob Kemp and Daniel McDowell (collectively "Defendants") respond to Plaintiff's Application for Temporary Restraining Order and Request for Preliminary Injunction (ECF No. 8) and Renewed Application for Temporary Restraining Order and Request for Preliminary Injunction (ECF No. 9) (collectively, the "Application") as follows:

This non-compete case boils down to a critical distinction—that between live terrestrial radio (free to the public and fueled by money from advertisers) and subscription-based on-demand internet podcasts (fueled by money from listener subscription payments, not advertisers). Plaintiff is engaged in the former. Defendants are engaged in the latter. Put simply, there is no competition.

Plaintiff's business is the operation of terrestrial radio stations—old media. It was only in the business of terrestrial radio that Plaintiff employed Defendants. Plaintiff has simply realized too late, after ignoring Defendants' requests to invest in new frontiers, that it should have been moving into new media platforms for years now.

For that reason, among others, Defendants' new venture (a non-streaming Patreon podcast with no advertising and requiring user subscription to access with select clips posted to YouTube) does not compete with Plaintiff. The only podcasting efforts by Plaintiff are passive—merely reposting radio segments online. Defendants' conduct has complied and continued to comply with the restrictive covenants of their employment contracts, despite that nearly all such covenants unlawfully restrict Defendants' rights under the National Labor Relations Act. Before this lawsuit Defendants filed retaliation claims that remain pending before the NLRB.

The lawsuit's effort to expand the concept of competing businesses to encompass whole swaths of media in which Plaintiff does not compete is against public policy.

The lawsuit's effort to expand the concept of competing businesses to encompass whole swaths of media in which Plaintiff does not compete is against public policy. As articulated in the Texas Free Enterprise and Antitrust Act,[1] Texas public policy abhors the restraint of trade. It declares "Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful."[2] The Act's paramount purpose "is to maintain and promote economic competition in trade and commerce ... and to provide the benefits of that competition to consumers in the state."[3] The Covenant Not To Compete Act is an exception to this policy, but it is a narrow exception. A covenant not to compete is enforceable if it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the party seeking enforcement. TEX. BUS. & COM. CODE § 15.50. But this exception is just that – an exception to the public policy favoring competition in trade and commerce. Accordingly, non-compete agreements must be narrowly tailored to limit the impact on employee mobility to the greatest extent possible.

The non-compete agreements in this case, or more particularly the Plaintiff's attempted use of them, come nowhere close to fitting within the narrow confines of a valid restraint of trade and employee mobility. Plaintiff does not simply seek to protect a legitimate business interest in the communications medium in which it operates - commercial radio, or its geographic location – Dallas/Fort Worth or in its revenue sources – advertisers and sponsors. Rather, it seeks to thwart competition in nearly all mediums of communication worldwide even though its revenue stream would remain unaffected. The Plaintiff's non-compete clauses and their use as a cudgel of

---

[1] TEX. BUS. & COM. CODE §§ 15.01-15.22.
[2] *Id.* at § 15.05(a).
[3] *Id.* at 15.04.

protectionism are precisely the naked restraint of trade Texas law prohibits. As then Texas Supreme Court Justice Willett observed:

> Under Texas law, we must dutifully enforce noncompetes that impose reasonable limitations that are no more restrictive than necessary in order to advance legitimate business interests. But this duty requires circumspection, lest the "Covenants Not to Compete Act" exception swallow the "Free Enterprise and Antitrust Act" rule. The latter sides with the virtues of economic liberty—the basic right to pursue what you choose, where you choose, and among whom you choose—not the vice of unduly denying skilled people the rewards of their earned success or injuring society by depriving the wider public of someone's talents and enterprise. So while free enterprise recognizes—*demands*, actually—that economic actors will doggedly pursue self-interest, Texas noncompete law recognizes the difference between constructive self-interest and destructive selfishness. Where a naked restraint of trade masquerades as a covenant not to compete, we must strike it down—always.

*Marsh United States, Inc.*, 354 S.W.3d at 787-88 (Willett, J. concurring).

Attempting to expand the concept of competing businesses to encompass wholly different monetization structures simply is the modern-day equivalent of a colonial era land grab. Further, the suit includes claims based on legal theories that failed in past cases filed by Plaintiff, and the timeline reflects a transparent effort to retaliate against Defendants for engaging in protected activities. This is unacceptable under both the NLRA and Texas law.

Plaintiff's complaint contains many inaccurate assertions and misleading characterizations of Defendants' words and actions, all of which is sworn to by Plaintiff's corporate representative "to the best of [his unexplained] knowledge." Aside from the legal arguments, the deficiencies in Plaintiff's purported evidence also prevent it from establishing a likelihood of success on the merits. Defendants are not competing with Plaintiff, have not disparaged Plaintiff, have not solicited Plaintiff's advertisers, and have breached no duties, contractual or otherwise, to Plaintiff.

Even taking the allegations as true for purposes of argument, all of Plaintiff's claims are addressable in monetary damages and, especially because of the nature of the claims and Defendant's business, any injury to Plaintiff is not irreparable.

Additionally, many of Plaintiff's claims are preempted by the National Labor Relations Board's ("NLRB") exclusive and preexisting jurisdiction, making any injunction in this case one that would disserve the public's interest in uniformity of decisions regarding the National Labor Relations Act ("NLRA").

## II.
## OBJECTIONS TO PLAINTIFF'S EVIDENCE

As a threshold matter, Plaintiff's Application is supported by no evidence other than its Original Complaint. The only documentary evidence Plaintiff submitted are the employment agreements. Plaintiff's complaint is verified by Dan Bennett "to the best of [his] knowledge." However, there are two key issues with the verification. First, the complaint contains many mixed statements of law and fact or application of law to fact, using phrases such as "steal," which Mr. Bennett cannot properly verify. Second, neither Mr. Bennet's declaration nor the allegations in the complaint provide any information or explanation as to the basis of Mr. Bennett's knowledge for many allegations. For example, while Mr. Bennett's position may well give him knowledge of Plaintiff's intentions, he provides no explanation of the basis of any purported knowledge as to the intentions of Defendants or third parties, as well as events occurring with none of Plaintiff's personnel present.

The complaint also uses portions of Defendant's podcast as citations for various factual allegations. However, Plaintiff fails to provide the actual audio files. Defendants have provided full copies of the audio with their declarations and believe the inaccuracies of Plaintiff's statements regarding the podcast and its mischaracterizations of the podcast's content is apparent from the audio itself.

## III.
## FACTUAL BACKGROUND

The factual assertions in this response are supported by the sworn declarations of Defendants Daniel McDowell ("Dan") and Jacob Kemp ("Jake"). Exhibit 1, Declaration of Daniel McDowell; Exhibit 2, Declaration of Jacob Kemp. Dan and Jake were on-air personalities in the Dallas/Fort Worth terrestrial radio market, formerly employed at Plaintiff's radio station KTCK 1310 AM/96.7 FM ("The Ticket"). Defendants left The Ticket in when they decided they wanted to do something different and contract negotiations with Plaintiff broke down.

To say that Defendants' decision to leave was a hard one to make would be a gross understatement. Dan devoted 25 years of his career to the station. Jake has only ever worked at The Ticket his entire adult life.

Dan was a show host at the Ticket for nearly 25 years (the vast majority of The Ticket's existence) before his departure on July 14, 2023, mainly in the mid-day time slot (12 p.m. to 3 p.m.). Dan worked at The Ticket from 1999 to June 30, 2023, when he ceased employment by not going to work.

Jake was employed at the Ticket for 14 years in various capacities with last 3 years as show host with Dan before his departure on July 14, 2023. Jake worked for The Ticket on and off since he was a high school student. Before Jake became a show host in 2019, Defendants worked together for many years on the midday shift when Jake worked in non-host roles for Dan's show. Jake ceased employment with The Ticket on June 30, 2023, by not going to work.

Defendants submitted written notices of resignation to Plaintiff on July 17, 2023.

***Protected Activity by Defendants***

In the months before they terminated their employment with Plaintiff, Defendants spent a large amount of time attempting to negotiate new contracts to remain employed by Plaintiff. In

these efforts, Defendants were acting in concert to improve working conditions both for themselves and for other employees of Plaintiff. These efforts included securing Plaintiff's tentative agreement to increase the pay of other employees appearing on Defendants' show "The Hang Zone." In the wake of Defendants' departure, Plaintiff promptly refused to honor these raises.

In fact, throughout their employment with Plaintiff, Defendants sought to act in concert with each other and with other co-workers to improve working conditions for all of them. These efforts were met with unethical, and potentially illegal, tactics by Plaintiff. When on-air personalities sought to line up the termination dates of their employment contracts to provide greater bargaining leverage, Dan Bennett, the affiant verifying Plaintiff's complaint, ordered them to refrain from discussing compensation or contract terms.

A key sticking point in the negotiations was Defendants' desire to embark on other media content creation activities—activities not competing with Plaintiff—in part to help fund higher salaries for the other employees on their show, as well as to provide similar content creation opportunities to other on-air personalities on The Ticket.

Instead of placing a value on these non-competitive content creation opportunities and compensating Defendants for avoiding them, Plaintiff instead espoused the legally untenable position that its non-compete provisions were so expansive as to cover any media business Plaintiff imagined it might one day engage in, regardless of whether it had ever done so. Plaintiff's position also lacked any relationship to the actual language of the restrictive covenants in Defendants' contracts.

In the end, the restrictive covenants demanded by Plaintiff, which went far beyond their prior contracts, simply weren't acceptable. Defendants left to pursue other employment.

***Defendants' Podcast Does Not Compete with Plaintiff***

Plaintiff's claims that Defendants have violated any enforceable, contractual terms of their employment is supported by nothing other than the *ipse dixit* of Plaintiff (supported by a verification that provides no explanation of the basis for the affiant's knowledge of the facts).

Defendants have been publishing a video and audio recorded entertainment program called The Dumb Zone since July 20, 2023, not before they left Plaintiff's employment as alleged in the complaint.[4]

The Dumb Zone's only source of revenue is monthly subscriptions from viewers and listeners. It accepts no advertising.

The Dumb Zone has no live audience. It is simply released as a recorded program on a not very regular schedule that seems to correlate to when editing is finished. Therefore, it cannot take calls from fans, break news, provide a traffic or weather report, or do any of the other temporal activities that live, terrestrial radio does.

The Dumb Zone does not occur at any specific time. It is not published daily or even on five consecutive workdays. There is nothing about The Dumb Zone that prevents or discourages listeners from listening to The Ticket at any time. To the contrary, Ticket listeners choose to listen to The Ticket based on content The Ticket broadcasts. If Plaintiff suggests that its audience has shrunk, it's not difficult to identify the primary reason.

***Defendants Have Not Solicited Plaintiff's Customers***

Defendants have not attempted to sell advertising, have not contacted any of Plaintiff's sponsors or advertisers for advertising, and have refused offers of advertising when contacted by

---

[4] https://www.youtube.com/@TheDumbZone.

third parties. In fact, when contacted by Plaintiff's advertisers, Defendants refused to entertain offers of advertising.

Jake has not attempted to contact any of Plaintiff's advertisers since leaving his employment. Jake's only contact with Plaintiff's employees has been to say goodbye or for other personal reasons as many are also close friends.

Dan has spoken to Plaintiff's advertisers only for personal reasons, such as to coordinate returning a car provided to him by a Ticket advertiser. Dan has not solicited their advertising nor sought to interfere with their relationship with Plaintiff. In fact, on two occasions when contacted by Plaintiff's advertisers he encouraged the advertisers to continue their relationships with Plaintiff.

### Defendants have not Disparaged Plaintiff

While only Jake's contract contains a non-disparagement clause, both Defendants have expressly avoided disparaging Plaintiff.[5]

Defendants have consistently called for listeners to keep listening to The Ticket or even listen more.[6] Defendants were even complimentary of the entertainers who took over their time slot on The Ticket, entertainers who are also their close friends.[7]

Defendants' farewell YouTube broadcast was very respectful of Plaintiff and done with the prior knowledge of Plaintiff's affiant, Dan Bennett.[8]

---

[5] Although Dan's contract contains no non-disparagement clause, he has chosen to take the high road.
[6] Keep listening to The Ticket https://www.dropbox.com/scl/fi/cd0quwd0tgi7visj1x0yy/7-20-2-keep-listening-to-the-ticket.mp3?rlkey=4aqkk8v3t2516js23a33cawk0&dl=0
[7] Defendants' comments on new lineup https://www.dropbox.com/scl/fi/98z609mz5n9yscrqsjg99/8-1-1-opinion-of-new-lineup.mp3?rlkey=bbri1wtkhrm0vq0u54n9k08qj&dl=0
[8]      Farewell      https://www.dropbox.com/scl/fi/r5sutl6wna6iyjarfrqdg/7-20-0-Dan-and-Jake-Ticket-goodbye-FULL.mp3?rlkey=xvivlosymu4eo5k9rdfvwmqzu&dl=0

Defendants have uniformly described the end of their contract negotiations with Plaintiff in business terms not designed to harm Plaintiff in any way.[9]

***Plaintiff Owns None of the Property Alleged***

Plaintiff, in sworn pleadings, alleges that it owns 1) the name "The Dumb Zone," 2) The Dumb Zone logo, 3) thedumbzone.com website, 4) The Dumb Zone social media accounts, and 5) all content The Dumb Zone has published. *See* Pl.'s Compl. at 13-16, 20; Pl.'s Application at 21-22. These allegations are inaccurate.

### *"The Dumb Zone" Name*

The name "The Dumb Zone" originated from a humorous play on the name of Defendants' former show called The Hang Zone. It was used by on-air personalities to preface a question or statement that might make the speaker sound dumb. It was not a segment of the show. It was never owned, promoted, or otherwise used by Plaintiff. It is not protected by trademark.

### *The Logo*

Plaintiff alleges it owns The Dumb Zone logo because it is a modification of The Hang Zone logo. But Plaintiff never owned the Hang Zone logo.

First, the Hang Zone logo was created by a listener to that show who created the logo by using the movie poster image from the art house cinema feature "House Party" starring Christopher "Kid" Reid and Christopher "Play" Martin of the hip hop group Kid 'n' Play. Kid has made many appearances on The Hang Zone and its predecessor show and performed voice acting for The Hang Zone.

---

[9] All parties will be good https://www.dropbox.com/scl/fi/ldlmpdx75468ckor8pjwu/7-20-3-all-parties-will-be-fine.mp3?rlkey=8qm9yzot8d93bxxbjy3oaw5qb&dl=0 and we part on good terms https://www.dropbox.com/scl/fi/6v5ctiq7zugvelhntjvvw/7-20-1-we-part-on-good-terms.mp3?rlkey=0315abdyfll5lgapnwjvqscu9&dl=0

Second, the Dumb Zone logo was not created by Jake or Dan.  It was created by a different listener than the one who created The Hang Zone logo.

Below is a side-by-side comparison of the "House Party" movie poster, The Hang Zone logo, and The Dumb Zone logo:

| House Party | The Hang Zone (created by listener #1 logo) | The Dumb Zone (created by listener #2) |
|---|---|---|
|  | | |

Plaintiff never owned, promoted, or otherwise used either of these logos. The logos are humorous fan art utilizing a mark owned by LeBron James's SpringHill Company. Mr. James has not objected to Defendants' use of the logo.

***The Website***

Plaintiff claims to own the website thehangzone.com. However, over the years Dan was forced to buy multiple website URLs and pay for the hosting fees for the websites and the promotional material he published for Plaintiff's benefit because Plaintiff would not.

Over many years, Dan and his previous broadcast partner Bob Sturm paid not only for the websites and their operation, they paid from their own funds to hire a contractor for the editing, production, and publishing of "The BaD Radio Weekly Wrap-up Podcast" and "The Hang Zone Weekly Wrap-up Podcast," which were expensive exercises to benefit Plaintiff's business despite Plaintiff's refusal to make any efforts of its own to enter such markets. Jake later did the same with

The Hang Zone. Plaintiff repeatedly refused to contribute to these promotional exercises, which Defendants were under no obligation to perform and were not considered part of their job duties.

Plaintiff *could* have owned thehangzone.com but chose not to.[10]

### Plaintiff's History of Treating Restrictive Covenants as Limited to Terrestrial Radio

Plaintiff's employees with restrictive covenants have gone on to television and been allowed to do so (for good or ill).[11]

Other hosts from The Ticket with presumably identical restrictive covenants are, today, making identical content to Defendants with Plaintiff's apparent consent.[12]

Jake is also the co-host of one of the oldest podcasts on the internet. Jake has monetized this podcast for many years with express notice to Plaintiff. The content of that podcast frequently has overlapped with his on-air work for Plaintiff without complaint from Plaintiff.[13]

Plaintiff has never enforced its rights to prevent republication of its content on the internet. The popular website The Unticket has republished the terrestrial radio content on the internet for many years.[14] Further, other Ticket listeners have been allowed to republish content on usaveit.com.[15] Both of these sites profit from the republication.

### Social Media Accounts and Channels

Plaintiff claims to own multiple social media accounts that belong to Defendants.

---

[10] Plaintiff's behavior is consistent with its reputation for asking prospective salespeople to provide their own laptops to be considered for employment.

[11] *See, e.g.,* https://sports.yahoo.com/report-ex-espn-host-rachel-nichols-to-join-richard-sherman-as-undisputed-co-host-alongside-skip-bayless-184253339.html.

[12] Bob Sturm's substack https://bobsturm.substack.com/; Gordon Keith's Twitch https://www.twitch.tv/actualgordonkeith

[13] https://www.patreon.com/itsjustbanter

[14] https://www.theunticket.com/

[15] https://www.dropbox.com/scl/fi/6iprq2hizum1h0e4l46sx/Fwd_-Email-Showing-that-Ticjet-Management-is-Aware-of-USave.it.pdf?rlkey=ml16e5mt595n5365if1jkhoz1&dl=0

Regarding X (formerly Twitter), the X account now named "@thedumbzone" is a personal account solely owned by Dan that Dan created in March of 2011. Dan used his X account to discuss personal topics and share humorous videos unrelated to Plaintiff, as well as to promote his work for Plaintiff. Dan was never obligated to promote Plaintiff's business on his personal X account as part of his job duties. *See* ECF No. 1-1, ¶ 2.4.[16] Plaintiff never used, had access to Dan's personal X account, and does not have the password for the account. Plaintiff never owned, acquired, or attempted to acquire the X account from Dan.

Instead, Plaintiff operates its own X account, currently named "@dfwticket," which has seven times as many followers as Dan's personal X account. Plaintiff actively uses its own X account and requires its employees to post promotional material for the radio station on that account.

Regarding Facebook, Dan created a Facebook account years ago for personal use, which sometimes included promoting The Ticket. Plaintiff never promoted or otherwise used this account. Plaintiff never had access to this account. Dan rarely used his account on Facebook, and it has few followers.

However, a search of Facebook shows The Ticket's own account still active and presumably operated by Plaintiff (Defendants are not operating Plaintiff's account):



Thus, Defendants did not convert Plaintiff's Facebook account.

---

[16] Jake's contract is identical in this provision.

Dan was never under any obligation to promote Plaintiff's business on his personal X account. Instead, Plaintiff placed this in his employment contract:

> **2.4     Social Media Platforms.** During the Employment Period, the Employee, as directed by the Company, shall use and operate the designated Company owned social media platforms in furtherance of the Job Duties hereunder for the sole and exclusive benefit of the Company.  In all cases Employee shall not use broadcast tools or content, or the Station's promotional tools, including but not limited to, Company owned and controlled social media platforms to promote and further the Employee's separate and independent controlled social media platforms, unless approved in writing by the Company.

[17]

Plaintiff never provided a "Company owned social media platform" to Dan or Jake. Defendants are unaware of any social media platforms owned by Plaintiff.

As for social media channels, Dan personally owns a YouTube channel that is currently named "The Dumb Zone." Plaintiff never used or had access to Dan's personal YouTube channel and does not have the password for the account. Plaintiff never owned, acquired, or attempted to acquire the YouTube channel from Dan.

Defendants are unaware of Plaintiff owning or operating any YouTube channel. A basic search of that platform using search terms "1310 The Ticket," "The Ticket," and "Ticket Radio" found no such channel.

Despite Dan's social media accounts being active for years, Plaintiff never claimed to own the accounts until this lawsuit.

## IV.
## SUMMARY OF ARGUMENT

Denial of Plaintiff's application is warranted because (1) the Court currently lacks subject-matter jurisdiction over the non-compete and non-disparagement claims as a result of NLRB

---

[17] Jake's contract is identical in this provision.

preemption, and (2) Plaintiff fails to establish any of the four requirements for injunctive relief as to the customer non-solicitation and conversion claims over which it has subject-matter jurisdiction.

First, the evidence negates rather than supports Plaintiff's claims based on alleged obligations under the Employment Agreement. The evidence establishes that the restrictive covenants are unenforceable under the Texas Non-Compete Statue. Plaintiff failed to show that any of its information constitutes truly confidential information or a trade secret sufficient to constitute consideration for a non-compete covenant. Further, the covenants are overbroad in geography and scope. Aside from enforceability, there is also no evidence of any prohibited competition or solicitation because Defendants' podcast is based on a wholly different monetization structure—it does not accept money from advertisements, only direct subscriptions by listeners who make the conscious decision that they want to hear what Defendants have to say. Similarly, nothing Defendants have done discourages advertising on The Ticket or listening to The Ticket. Notably, Plaintiff does not even operate on Patreon or YouTube.

Second, because Defendants do not accept advertisements, the allegedly threatened injury that would result from a violation of Defendants' allegedly unlawful conduct is an injury that can be easily calculated and addressed through an award of legal damages.

Third, the balancing of potential harms favors Defendants because the injunction would mean they cannot make a living if the requested relief is granted. If injunctive relief is granted, *Defendants* will suffer irreparable harm; whereas, if injunctive relief is denied, *Plaintiff will not* suffer irreparable harm.

Fourth, public policy favors free competition, and respecting the NLRB's exclusive jurisdiction over *any* activity implicating Sections 7 or 8 of the National Labor Relations Act.

Thus, Plaintiff's Application should be denied because it cannot carry its burden to demonstrate that it is entitled to a preliminary injunction.

## V.
## ARGUMENT AND AUTHORITIES

The Court should deny Plaintiff's Application because Plaintiff cannot show (1) a substantial likelihood of success on its claims, (2) imminent and irreparable harm and lack of an adequate remedy at law, (3) that the balancing of potential harms favors an injunction, and (4) that the injunctive relief sought would not disserve the public interest.

**A.    This Court currently lacks subject-matter jurisdiction over the non-compete and non-disparagement claims due to *Garmon* preemption and the NLRB's exclusive jurisdiction.**

The NLRB's exclusive subject-matter jurisdiction over the contract provisions implicating coercive rules issues preempts the Court from granting injunctive relief while Defendants' NLRB complaints are pending.

Defendants' briefing and argument on NRLB preemption included here will also be urged as a formal Rule 12(b)(1) motion along with Defendants' other 12(b) pleadings. Such case law argument is presented here in the context of Plaintiff's Application to demonstrate that issuing even temporary injunctive relief here would be improper.

### 1.    Unfair Labor Practices Generally

NLRA Section 7 provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The NLRA protects these Section 7 rights by making it an "unfair labor practice for an employer to interfere with, restrain, or coerce employees

in the exercise of the rights guaranteed in section [7]" and empowering the NLRB "to prevent any person from engaging in any unfair labor practice." 29 U.S.C. § 158(a)(1); 29 U.S.C. § 160(a).

The NLRB's process for preventing unfair labor practices begins when an individual files a charge alleging that an unfair labor practice has occurred "with the Regional Director for the Region in which the alleged violations have occurred or are occurring." 29 C.F.R. § 101.2. Once the charge is filed, the charging party promptly provides evidence in support of the charge and a member of the Region's field staff is assigned to investigate the charge. 29 C.F.R. § 101.4.

If, after investigation, the Regional Director determines that the charge has merit, the Regional Director typically "institutes formal action by issuance of a complaint and notice of hearing." 29 C.F.R. § 101.8. However, if the case involves "novel and complex issues," the Regional Director "must submit the case for advice from the General Counsel before issuing a complaint." *Id*. After a complaint is issued, an administrative law judge ("ALJ") holds a hearing where it listens to evidence and testimony relevant to the complaint and then subsequently issues a decision and recommended order in the case. 29 C.F.R. §§ 101.10-101.11.

The parties may file "exceptions" to the ALJ's decision and recommended order to the Board. 29 C.F.R. § 101.12. If a party files exceptions, then the Board hears those exceptions prior to issuing its own decision and order in the case. 29 C.F.R. § 101.12(a). If a party does not file exceptions, then the ALJ's decision and recommended order "automatically become the decision and order of the Board." 29 C.F.R. § 101.12(b).

Periodically, the General Counsel of the NLRB publishes memorandums outlining certain types of unfair labor practice charges that Regional Directors must submit to the General Counsel for advice pursuant to the process outlined in 29 C.F.R. § 101.8. *See, e.g.*, Subject: Mandatory Submissions to Advice, Memorandum GC 21-04, 2021 WL 3662454 (Aug. 12, 2021); Subject:

Electronic Monitoring and Algorithmic Management of Employees Interfering with the Exercise of Section 7 Rights, Memorandum GC 23-02, 2022 WL 16646853 (Oct. 31, 2022). These memorandums indicate areas of Board law that the General Counsel wants to modify or develop by processing a relevant case through the Board process described above. In some cases, the General Counsel's memorandums even outline the precise legal position that the General Counsel intends to take on the kinds of cases that the General Counsel is requiring Regional Directors to submit for advice. *See, e.g.,* Subject: Non-Compete Agreements That Violate the National Labor Relations Act, Memorandum GC 23-08, 2023 WL 3750775 (May 30, 2023).

### 2.   *Garmon* **Preemption Generally**

After the NLRA was enacted, the NLRB's sweeping power to prevent unfair labor practices "inevitably gave rise to difficult problems of federal-state relations." *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 239 (1959). All kinds of state regulation came into conflict with the Board's application of the NLRA, often in idiosyncratic and unanticipated ways, generating frequent litigation about how to resolve these conflicts. *Id*. at 240-241.

The Supreme Court resolved this problem in *Garmon* by declaring that "[w]hen an activity is arguably subject to [Section] 7 or [Section] 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [NLRB]." *Id*. at 245. To establish that *Garmon* preemption applies, "a party asserting pre-emption must advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board" and must then "put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation." *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 143 S. Ct. 1404, 1411 (2023) (quoting *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 395 (1986)).

"If the court determines that the party has met its burden to show that 'there is an arguable case for pre-emption,' it generally must grant the party's preemption defense and await the Board's resolution of the legal status of the relevant conduct. After that, 'only if the Board decides that the conduct is not protected or prohibited [by the NLRA] may the court entertain the litigation.'" *Ibid*. (quoting *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 at 397 (1986)) (internal citations omitted).

### 3.  The non-compete provisions are subject to *Garmon* preemption.

The NLRB's General Counsel declared in Memorandum GC 23-08, titled "Non-Compete Agreements that Violate the National Labor Relations Act," that, in her view, "carrying out concerted threats to resign or otherwise concertedly resigning to secure improved working conditions," "concertedly seeking or accepting employment with a local competitor to obtain better working conditions," and "soliciting [one's] co-workers to go work for a local competitor as part of a broader course of protected concerted activity" are "protected under Section 7 of the Act." 2023 WL 3750775 at *2.

The General Counsel also declared that, in her view, "the proffer, maintenance, and enforcement of a non-compete provision that reasonably tends to chill employees from engaging in Section 7 activity as described above violate Section 8(a)(1) unless the provision is narrowly tailored to special circumstances justifying the infringement on employee rights. In this regard, a desire to avoid competition from a former employee is not a legitimate business interest that could support a special circumstances defense." *Id*. at *2. The memorandum concludes by directing the NLRB "Regions [to] submit to Advice cases involving non-compete provisions that are arguably unlawful under the analysis summarized herein."

This memorandum makes it clear that Defendants' concerted resignation, concerted pursuit of employment through a podcast, and soliciting of one another to work for that podcast are

arguably protected activity under NLRA Section 7 and that Plaintiff's maintenance and enforcement of the non-compete provision and non-solicitation provision is arguably a violation of NLRA Section 8(a)(1). That the NLRB's General Counsel stated this in a guidance memorandum also indicates the NLRB will likely issue a complaint in the unfair labor practice charges that the Defendants filed with the NLRB and that the Board reasonably could uphold a claim based on this interpretation. Accordingly, *Garmon* preemption applies, and the Plaintiffs claims based on these provisions should be dismissed.

### 4.      The non-disparagement provision is subject to *Garmon* preemption.

NRLA Section 7 "protects employee communications to the public that are part of and related to an ongoing labor dispute." *Valley Hospital Med. Center, Inc.*, 351 NLRB 1250, 1252 (2007) (citing *Allied Aviation Svc. Co. of New Jersey, Inc.*, 248 NLRB 229, 231 (1980)). These rights "are not limited to discussions with coworkers, as they do not depend on the existence of an employment relationship between the employee and the employer, and the Board has repeatedly affirmed that such rights extend to former employees." *Mclaren Macomb*, 372 NLRB No. 58, slip op. at 7 (Feb. 21, 2023). These rights "extend to employee efforts to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship," including through "newspapers, the media, social media, and communications to the public." *Id*.

"Employee critique of employer policy pursuant to the clear right under the Act to publicize labor disputes is subject only to the requirement that employees' communications not be so "disloyal, reckless or maliciously untrue as to lose the Act's protection." *Id*. at 9 (quoting *Emarco, Inc.*, 284 NLRB 832, 833 (1987)).

Communication "that is otherwise proper does not lose its protected status simply because [it is] prejudicial to the employer." *Hacienda De Salud-Espanola*, 317 NLRB 962, 966 (1995)

(quoting *NLRB v. Circle Bindery*, 536 F.2d 447, 452 (1st Cir. 1976)). Communications are considered disloyal enough to lose protection when they are made with a "malicious motive" and constitute "a sharp, public, disparaging attack upon the quality of the company's product and its business policies." *Richboro Community Mental Health Council*, 242 NLRB 1267, 1268 (1979); *Valley Hospital Medical Center, Inc.*, 351 NLRB at 1252 (citing *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464, 472 (1953)).

"The mere fact that statements are false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue." *Valley Hospital Medical Center, Inc.*, 351 NLRB at 1252. Communications are considered maliciously untrue "if they are made with knowledge of their falsity or with reckless disregard for their truth or falsity." *Id.* at 1253.

Based on this well-settled Board law, Defendants' communications to the public through The Dumb Zone podcast about their labor dispute with Plaintiff are arguably protected activity under NRLA Section 7. Thus, Plaintiff's effort to enjoin these communications should be dismissed under *Garmon* preemption.

Additionally, maintaining and enforcing work rules and contractual provisions that have a "reasonable tendency to chill employees from exercising their Section 7 rights" presumptively violates NLRA Section 8(a)(1). *Stericycle, Inc.*, 372 NLRB No. 113, slip op. at 2. (Aug. 2, 2023). This presumption may be rebutted by "proving that the rule advances a legitimate and substantial business interest and that the employer is unable to advance that interest with a more narrowly tailored rule." *Id*. An overbroad non-disparagement clause that, by its terms, would prevent employees from exercising their Section 7 rights by speaking out publicly about their workplace violates NLRA Section 8(a)(1). *Mclaren Macomb*, 372 NLRB No. 58, slip op. 8 (Feb. 21, 2023)

(employer's "nondisparagement and confidentiality provisions interfere with, restrain, or coerce employees' exercise of Section 7 rights" and thereby "violated Section 8(a)(1) of the Act.").

Defendants have already filed unfair labor practice charges alleging that the maintenance and enforcement of the non-disparagement provision at issue in this case violates Section 8(a)(1) of the NLRA. These authorities make clear that the contractual provisions here at least arguably violate NLRA Section 8(a)(1) and the Board could reasonably uphold a claim based on that interpretation. Accordingly, *Garmon* preemption applies, and Plaintiff's claims based on these provisions should be dismissed.

### 5.    Fifth Circuit precedent mandates that this Court respect the Board's exclusive jurisdiction while Defendants' claims are pending.

The Fifth Circuit has historically followed NRLB precedent on questions related to the issue of coercive rules and this Court should follow suit. Because the Board is actively considering Defendants' charges, this Court should dismiss Plaintiff's claims implicated by the NRLB charges.

Between 2004 and 2017, the NLRB analyzed whether contractual provisions and handbook rules violate Section 8(a)(1) using the test established by *Lutheran Heritage Village–Livonia*, 343 NLRB 646, 647 (2004). During that time, the Fifth Circuit decided four NLRB cases concerning coercive rules and, in all four cases, simply applied the *Lutheran Heritage* test. *N.L.R.B. v. Arkema, Inc.*, 710 F.3d 308, 317 (5th Cir. 2013); *Flex Frac Logistics, L.L.C. v. N.L.R.B.*, 746 F.3d 205, 208 (5th Cir. 2014); *T-Mobile USA, Inc. v. N.L.R.B.*, 865 F.3d 265, 270 (5th Cir. 2017); *LogistiCare Sols., Inc. v. N.L.R.B*, 866 F.3d 715, 719 (5th Cir. 2017).

At the end of 2017, the NLRB overturned *Lutheran Heritage* and began analyzing coercive rules using a test established by *The Boeing Co.*, 365 NLRB No. 154 (Dec. 14, 2017). After the NLRB changed its test, the Fifth Circuit acknowledged the overruling and remanded a case back to the NLRB that had been decided using the then-overruled *Lutheran Heritage* test. *Dish Network,*

*L.L.C. v. NLRB*, 731 F. App'x 368, 369 (5th Cir. 2018). Thereafter, the Fifth Circuit decided one case where the underlying ruling was based on the *Boeing* test and, in that case, the Fifth Circuit simply analyzed the appeal under the new *Boeing* test. *Lowes Home Centers, L.L.C. v. N.L.R.B.*, 850 F. App'x 886, 889 (5th Cir. 2021).

The line of Fifth Circuit case law reflects that, with respect to coercive rules cases, courts in this circuit are to follow the most-current NRLB precedent. Between November 19, 2004 and December 14, 2017, that was *Lutheran Heritage*. Between December 14, 2017 and August 2, 2023, that was *Boeing*. Between August 2, 2023 and present, it is *Stericycle Inc.*, 372 NLRB No. 113 (Aug. 2, 2023). Thus, the *Stericycle* test is applicable to this case.

The current *Stericycle* test is essentially the same as the old *Lutheran Heritage* test. While the Fifth Circuit has not yet heard an appeal of an NLRB case decided under *Stericycle*, the Fifth Circuit's consistent approach to analyzing coercive rules has been to follow the NRLB law, which is now *Stericycle*. Also, insofar as *Stericycle* is essentially a return to *Lutheran Heritage*, there is no reason the Fifth Circuit should find it objectionable as the Fifth Circuit faithfully applied *Lutheran Heritage* for the thirteen years it was the controlling NRLB case.

Further, Plaintiff's threat to enforce and attempt to enforce its rules to restrict Section 7 activity is a violation of Section 8(a)(1), even under the stricter and now-overruled *Boeing* test. While under *Boeing*, the *maintenance* of such rules was not a violation, under the current *Stericycle* precedent, the mere maintenance, as well as the threat or attempt to enforce such rules violates Section 8(a)(1).

Here, Defendants have filed claims with the Board and have responded to the Board's requests for information. The Board has been made aware of this suit and the emergency relief Plaintiff seeks (both of which support amended NLRA claims for retaliation). Because this circuit

strictly adheres to NLRB precedent in coercive rules cases, this Court must refrain from taking action, including the issuance of temporary injunctive relief, on any of Plaintiff's claims based on the coercive rules provisions of the employment agreement until the Board's process is concluded. The only appropriate action by a district court in this situation is to dismiss the claims without prejudice to refiling in the even the Board denies the claims.

In sum, because Defendants have filed charges based on their protected activity and Plaintiff's prohibited maintenance of, threat to enforce, and attempt to enforce non-competes, the Court should dismiss the non-compete action until the Board has ruled on Defendants' charge. While the Board does not have exclusive jurisdiction over Plaintiff's breach of contract claim, it has exclusive jurisdiction over Defendants' coercive rules claims and, per *Garmon*, Defendants' coercive rules claims must be processed first.

**B.     Standard for Injunctive Relief**

A temporary restraining order and preliminary injunction are forms of extraordinary relief. A court may grant such relief only when the movant establishes that: (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat of immediate and irreparable harm for which the movant has no adequate remedy at law; (3) greater injury will result from denying the temporary restraining order or preliminary injunction than from its being granted; and (4) the granting of a temporary restraining order or preliminary injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir.1987); *Gonannies, Inc. v. Goupair.com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006).

The movant bears the burden of persuasion on all four requirements and must make "a clear showing" of these elements before the court can grant a temporary restraining order or preliminary injunction. *See Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012); *see also Transperfect Translations, Inc. v. Leslie,* 594 F. Supp. 2d

742, 748 (S.D. Tex. 2009) ("A preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion.") (internal quotations omitted) (citing *Lake Charles Diesel, Inc. v. Gen. Motors Corp.,* 328 F.3d 192, 196 (5th Cir. 2003)); *Medlin v. Palmer,* 874 F.2d 1085, 1091 (5th Cir. 1989); *Clark,* 812 F.2d at 993; *Miss. Power & Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985).

A party requesting a temporary restraining order must show reasonable diligence in presenting his or her request. *Stacy v. JPMorgan Chase Bank, N.A.*, No. 3:19-cv-446-M-BN, (N.D. Tex. 2020) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018)).

## C.    Plaintiff cannot show a substantial likelihood of success on the merits.

Beyond the fact that all Plaintiff's noncompete claims are preempted and subject to the NRLB's exclusive jurisdiction, Plaintiff cannot demonstrate a likelihood of success on the merits of such claims because Defendants simply have not violated any enforceable provision of a valid contract. Plaintiff also cannot demonstrate a likelihood of success on the merits on its conversion claims because Plaintiff lacks a valid interest, and Defendants have not converted any convertible property. Defendants have not diverted any business from Plaintiff. Further, Plaintiff's sworn factual allegations are comprehensively debunked by Defendants' sworn statements and evidence.

For these reasons, Plaintiff has failed to establish a substantial likelihood of success on the merits for the claims made the basis of its Application.

### 1.    Plaintiff cannot establish a substantial likelihood of success on its non-compete claims.

In Texas, a covenant not to compete is unreasonable unless it bears some relation to the activities of the employee. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386-87 (Tex.1991)). "A covenant not to compete that contains an industry-wide exclusion from

subsequent employment is unenforceable." *See id.* (citing *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied)); *see also Haass*, 818 S.W.2d at 386-88. Where a noncompete agreement does not apply to the employee's post-employment activities, a breach of contract cannot occur. *Burke v. Cumulus Media, Inc.*, No. 16-cv-11220, 2016 U.S. Dist. LEXIS 91880, at *29 (E.D. Mich. 2016).

> **a.     Dan's noncompete does not apply to Defendants' podcast because it does not involve the same "Job Duties" and is not a "Competing Business" under the agreement.**

The noncompete agreement at issue states as follows:

> **AGREEMENT NOT TO COMPETE.** While employed by the Company, and for six (6) months following termination of such employment, Employee shall not, directly or indirectly, engage in any activities the same or essentially the same as Employee's Job Duties for any Competing Business located or selling advertising within, or broadcasting to, the Business Area.

ECF No. 1-1, ¶ 7.

For the noncompete agreement to apply, Defendants must (1) engage in the same or essentially the same "Job Duties" they performed for Plaintiff (2) for a "Competing Business" located or selling advertising within, or broadcasting to, the Business Area.

> **i.      Recording a podcast is not engaging in the same "Job Duties" Defendants performed for Plaintiff.**

Under the terms of the employment agreement, Dan's "Job Duties" was as an "On-Air Personality for the Company's radio station KTCK-AM (the "Station")…"[18] This involved primarily "performing all duties and technical operations required of on-air personalities at the Station and/or by the Federal Communications Commission ("FCC") regulations."[19]

---

[18] ECF No. 1-1, ¶ 1.5.
[19] *Id.*

The defining nature of Defendants' "Job Duties" for Plaintiff was "On-Air" personalities. The term "On-Air" in this context is denoted with capital letters as if it is a defined term or term of art. It is not defined in the contract. But it is a term or art and is an important limitation here. "On-Air" is synonymous with "over-the-air" as opposed to other forms of communication transmissions such as cable or internet transmissions. "Over-the-air" transmissions are just that – transmissions from a communications tower broadcasting to consumers through the air waves. Further, the Defendants' "Job Duties" are described with reference to requirements imposed by the Federal Communications Commission which only regulate "over-the-air" communications, not internet communications such as podcasts. *See Reno v. Aclu*, 521 U.S. 844, 884 (1997) (Distinguishing "broadcast media" from the internet and holding the Federal Government cannot regulate speech on the internet as it can in broadcast media). These aspects of Dan's job with Plaintiff make it clear that his job duties with Plaintiff were traditional, terrestrial radio show hosts – on-air personalities who are FCC regulated.

In *Reno v. ACLU*, the United States Supreme Court struck down as unconstitutional the portion of the Communications Decency Act which sought to regulate speech on the internet. In doing so, the Court went to great lengths to distinguish traditional broadcast media from the internet. It noted the "special factors" which exist in broadcast media that do not exist in "cyberspace:" 1) a history of governmental regulation, 2) a scarcity of frequencies, and 3) an "invasive" nature that allows transmissions to appear unbidden. *Id* at 868. Because of the differences between broadcast media and the internet, the *Reno* court held that a blanket speech regulation which applies to both mediums is overly broad, not narrowly tailored, and constitutes "burning the house to roast the pig." *Id*. at 882; *see also Sable Commc'ns of Cal. v. FCC*, 492 U.S.

115, 127 (1989) (holding private commercial telephone communications at issue were substantially different from a public radio broadcast).

The recording and transmission of a podcast does not constitute engaging in "activities the same or essentially the same as Employee's Job Duties…" because the podcast is not "On-Air." It is transmitted through a completely different medium - the internet. Unlike his job duties with Plaintiff, Dan's podcasting activities are not regulated by the FCC. Thus, the product Dan is creating through podcasting is qualitatively different than the radio show he produced for Plaintiff. Plaintiff's attempt to encompass the business of podcasting within the ambit of "radio station" operations is just as over broad as the blanket speech regulations at issue in *Reno*.

Because the performance of the same job duties is a necessary element Plaintiff must prove for the noncompete agreement contained in Dan's employment agreement to apply, Plaintiff's failure to prove this element renders the noncompete agreement inapplicable. Accordingly, Plaintiff cannot establish a likelihood of success on its breach of contract, and the Application should be denied.

### ii.     Dan's podcast enterprise does not meet the definition of a "Competing Business" which renders the noncompete agreement inapplicable.

The noncompete agreement in Dan's contract does not apply unless Plaintiff can prove that the Defendants' podcast enterprise is a "Competing Business" located or selling advertising within, or broadcasting to, the Business Area. A "Competing Business is defined in the contract as follows: "Competing Business" means any person (including Employee) or entity carrying on a business that is the same or essentially the same as the Company Business. In turn, "Company Business" means the operation, promotion, and marketing of commercial radio stations. Thus, for the non-compete agreement to be applicable, the Defendants' podcast activity

must be "the same or essentially the same as…" "the operation, promotion, and marketing of commercial radio stations."

First, the use of the phrase "the same or essentially the same" to describe a competing business is both ambiguous and overly broad. *Stonecoat of Tex., LLC v. Procal Stone Design, LLC*, Civil Action No. 4:17CV303, 2019 U.S. Dist. LEXIS 156005, at *254 (E.D. Tex. 2019)(holding non-compete prohibiting employee from activities "similar" to ex-employer was unreasonably broad because it was not related to the activities of the employee, and did not define the type of work in which the employee could not engage.); *Marquis Software Sols., Inc. v. Robb*, No. 3:20-CV-0372-B, 2020 U.S. Dist. LEXIS 33385, at *17 (N.D. Tex. 2020).

But more importantly, there can be no question that the recording and transmission of a podcast behind a paywall with no advertisers or sponsors is not the same or essentially the same as "the operation, promotion, and marketing of commercial radio stations." Under any definition, a podcast is not a radio station and the operation of one is not the same as the operation of the other.

In a well-reasoned, non-published case from an Ohio state court, the court held under almost identical circumstances and identical contract provisions that a non-compete agreement did not prohibit radio hosts from operating a podcast business. *Deluca v. D.A. Peterson, Inc.,* Court of Common Pleas, Stark County, Ohio. (attached as Exhibit 3). The substantively identical non-compete agreement at issue in *Deluca* provided:

> 7.   AGREEMENT NOT TO COMPETE.  While employed by the Company, and for one year after termination of such employment, Employee shall not directly or indirectly, within the Business Area, engage in any activities **the same as Employee's Job Duties for any Competing Business.** (Emphasis added.)

Furthermore, the definitions of "Competing Business" and "Company Business" in *Deluca* were nearly identical to the definitions of those terms in this case:

> The term "Competing Business" is defined in Paragraph 1.3 of the Employment Agreement as follows:
>
> 1.3    "Competing Business" means "any person (including Employee) or entity carrying on a business that is the same or **essentially the same as the Company Business**. (Emphasis added.)
>
> The term "Company's Business" is defined in Paragraph 1.1 of the Employment Agreement as follows:
>
> 1.1    The "Company's Business" means "the operation, promotion, and marketing of **commercial radio stations**, print and direct mail operations, and bulk mail facilities. (Emphasis added.)

The court in *Deluca* framed the issue as "whether the internet webcasting of the Deluca show is the same or similar as a commercial radio station." *Id*. at pg. 7. The court held that an internet webcast is not the same as an FCC regulated radio station and thus, the non-compete agreement did not prohibit the radio hosts from operating a podcast. *Id.* at pg. 7-8.

Just as in *Deluca*, Dan's podcasting content is not a "Competing Business" as it is not the same or essentially the same as a commercial radio station. A commercial radio station is an entity that transmits communications on an AM or FM frequency. 47 CFR 73.3555. A commercial radio station is heavily regulated by the FCC including requirements for broadcast content and formatting. *See* 47 CFR 73.1001 *et seq.* Commercial radio stations derive their income from advertisers and sponsors. Dan and Jake's podcast derives income from subscribers and accepts no advertisers or sponsors. And as a podcast that exists behind a paywall, it in no way competes with a public radio station accessible for free with the simple step of turning a radio dial. *See Reno*, 521

U.S. at 854 ("Unlike communications received by radio or television, 'the receipt of information on the Internet requires a series of affirmative steps more deliberate and directed than merely turning a dial.'). Simply stated, Dan's non-compete agreement does not prohibit him from operating a paywall protected podcast.

Another basis on which the *Deluca* court determined that the radio station non-compete did not apply to a podcast business is that the non-compete applied only to a "Business Area" of 60 miles like the 50-mile area specified in Dan's contract. The court reasoned that this 60-mile radius limitation is impossible because the internet is available worldwide. *Id.* at pg. 8. This is further evidence that the parties contemplated that the non-compete applies only to a communication medium with a broadcast range of a 50-mile radius, not an internet communication medium with world-wide range. For this additional reason, Plaintiff cannot satisfy its burden of establishing the applicability of the non-compete agreement to the Defendants' podcast. Accordingly, Plaintiff cannot establish a likelihood of success on the merits of its breach of contract claim, and no injunctive relief is appropriate.

Finally, while Plaintiff takes the position that the operation of a podcast somehow competes with the operation of a radio station and is subject to the non-compete agreement, other portions of the contract belie this argument. Paragraph 2.3 of the contract provides:

> **2.3** Sole Employment. ***During the Employment Period***, Employee shall devote Employee's full business time, energy, ability, attention and skill to Employee's employment hereunder. Employee agrees that, during the Employment Period, Employee will not provide services as an employee, consultant, independent contractor or otherwise to any individual or entity, or otherwise conduct business on Employee's own behalf, without the written consent of the Company, not to be unreasonably withheld.
>
> Employee acknowledges that the Company operates a website on which it streams the broadcasts of the Station as well as video and other Station-related content, and Employee is not entitled to any additional compensation as a result. Employee agrees not to own, operate, or maintain, either directly or indirectly, any website, social media platform, which may include, but is not limited to a narrative or video

based blog, feed, podcast or any type of on-demand or live streaming platform currently in existence or which may come into existence ***during the Employment Period***, except as expressly approved in writing by the Company.

(ECF No. 1-1, ¶ 2.3) (emphases added).

This provision of the contract deals specifically with the operation of a podcast and only prohibits employees from operating a separate podcast during the Employment Period. This provision of the contract expressly does not survive after the termination of employment (*See* ECF No. 1-1, ¶ 22). This evidences the parties' understanding that the operation of a podcast is only prohibited during the employment relationship and is not subject to the non-compete agreement. At a minimum, it creates an ambiguity in the scope of the non-compete agreement.

   **b.**  **The non-compete agreement in Jacob Kemp's contract is overly broad in scope and constitutes an impermissible industry-wide exclusion from subsequent employment.**

Unlike Dan's non-compete agreement which is expressly limited to competition in the traditional terrestrial radio portion of the audio communications industry, Jake's non-compete agreement purports to apply to the audio/video communications industry as a whole. It now defines a "Competing Business" as:

> **1.3** "Competing Business" means any person (including Employee) or entity carrying on a business that is the same or essentially the same as the Company Business. Competing Business shall include, without limitation, all commercial audio outlets, such as radio stations, radio networks, television stations, cable operators, podcasters, Internet/streamed radio and Internet/streamed programs/programming and other current and future audio platforms.

Where the scope of a non-compete agreement is too broad, it constitutes an impermissible restraint of trade. *Stonecoat of Tex., LLC v. Procal Stone Design, LLC*, 2019 U.S. Dist. LEXIS 156005, at *253 (E.D. Tex. 2019). A covenant not to compete is unreasonable unless it bears some relation to the activities of the employee. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d

381, 386-87 (Tex.1991)).  "A covenant not to compete that contains an industry-wide exclusion from subsequent employment is unenforceable." *See id.* (citing *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied)); *see also Haass*, 818 S.W.2d at 386-88. As one court aptly put it, an "employer is only entitled to keep ex-employees from competing with the employer's actual business, not some overblown contractual definition of business designed to cover the proverbial waterfront and keep ex-employees from being able to make a living in any segment of the ex-employer's industry. *See Vartech Sys. v. Hayden*, 951 So. 2d 247, 259 n. 15. (La. App. 1st Cir. 2006).

Despite the fact that the job duties of an "On-Air personality" for Plaintiff did not change between the time Dan's contract was executed in 2018 and Jake's in 2022,[20] somehow the segments of the audio/video communications industry in which Jake is unable to work expanded to encompass the whole of the industry. The job duties of a Ticket radio show host did not change, but the scope of the non-compete broadened mightily. This inexplicable expansion cannot be reconciled with the requirement that the scope of a covenant not to compete must relate to the employee's role with the ex-employer.

Plaintiff's attempt to insulate itself from any competition from Jake whatsoever is transparent protectionism – going too far to protect what may be protectable. *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 782 (Tex. 2011) (Willett, J. concurring). While Texas law allows limited non-compete agreements, it does not allow this type of protectionism to trump individual or societal interests in a dynamic marketplace. *Id.* at 783. A non-compete rooted in protectionism alone is per se invalid under the Covenants Not to Compete Act. *Id.* at 784.

---

[20] Compare paragraph 1.5 in ECF No. 1-1 to paragraph 1.5 in ECF No. 1-2.

c.      **Waiver**

Even were the The Dumb Zone a competing with Plaintiff, Plaintiff has always interpreted its own restrictive covenants to apply to terrestrial radio only. Employees that have gone on to television have been allowed to do so, for good or ill.[21]

Other hosts from The Ticket with presumably identical restrictive covenants are, today, making identical content to Defendants with Plaintiff's apparent consent.[22]

But perhaps the starkest example of waiver is the fact that Jake is the co-host of one of the oldest podcasts on the internet. Jake has monetized this podcast for many years with express notice to Plaintiff. The content of that podcast frequently has overlapped with his on-air work for Plaintiff without complaint from Plaintiff.[23]

2.      **Plaintiff cannot show a substantial likelihood of success on the merits of its customer non-solicitation claim because there is no evidence that Dan and Jake are or have ever solicited any of Plaintiff's advertisers.**

In its Motion for Temporary Restraining Order, Plaintiff alleges that Dan and Jake have contacted Plaintiff's customers and sponsors to sponsor their podcast. This is demonstrably false. Plaintiff can produce no evidence that Dan and Jake have solicited any advertisers or sponsors or that there is any continuing solicitation of advertisers or sponsors. Thus, Plaintiff has no likelihood of success on its breach of the agreement not to solicit clients.

3.      **Plaintiff cannot show a substantial likelihood of success on the merits of its non-disparagement claim.**

Plaintiff alleges that Jake has and continues to violate the non-disparagement clause in his contract. Although the term disparage is not defined in the contract, it provides:

---

[21]       https://sports.yahoo.com/report-ex-espn-host-rachel-nichols-to-join-richard-sherman-as-undisputed-co-host-alongside-skip-bayless-184253339.html.
[22]       Bob    Sturm's    substack    https://bobsturm.substack.com/;    Gordon    Keith's    Twitch https://www.twitch.tv/actualgordonkeith.
[23] https://www.patreon.com/itsjustbanter

the term "disparage" includes, without limitation, comments, or statements to the press or to any individual or entity with whom the Company has a business relationship (including, without limitation, any vendor, supplier, customer, or distributor), or any public statement, that in each case is intended to, or can be reasonably expected to, damage any of the Company Parties.

(ECF No. 1-2, ¶ 6.3)

### a.     The statements are not disparaging.

Whether a statement is a "disparaging comment" is subjective and requires the trier of fact to determine if the comment "would cause" a third party "to think poorly of or negatively about [another], whether or not such statement is true or false." *McGowan & Co. v. Bogan*, 93 F. Supp. 3d 624, 647 (S.D. Tex. 2015). Where fact issues exist, a party fails to establish a substantial likelihood of success on the merits. *Wicked Hot Vapors, LLC v. Vaporpro, LLC*, 2013 U.S. Dist. LEXIS 196251, at *10 (E.D. Tex. 2013); *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 2014 U.S. Dist. LEXIS 173835, at *40 (W.D. Tex. 2014); *Apogee Telecom, Inc. v. Univ. Video Servs.*, 2018 U.S. Dist. LEXIS 228322, at *6 (W.D. Tex. 2018) Because the trier of fact is required to determine whether any statements made by Jake were disparaging, Plaintiff has failed to establish a substantial likelihood of success on the merits, and injunctive relief should be denied.

### b.     All the allegedly disparaging statements are protected by the litigation privilege.

"Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel." *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 111, 166 S.W.2d 909, 912 (Tex. 1942). This privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *James v. Brown*, 637 S.W.2d 914, 917-18 (Tex. 1982). Furthermore, out-of-court statements by

parties are privileged so long as they bear "some relation to the proceeding," and all doubt should be resolved in favor of there being "some relation." *Odeneal v. Wofford,* 668 S.W.2d 819 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).

The Texas litigation privilege embodies Texas public policy "founded on the theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual." *Reagan*, 166 S.W.2d at 913. As a matter of Texas public policy, the litigation privilege apples in Federal Court. *Cisco Sys. v. Mushkin, Inc.*, Civil Action No. 3:20-CV-2588-K, 2021 U.S. Dist. LEXIS 150699, at *23 (N.D. Tex. 2021).

Furthermore, the litigation privilege applies to a litigant's obligations under a pre-existing contract. *See, e.g., Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377-78 (7th Cir. 2010) (describing cases in which courts in other jurisdictions have found that the absolute litigation privilege was applicable to claims for breach of contract, and predicting that Indiana Supreme Court would refuse to impose liability for violation of settlement agreement based on application of the privilege); *Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir. 2004) (finding that defendant was not entitled to summary judgment on counterclaim for breach of a confidentiality agreement where actions giving rise to counterclaim occurred in the context of litigation and were protected by the absolute litigation privilege).

Plaintiff alleges that Jake made disparaging statements about Plaintiff in which he "falsely stated he did not get any pay raises, has criticized the Ticket's lineup and hiring decisions and employee pay, and has mocked the cease-and-desist letters."[24]

On July 25, 2023, Plaintiff sent a cease-and-desist letter to Jake in which it threatened litigation. Each of the allegedly disparaging statements Plaintiff alleges Jake made occurred after

---

[24] Plaintiff's Application at 21; Plaintiff's Orig. Compl.at ¶¶ 29-34.

Plaintiff sent the cease-and-desist letter threatening litigation.[25] Each statement bears some relation to the issues in this lawsuit. Accordingly, each of the alleged disparaging statements is absolutely privileged. Plaintiff failed to establish a substantial likelihood of success on the merits, and injunctive relief should be denied.

### c.    Injunctive relief prohibiting future disparaging statements would constitute an unconstitutional prior restraint on free speech.

Plaintiff bears the burden at the temporary restraining order stage to prove that its non-disparagement clause is enforceable. *Pizza Hut LLC v. Pandya*, 2019 U.S. Dist. LEXIS 230073, at *11 (E.D. Tex. Nov. 26, 2019). Prior restraints against speech are generally unconstitutional. *Cf. Tory v. Cochran*, 544 U.S. 734, 738, 125 S. Ct. 2108, 161 L. Ed. 2d 1042 (2005) (relating to injunctions against defamation). Moreover, Texas courts have discretion to invalidate contractual provisions that are against public policy by looking primarily to Texas statutes, the Texas Constitution, and the United States Constitution to identify what qualifies as the public interest. *Montgomery v. Browder*, 930 S.W.2d 772, 778 (Tex. App.—Amarillo 1996), *writ denied* (1997); *Pizza Hut LLC*, 2019 U.S. Dist. LEXIS at *11. Plaintiff cannot establish that Texas law permits the prior restraint of speech in the context of employment contracts containing non-disparagement provisions. *See id.* Therefore, Plaintiff failed to establish a substantial likelihood of success on the merits, and injunctive relief should be denied.

### 4.    Plaintiff cannot show a substantial likelihood of success on the merits of its conversion claims.

Plaintiff claims to own the website, and social media accounts, the podcast, and essentially everything related to The Dumb Zone. *See* Pl.'s Application at 21-22. But its conversion claims

---

[25] *Id.*

fail because it lacks an actionable right to the content. Further, much of what it claims ownership to is not actionable personal property under Texas law.

Under Texas law, conversion is "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Carson v. Dynegy, Inc.,* 344 F.3d 446, 456 (5th Cir. 2003) (quoting *Waisath v. Lack's Stores,* 474 S.W.2d 444, 447 (Tex. 1971)). "Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted." *Simmonds Equip., LLC v. GGR Intern., Inc*., 126 F. Supp. 3d 855, 869 (S.D. Tex. 2015) (quoting *Express One International, Inc. v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.)); *see also Rehak Creative Servs. v. Witt*, 404 S.W.3d 716, 734 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), *disapproved on other grounds*, *In re Lipsky*, 460 S.W.3d 579 (Tex. 2015).

When an "allegation involves only intellectual property rights ... rather than rights regarding physical property ... [it] is outside the scope of Texas conversion law, which concerns only physical property." *Carson,* 344 F.3d at 456*.* "Intellectual property rights are largely the province of federal law, and the Fifth Circuit has expressly held state law claims such as conversion 'based on ideas fixed in tangible media' are preempted by the Copyright Act." *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 667 (S.D. Tex. 2015) (quoting *Spear Mktg., Inc. v. BancorpSouth Bank,* 791 F.3d 586, 597 (5th Cir. 2015)).

The Southern District of Texas held a website was not subject to conversion. Specifically, the *Simmonds* court found allegations insufficient to state a claim for conversion under Texas law because the plaintiff alleged conversion of its website. *Simmonds Equip., LLC*, 126 F. Supp. 3d at

869. "[A] website is intangible, and conversion applies only to tangible property under Texas law." *Id*. "Courts have likewise denied claims of conversion of a trademark and trade dress. *Beardmore*, 131 F. Supp. 3d at 667 (citing *Neles–Jamesbury, Inc. v. Bill's Valves,* 974 F. Supp. 979, 982 (S.D.Tex.1997) (trademark); *Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F. Supp. 1513, 1569 (S.D. Tex.1996), *aff'd as modified,* 155 F.3d 526 (5th Cir.1998) (trade dress)).

Here, Plaintiff's claims revolve around unactionable property: trade names, websites, and social media accounts. Moreover, even if they were actionable property, Plaintiff fails to show it owned or had a right to possess same. *See supra,* Sec. III at 8-9.

First, the name The Dumb Zone is not associated with The Hang Zone, is dissimilar from The Hang Zone, and is too generic to be actionable property. *Express One*, 53 S.W.3d at 901 (a trade name is intangible and cannot be converted). As discussed above in Section III, Plaintiff's prior conduct makes clear it did not own, or even believe that it owned these things.  Therefore, Plaintiff failed to establish a substantial likelihood of success on the merits, and injunctive relief should be denied.

**D.     Plaintiff did not and cannot show it will suffer irreparable harm.**

Plaintiff has not shown that it will be imminently and irreparably harmed, nor has it shown that it has no adequate remedy at law.

A movant seeking to show irreparable harm must show that: (a) harm to the movant is imminent; (b) the injury would be irreparable; and (c) the movant has no other adequate legal remedy. *Mannatech, Inc. v. Wellness Quest, LLC*, Civ. Action No. 3:14-CV-2497-K, 2014 WL 11515729, at *1 (N.D. Tex. Nov. 4, 2014) (Kinkeade, J.) (citing *Conlay v. Baylor Coll. of Med.*, Civ. Action No. H-08-1038, 2010 WL 774162, at *5 (S.D. Tex. Mar. 3, 2010)).   For  purposes of injunctive relief, an adequate remedy at law exists when the situation sought to be enjoined is

capable of being remedied by legally measurable damages. *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004).

Where harm can be remedied by monetary relief, there is no irreparable harm. *Am. Telnet, Inc. v. GTE Corp.*, No. 3:99-CV-0280, 1999 U.S. Dist. LEXIS 5781, at *11 (N.D. Tex. Apr. 16, 1999). Loss of income, compensable after trial on the merits, or financial distress, does not constitute irreparable injury. *Dig. Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 781 (N.D. Tex. 2012) (Lindsay, J.) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). The "exception to [this] general rule that damages cannot be compensable in monetary relief . . . applies only in cases 'where the potential economic loss is so great as to threaten the existence of the movant's business' or where a business 'would suffer a substantial loss of business and perhaps even bankruptcy' absent injunctive relief." *Id.* (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)).

Further, a contention that there would be a loss of goodwill, damage to reputation, inevitable loss of customers, and the claim that the party will be forced out of business in the relevant markets are all claims that can be remedied monetarily and are not irreparable. *See Am. Telnet, Inc. v. GTE Corp.*, No. 3:99-CV-0280, 1999 U.S. Dist. LEXIS 5781, at *7-11 (N.D. Tex. Apr. 16, 1999). Loss of customers or goodwill is only an irreparable harm when the movant shows that the loss cannot be measured in money damages. *Id.* at 778 (citing *Millennium Rests. Grp., Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001) (Fish, J.)).

Here, there is no threat of imminent and irreparable injury from any of the claims advanced in Plaintiff's Application. Because Plaintiff is a terrestrial radio station open to the public, its only revenue is from advertising. Thus, Plaintiff's customers are its advertisers. Additionally, Plaintiff's pursuing this suit does more to harm its reputation and goodwill than anything Defendants have

done. This is especially the case because The Dumb Zone is not accepting any advertisers, and thus is not pulling any revenue from Plaintiff.

Additionally, Plaintiff cannot establish that there is a threat of imminent harm with respect to the solicitation of advertisers or sponsors. The mere suspicion that a defendant might utilize confidential or protected information is insufficient to entitle a party to injunctive relief. *Blue Yonder Grp. v. Kinaxis Inc.*, Civil Action No. 3:20-CV-3636-K, 2021 U.S. Dist. LEXIS 194786, at *5 (N.D. Tex. Mar. 5, 2021 (Kinkeade, J.). Furthermore, in the context of a breach of a non-solicitation of clients claim, absent evidence of ongoing or continuing solicitation of clients, the threat of imminent harm does not exist, and injunctive relief is not available. *Alscott, Inc. v. Sealer*, Civil Action No. 3:22-CV-00844-L, 2022 U.S. Dist. LEXIS 193896, at *11 (N.D. Tex. Oct. 25, 2022) (Lindsay, J.); *see also Fromhold v. Insight Glob., LLC*, Civil Action No. 3:23-CV-0048-X, 2023 U.S. Dist. LEXIS 45878, at *13 (N.D. Tex. Feb. 23, 2023) (Starr, J.) (injunctive relief unavailable absent evidence that clients are actually being solicited).

Plaintiff simply does not have any credible allegation of irreparable harm. *See Am. Telnet, Inc. v. GTE Corp.*, No. 3:99-CV-0280, 1999 U.S. Dist. LEXIS 5781, at *7-8 (N.D. Tex. Apr. 16, 1999) ("The irreparable harm element must be satisfied by independent proof, or no injunction may issue."). Plaintiff has not even alleged that the damage to its business would be severe, much less force it into bankruptcy.

Coming back to the essence of this dispute discussed in the introduction above, the critical distinction of subject matter in this case reflects the bottom line that Plaintiff, who only has a square peg, seeks to reserve all the shapes of holes on the board for itself (including Defendants' round hole of subscription-based podcasting), regardless of whether its business fits.

The Ticket's long-standing motto has been "we can do what they do, but they can't do what we do" when referencing its competition—other radio stations. The circumstances here simply don't fit that mold: Plaintiff can't do what Defendants are doing, and Defendants can't do what Plaintiff is doing. To do what Defendants are doing, Plaintiff would have to create a whole new marketing system and infrastructure that it currently lacks. For that reason, the two media products simply do not overlap in any sense of business competition and thus there is irreparable harm to Plaintiff.

Therefore, Plaintiff failed to make a showing of imminent and irreparable harm and the Court should deny its Application.

**E.     Balancing of the respective harms favors Defendants and disfavors injunctive relief.**

The threatened injury to Defendants outweighs the threatened injury to Plaintiff because Defendants' subscription numbers are a miniscule amount compared to Plaintiff's profits. But an injunction would mean Defendants cannot earn a living.

"It is not enough for the movant to demonstrate harm of the same magnitude as would be suffered by the nonmovant if the injunction is issued, and the balance of harm is not presumed in the movant's favor merely by a showing of substantial likelihood on the merits." *Finlan v. City of Dallas*, 88 F. Supp. 779, 791 (N.D. Tex. 1995) (citing *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 389-91 (5th Cir. 1984)).

Here, the balancing weighs heavily against injunctive relief. Plaintiff's requested relief would not maintain the status quo. Maintaining the status quo (the last peaceable point between the parties being before the breakdown of contract negotiations when Defendants still worked for Plaintiff) is simply not feasible given the circumstances of this case. Only half of the status quo could be achieved, that is what Plaintiff seeks. But returning Plaintiff to a situation where Defendants were not working at all, would prevent them from earning a living.

Further, both Defendants have worked in terrestrial radio almost their entire adult lives. Their skills are transferrable to the different medium of on-demand podcasting but prohibiting them from using their sole marketable skillset in that area would force them to start over and find new careers altogether.

Granting injunctive relief at this point, when there is no immediate and irreparable harm to Plaintiff, would significantly injure Defendants' ability to build their new business separate and apart from Plaintiff while providing only superficial relief to Plaintiff (namely, blocking out a new Patreon market for Plaintiff that it does not currently occupy). The Dumb Zone is a new business that is in the stage of establishing a brand and market presence wholly separate from The Ticket brand. An injunction requiring Defendants to cease operating the business at this critical stage would effectively foreclose their ability to earn a living.

Yet the harm to Plaintiff, if any, is minimal considering it has no current presence in the subscription podcast market. Thus, if injunctive relief is granted, *Defendants will* suffer irreparable harm; whereas, if injunctive relief is denied, *Plaintiff will not* suffer irreparable harm. Therefore, the balancing of harms weighs against granting a preliminary injunction.

## F.    Granting injunctive relief would thwart public interest.

Allowing Plaintiff to enjoin Defendants' wholly different product simply because it is *a* form of media would work a severe disservice to public interest. This is especially the case given that a media fueled by listener subscriptions is more a media "of the people" than one fueled by advertising dollars. To prioritize Goliath-Plaintiff's tangential interest to reserve a space it may one day decide to enter, one in which individual listeners have already shown their intention to hear Defendants' ideas, would bar speech between individual citizens chosen by their fellow citizens to elevate an opportunity to disseminate corporate content fueled by advertising dollars from other corporations.

When workers in this country are victims of unfair labor practices, they have a right to have those resolved at the NLRB using the NLRB process. And this is not a trivial right. The NLRB process is much less costly for both sides than traditional litigation. Indeed, though workers sometimes choose to hire lawyers to help them through the NLRB process, it is by no means necessary. Many workers successfully file and win charges themselves without ever incurring a single cent in legal fees. This is purposeful—the NLRA was written with this specific administrative design in mind. Dan and Jake are two workers that made proper claims to the NLRB that they suffered unfair labor practices, which the NLRB has taken up for decision. Forcing the parties to continue litigating NLRB claims in district court before the administrative process is completed would actively deny Dan and Jake their rights under the NLRA. Therefore, an injunction would disserve the public interest.

## VI.
## <u>CONCLUSION</u>

Injunctive relief is inappropriate because there is a threshold issue of subject-matter jurisdiction preventing the Court from entertaining the request as it relates to Plaintiff's non-compete and non-disparagement claims, many of Plaintiff's claims in the Complaint are subject to the NLRB's exclusive jurisdiction, and the remainder appear to be mere retaliatory claims riding the coattails of the non-compete claim. The Court should not attempt to exercise jurisdiction over the claims even for the purpose of temporary injunctive relief.

Plaintiff also failed to demonstrate a substantial likelihood of success on the merits of its claims. Its factual allegations are supported only by a vague verification lacking bases of knowledge explanations and taking portions of Defendants' podcast out of context. Moreover, Plaintiff's allegations are conclusively negated by Defendants' sworn declarations, based on personal knowledge, as well as documentary and audio evidence.

Plaintiff's attempt to obtain *ex parte* relief from this Court one day after filing its application, four days after filing suit, and without any attempt at notice to Defendants and despite having their counsel's contact information is extremely troubling.

Even if Plaintiff were likely to succeed on the merits, it failed to demonstrate irreparable harm and that it has no adequate remedy at law. Plaintiff has not even alleged that the damage to its business would be severe, much less that it would force it into bankruptcy.

Further, injunctive relief is not appropriate because even were Plaintiff faced with some irreparable harm, it is significantly outweighed by the harm Defendants would certainly face if they were enjoined from podcasting.

Therefore, Defendants respectfully request that the Court deny Plaintiff's Application for Temporary Restraining Order and Request for Preliminary Injunction (ECF No. 8) and Renewed Application for Temporary Restraining Order and Request for Preliminary Injunction (ECF No. 9).

Respectfully submitted,

*/s/ Philip Kingston*
**Philip Kingston**
Texas Bar No. 24010159
Sheils Winnubst PC
1701 N. Collins, 1100 Atrium II
Richardson, Texas 75080
(214) 642-1707
philip@sheilswinnubst.com

**Matthew Bruenig**
District of Columbia Bar No. 1045571
(admitted *pro hac vice*)
124 4th St.
Stamford, Connecticut 06905
(857) 540-1205
matthewbruenig@gmail.com

**ATTORNEYS FOR DEFENDANTS**

DECLARATION OF DAN MCDOWELL

Jake Kemp and I have been publishing a video and audio recorded entertainment program called The Dumb Zone since July 20th, 2023, not before we left Plaintiff's employment as alleged in the complaint.

The Dumb Zone's only source of revenue is monthly subscriptions from viewers and listeners. It accepts no advertising, and we have not attempted to sell advertising.

I have not contacted Plaintiff's advertisers to sell advertising nor to interfere with their relationships with Plaintiff. In fact, I strongly encouraged two advertisers who contacted me to maintain their advertising with The Ticket.

The Dumb Zone has no live audience. It is simply released as a recorded program. Therefore, it cannot take calls from fans, break news, provide a traffic or weather report, or do any of the other temporal activities that live, terrestrial radio does.

The Dumb Zone does not occur at any specific time. It is not published daily or even on five consecutive work days. There is nothing about The Dumb Zone that prevents or discourages listeners from listening to The Ticket at any time. To the contrary, Ticket listeners choose to listen to The Ticket based on the content The Ticket broadcasts.

The Dumb Zone is sometimes recorded remotely from far outside of the geographic restrictions of my employment contract restrictive covenants.

For many years, I have helped pay for the production of The Hang Zone Weekly Wrap-up Podcast and The BaD Radio Weekly Wrap-up Podcast including employing a contractor producer. I funded this promotional activity to benefit Plaintiff's business with no compensation from Plaintiff. Plaintiff refused to contribute when requested.

Plaintiff alleges that it owns 1) the name "The Dumb Zone," 2) The Dumb Zone logo, 3) thehangzone.com website, and 4) The Dumb Zone social media accounts. All these allegations are false.

The name "The Dumb Zone" originated from a humorous play on the name of mine and Jake's former show called The Hang Zone. It was used by on-air personalities to preface a question or statement that might make the speaker sound dumb. It was not a segment of the show; it was never owned, promoted, or otherwise used by Plaintiff; it is not protected by trademark.

The Hang Zone logo was created by a listener to that show who created the logo by using the movie poster image from the art house cinema feature "House Party" starring Christopher "Kid" Reid and Christopher "Play" Martin of the hip hop group Kid 'n' Play. Kid has made many appearances on The Hang Zone and its predecessor show and performed voice acting for The Hang Zone.

EX A



Here is the listener created logo for The Hang Zone:



And here is The Dumb Zone logo created by another listener:



Plaintiff never owned, promoted, or otherwise used either of these logos.

Plaintiff claims to own the website thehangzone.com. In fact, over the years I was forced to buy multiple website urls and pay for the hosting fees for the websites and the promotional material I published for Plaintiff's benefit because Plaintiff would not.

EX A

Over many years, I and my previous broadcast partner Bob Sturm paid not only for the websites and their operation, we paid from our own funds to hire a contractor for the editing, production, and publishing of "The BaD Radio Weekly Wrap-up Podcast" and "The Hang Zone Weekly Wrap-up Podcast," which were expensive exercises meant only to benefit Plaintiff's business. Jake later did the same with The Hang Zone. Plaintiff repeatedly refused to contribute to these promotional exercises, which we were under no obligation to perform.

The X (formerly Twitter) account now branded "@thedumbzone" is my personal account created in March of 2011 and used by me to promote personal topics, share humorous videos unrelated to Plaintiff, and also to promote my work for Plaintiff.

Plaintiff has never owned, used, or had access to this X account. It does not have the password for the account and never acquired or attempted to acquire the account from me, its sole owner.

Instead, Plaintiff operates its own popular X account with seven times the followers of my personal account. Plaintiff actively uses the account currently branded "@dfwticket" where it requires its employees to post promotional material for the radio station.

I was never under any obligation to promote Plaintiff's business on my personal X account. Instead, Plaintiff placed this in my employment contract:

> **2.4    Social Media Platforms.** During the Employment Period, the Employee, as directed by the Company, shall use and operate the designated Company owned social media platforms in furtherance of the Job Duties hereunder for the sole and exclusive benefit of the Company.  In all cases Employee shall not use broadcast tools or content, or the Station's promotional tools, including but not limited to, Company owned and controlled social media platforms to promote and further the Employee's separate and independent controlled social media platforms, unless approved in writing by the Company.

Plaintiff never provided a "Company owned social media platform" to me or Jake.

The Dumb Zone YouTube channel is my personal channel. Plaintiff has never owned, used, or had access to this channel. It does not have the password for the account and never acquired or attempted to acquire the channel from me, its sole owner.

Plaintiff claims that Defendants converted Plaintiff's Facebook account, but a search of Facebook shows The Ticket's account still active and still presumably operated by Plaintiff:



EX A

Similarly to the other social media accounts Plaintiff has falsely claimed to own, I created a Facebook account years ago for personal use as well as promoting Plaintiff's business. Plaintiff never owned, promoted, or otherwise used this account and has never had access to it.

I do not possess any property belonging to Plaintiff, and I have no way to access websites or social media accounts owned by Plaintiff.

Since leaving Plaintiff's employment, I have meticulously avoided making disparaging comments about Plaintiff or its employees. The recordings cited by Plaintiff as disparaging are simple, factual statements that are all true. In fact, the majority of what I have said about Plaintiff and its station has been positive.[1]

In November of 2021, Jake Kemp, Corby Davidson, Bob Sturm, and I (all on-air hosts at The Ticket) had a meeting with Dan Bennett and Jeff Catlin, management at The Ticket. At this meeting, we expressed our interest in collectively having the end of each show pairing's (Kemp/McDowell, Sturm/Davidson) contracts expire simultaneously to let us negotiate in a more concerted manner. We were told at this meeting by Bennett that we were prohibited from discussing the particulars of our contracts with one another.

Further, in May of 2023, Kemp and I became aware of a series of "compensation memos" that were issued to a number of our junior co-workers. These memos were issued to employees who were simply receiving promotions. In a normal course of action, these employees would just have their base pay changed. In this case, however, these employees were asked to sign agreements that included non-competition clauses for employees making as little as $27,000.

Matt Bermingham and DJ Riggenberg personally attested to myself and Jake Kemp that they were told that if they did not sign these documents, they would not receive their pay increase. Kemp and myself have viewed these documents

In April of 2020 as the pandemic began, all "hosts" at The Ticket agreed to take a pay reduction to help keep company business as profitable as possible. I did this because I believed it was the best decision to help The Ticket and Cumulus.

---

[1] Keep listening to The Ticket https://www.dropbox.com/scl/fi/cd0quwd0tgi7visj1x0yy/7-20-2-keep-listening-to-the-ticket.mp3?rlkey=4aqkk8v3t2516js23a33cawk0&dl=0; Dan and Jake comments on new lineup https://www.dropbox.com/scl/fi/98z609mz5n9yscrqsjg99/8-1-1-opinion-of-new-lineup.mp3?rlkey=bbri1wtkhrm0vq0u54n9k08qj&dl=0; Farewell https://www.dropbox.com/scl/fi/r5sutl6wna6iyjarfrqdg/7-20-0-Dan-and-Jake-Ticket-goodbye-FULL.mp3?rlkey=xvivlosymu4eo5k9rdfvwmqzu&dl=0; All parties will be good https://www.dropbox.com/scl/fi/ldlmpdx75468ckor8pjwu/7-20-3-all-parties-will-be-fine.mp3?rlkey=8qm9yzot8d93bxxbjy3oaw5qb&dl=0 and we part on good terms https://www.dropbox.com/scl/fi/6v5ctiq7zugvelhntjvvw/7-20-1-we-part-on-good-terms.mp3?rlkey=0315abdyfll5lgapnwjvqscu9&dl=0

<span style="color:red">EX A</span>

I have filed claims with the general counsel's office of the National Labor Relations Board regarding the issues raised in Plaintiff's Complaint. I am cooperating in that investigation. My claim materials are attached as Exhibit 1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 10th, 2023, in Southlake, Texas, USA.


_Dan McDowell_____
Dan McDowell

EX A

FORM NLRB-501
(3-21)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**AMENDED CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Susquehanna Radio LLC | b. Tel. No.<br>(404) 949-0700 |
|---|---|
| | c. Cell No. |
| | f. Fax. No. |

| d. Address (Street, city, state, and ZIP code)<br>780 Johnson Ferry Road Suite 500<br>GA Atlanta 30342 | e. Employer Representative<br>Richard S Denning<br>General Counsel | g. e-mail<br>richard.denning@cumulus.com |
|---|---|---|
| | | h. Number of workers employed<br>50 |

| i. Type of Establishment (factory, mine, wholesaler, etc.)<br>Broadcasting & Cable TV | j. Identify principal product or service<br>Radio Station |
|---|---|

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections)  1  of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

**2. Basis of the Charge** (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Employer maintained, threatened to enforce, and attempted to enforce an overbroad non-compete provision, overbroad coworker non-solicitation provision, overbroad confidentiality provision, and an overbroad no-recording rule.

Employer filed a preempted, baseless, and retaliatory lawsuit against the charging party for engaging in Section 7 protected activity.

| 3. Full name of party filing charge (if labor organization, give full name, including local name and number)<br>Daniel McDowell | |
|---|---|

| 4a. Address (Street and number, city, state, and ZIP code)<br>961 Thousand Oaks Court<br>Southlake, TX 76092 | 4b. Tel. No.<br>(214) 893-2348 |
|---|---|
| | 4c. Cell No.<br>(214) 893-2348 |
| | 4d. Fax No. |
| | 4e. e-mail<br>dan1310@hotmail.com |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** (to be filled in when charge is filed by a labor organization)

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | Tel. No.<br>(857) 540-1205 |
|---|---|
| *Matthew Bruenig*      Matthew Bruenig<br>(signature of representative or person making charge)    (Print/type name and title or office, if any) | Office, if any, Cell No. |
| | Fax No. |
| Address   124 4th St, Stamford, CT 06905     Date   08/07/2023 | e-mail<br>matthewbruenig@gmail.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

DECLARATION OF JAKE KEMP

Dan McDowell and I have been publishing a video and audio recorded entertainment program called The Dumb Zone since July 20th, 2023, not before we left Plaintiff's employment as alleged in the complaint.

The Dumb Zone's only source of revenue is monthly subscriptions from viewers and listeners. It accepts no advertising, and we have not attempted to sell advertising.

The Dumb Zone has no live audience. It is simply released as a recorded program. Therefore, it cannot take calls from fans, break news, provide a traffic or weather report, or do any of the other temporal activities that live, terrestrial radio does.

The Dumb Zone does not occur at any specific time. It is not published daily or even on five consecutive work days. There is nothing about The Dumb Zone that prevents or discourages listeners from listening to The Ticket at any time. To the contrary, Ticket listeners choose to listen to The Ticket based on the content The Ticket broadcasts.

The Dumb Zone is sometimes recorded remotely from far outside of the geographic restrictions of my employment contract restrictive covenants.

Since being promoted to host, I have helped pay for the production of The Hang Zone Weekly Wrap-up Podcast including employing a contractor producer. I funded this promotional activity to benefit Plaintiff's business with no compensation from Plaintiff.

I do not possess any property belonging to Plaintiff, and I have no way to access websites or social media accounts owned by Plaintiff.

Since leaving Plaintiff's employment, I have meticulously avoided making disparaging comments about Plaintiff or its employees. The recordings cited by Plaintiff as disparaging are simple, factual statements that are all true. In fact, the majority of what I have said about Plaintiff and its station has been positive.[1]

Regarding the accusation made in paragraph 48 of the complaint, that I made a false statement that my pay did not increase when my position changed from "producer" to "host", my statement is verifiably accurate. When I became a host In February of 2020, my base pay was $50,000. My base pay remained the same until July of 2020. I then

---

[1] Keep listening to The Ticket https://www.dropbox.com/scl/fi/cd0quwd0tgi7visj1x0yy/7-20-2-keep-listening-to-the-ticket.mp3?rlkey=4aqkk8v3t2516js23a33cawk0&dl=0; Dan and Jake comments on new lineup https://www.dropbox.com/scl/fi/98z609mz5n9yscrqsjg99/8-1-1-opinion-of-new-lineup.mp3?rlkey=bbri1wtkhrm0vq0u54n9k08qj&dl=0; Farewell https://www.dropbox.com/scl/fi/r5sutl6wna6iyjarfrqdg/7-20-0-Dan-and-Jake-Ticket-goodbye-FULL.mp3?rlkey=xvivlosymu4eo5k9rdfvwmqzu&dl=0; All parties will be good https://www.dropbox.com/scl/fi/ldlmpdx75468ckor8pjwu/7-20-3-all-parties-will-be-fine.mp3?rlkey=8qm9yzot8d93bxxbjy3oaw5qb&dl=0 and we part on good terms https://www.dropbox.com/scl/fi/6v5ctiq7zugvelhntjvvw/7-20-1-we-part-on-good-terms.mp3?rlkey=0315abdyfll5lgapnwjvqscu9&dl=0

agreed to a new contract that increased my base pay to $80,000. However, I was not "back paid" for this time. So it is absolutely true that I worked as a host on a producer's salary for a period of five months.

When my base compensation was increased, as stated, it was increased to $80,000. After one year of producing ratings commensurate with the other hosts/shows on the station, I was initially offered no raise. After a few rounds of negotiations, I was offered a raise in pay to $85,000. At this point, I put in my two weeks' notice. After four days of absence, I was contacted via my representation at that time, Randy Bowman, and told that I was being offered a compensation package that had a base pay of $135,000. I accepted that offer.

Regarding the claim in paragraph 18 of the complaint that we secretly recorded conversations with Susquehanna employees during contract negotiations to use as content on a future show, this comment was made in jest while producing comedic content. We did not obtain these recordings; we do not possess them, and as such, we cannot release them. The joke is obvious in this true and correct recording of my comments:

https://www.dropbox.com/scl/fi/vukmyknuaacic0qfcxpc2/7-20-5-Jake-joke-about-recording-calls-SHORT.mp3?rlkey=qleie68qp20zew6jf9nv8vxgt&dl=0

In November of 2021, myself, Dan McDowell, Corby Davidson, and Bob Sturm (all on-air hosts at The Ticket) had a meeting with Dan Bennett and Jeff Catlin, management at The Ticket. At this meeting, we expressed our interest in collectively having the end of each show pairing's (Kemp/McDowell, Sturm/Davidson) contracts expire simultaneously to let us negotiate in a more concerted manner. We were told at this meeting by Bennett that we were prohibited from discussing the particulars of our contracts with one another.

Further, in May of 2023, McDowell and I became aware of a series of "compensation memos" that were issued to a number of our junior co-workers. These memos were issued to employees who were simply receiving promotions. In a normal course of action, these employees would just have their base pay changed. In this case, however, these employees were asked to sign agreements that included non-competition clauses for employees making as little as $27,000.

Matt Bermingham and DJ Riggenberg personally attested to myself and Dan McDowell that they were told that if they did not sign these documents, they would not receive their pay increase. McDowell and myself have viewed these documents

This topic of the treatment of fellow employees was the beginning of our conversation with Bennet regarding what we could do to improve the conditions for those that we work with. I mentioned these covenants in a conversation with Bennett. He expressed disbelief that these clauses were included. Since we had actually viewed the agreements, we reassured him that they were in fact present. He contacted us three days later and told us that "legal had put those clauses in there without contacting local." I asked him how

this could happen. He said that the response from "legal" was "you didn't ask us not to put it in there."

This conversation occurred on May 29, 2023. I have been in recent contact with both Riggenberg and Bermingham regarding this specific matter, and only this specific matter. Neither have been informed that this specific clause in their "compensation memorandum" has been removed.

In April of 2020 as the pandemic began, all "hosts" at The Ticket agreed to take a pay reduction to help keep company business as profitable as possible. I took that pay reduction from my previous, producer salary. I did this because I believed it was the best decision to help The Ticket and Cumulus. For the company to now defame me in this way regarding financial matters and my future potential work is unacceptable.

I have co-hosted a podcast called It's Just Banter since March 2010. I have monetized this podcast using both paid advertisement and subscription publication for many years. Plaintiff has known of, and consented to, this activity during my entire employment with Plaintiff.

I have filed claims with the general counsel's office of the National Labor Relations Board regarding the issues raised in Plaintiff's Complaint. I am cooperating in that investigation. My claim materials are attached as Exhibit 1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 10th, 2023, in Grapevine, Texas, USA.


Jake Kemp

FORM NLRB-501
(3-21)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**SECOND AMENDED CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Susquehanna Radio LLC | | b. Tel. No.<br>(404) 949-0700 |
|---|---|---|
| | | c. Cell No. |
| | | f. Fax. No. |
| d. Address *(Street, city, state, and ZIP code)*<br>780 Johnson Ferry Road Suite 500<br>GA Atlanta 30342 | e. Employer Representative<br>Richard S Denning<br>General Counsel | g. e-mail<br>richard.denning@cumulus.com |
| | | h. Number of workers employed<br>50 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Broadcasting & Cable TV | j. Identify principal product or service<br>Radio Station | |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and
(list subsections)  1  of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

### 2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Employer maintained, threatened to enforce, and attempted to enforce an overbroad non-compete provision, overbroad coworker non-soliciation provision, overbroad confidentiality provision, overbroad non-disparagement provision, and an overbroad no-recording rule.

Employer filed a preempted, baseless, and retaliatory lawsuit against the charging party for engaging in Section 7 protected activity.

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*<br>Jacob Kemp | |
|---|---|
| 4a. Address *(Street and number, city, state, and ZIP code)*<br>905 E. Worth St<br>TX Grapevine 76051 | 4b. Tel. No.<br>(817) 266-2674 |
| | 4c. Cell No.<br>(817) 266-2674 |
| | 4d. Fax No. |
| | 4e. e-mail<br>jkemp88@gmail.com |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | | Tel. No.<br>(857) 540-1205 |
|---|---|---|
| *Matthew Bruenig*<br>*(signature of representative or person making charge)* | Matthew Bruenig<br>*(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| | | Fax No. |
| Address  124 4th St, Stamford, CT 06905 | Date  08/07/2023 | e-mail<br>matthewbruenig@gmail.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Case 1:16-cv-11220-TLL-PTM  ECF No. 13-6, PageID.267  Filed 04/29/16  Page 1 of 13
Case 3:23-cv-01746-S  Document 19  Filed 08/15/23  Page 65 of 77  PageID 364
Apr. 24. 2012 11:33AM   Stark County Common Pleas Court        No. 8256   P. 2/14

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

**FILED**

**APR 24 2012**

NANCY S. REINBOLD
STARK COUNTY, OHIO
CLERK OF COURTS

PATRICK DELUCA, et al.,  :  CASE NO. 2012CV00661

Plaintiffs,  :  JUDGE CHARLES E. BROWN, JR.

:  **JUDGMENT ENTRY REGARDING**
vs.  :  **DEFENDANT'S MOTION FOR**
:  **PRELIMINARY INJUNCTION**

D.A. PETERSON, INC.,  :  **NUNC PRO TUNC**

Defendant.  :

The Court is filing this Judgment Entry Nunc Prot Tunc for the purpose of including the following phrase, "and/or capable of being received on a satellite radio" in the first full paragraph at p. 9.

The Court ahs also included the phrase, "however, the motion is granted in regard to prohibiting use of pricing and discounts if any are known by Plaintiffs" in the first full paragraph at p. 11.

This matter came before the Court on Defendant's Motion for Preliminary Injunction filed on March 9, 2012, Plaintiffs' Memorandum Contra filed on April 2, 2012, and Defendant's Reply filed on April 6, 2012.

The Court held a Hearing on Defendant's Motion for Preliminary Injunction on April 17, 2012, at 9:00 a.m.  Present for said Hearing was Attorney Steven P. Okey on behalf of the Plaintiffs and Attorney David L. Dingwell and Attorney Amanda M. Paar on behalf of the Defendant.

### Statement of the Case

On or about August 18, 2002, Defendant and Plaintiff Patrick DeLuca entered into a contract whereby the Defendant employed Patrick DeLuca as on-air talent for Defendant's



PLAINTIFF'S
EXHIBIT
**5**

Case 1:16-cv-11220-TLL-PTM  ECF No. 13-6, PageID.268  Filed 04/29/16  Page 2 of 13
Case 3:23-cv-01746-S  Document 19  Filed 08/15/23  Page 66 of 77  PageID 365
Apr. 24. 2012 11:55AM    Stark County Common Pleas Court         No. 8256  P. 3/14

commercial radio station Q92. A similar contract was entered into on September 3, 2008 between Defendant and Plaintiff Charlotte DiFranco to also work as on-air talent for Defendant's commercial radio station Q92. (Plaintiffs' Exhibit 1 and 2). The contracts were prepared by the Defendant's Vice President of Operations and General Manager, Donald A. Peterson, III.

The Plaintiffs were co-hosts of a live morning show that aired on radio station Q92 from 5:30 to 10:00 a.m., Monday through Friday. A pre-recorded "weekend rewind" aired on Saturdays. The radio broadcast was simultaneously webcast on the Internet.

Plaintiffs' job duties as on-air talent for Q92 are set forth in paragraph 1.5 of the Employment Agreement and includes a provision stating that the content and broadcast of Plaintiffs' on-air show is regulated by the FCC and sets forth the consequences for any inappropriate content. Paragraph 1.5 defines "Job Duties" as follows:

1.5    The "Job Duties" means the following: Employee is employed in the position of On-Air Talent for the Company's radio stations WDJQ/WDPN as deemed appropriate by station management at a time dictated by management not to exceed a reasonable on-air "shift", and an agent for the Company's print and direct mail business the Letter Shop, LLC and an agent for the Company's print and bulk mail business Postal Mail Sort LLC. The job duties consist of: (i) **Preparing and delivering a high-energy, content driven broadcast within the regulations outlined by the FCC.** Inappropriate show content or promotion (containing sexually explicit, socially unacceptable behavior such as burping, farting, or similar or related content, racial or ethnic slurs or making fun of physically or mentally challenged individuals) as deemed by DPIII will result in the loss of the highest offered bonus opportunity for the first occurrence and the second occurrence and will result in the loss of the second level of bonus opportunity. The third such occurrence will result in the loss of the third level of bonus opportunity and the forth will result in termination. (ii) Follow broadcast commercial and music logs as presented by the sales manager and program director (iii) continually promote and support the various business entities of

2

Case 1:16-cv-11220-TLL-PTM  ECF No. 13-6, PageID.269  Filed 04/29/16  Page 3 of 13
Case 3:23-cv-01746-S  Document 19  Filed 08/15/23  Page 67 of 77  PageID 366
Apr. 24. 2012 11:35AM    Stark County Common Pleas Court          No. 6296  P. 4/14

the Company. Without limiting the generality of the forgoing, Employee shall make himself/herself reasonably available to attend staff meetings, client remote broadcasts, station functions and any Company business all as directed by Company management. (iv) employee will continuously strive to gain listenership by utilizing production and promotional opportunities offered. A fair share of production is expected relative to the other station personalities. (v) station mandated appearances to be provided "pro bono" by employee not to exceed ten (10) (vi) Employee agrees that he/she has been assigned and will carry out these Job Duties on behalf of the Company. (Emphasis added.)

The Plaintiffs' contracts expired on February 2, 2012, and they are no longer employed by the Defendant. On February 20, 2012, Plaintiffs began webcasting The DeLuca Show via the Internet. The DeLuca Show can be heard only on the Internet, through podcasts obtained on the Internet and through the Android operating system that connects mobile devices such as smartphones and table computers to the Internet. The webcasting of the DeLuca Show cannot be heard over the radio. Plaintiffs were initially webcasting in the evenings once per week. However, as of March 7, 2012, Plaintiffs webcasting is three days per week during the mornings.

Defendant claims that the DeLuca Show webcast is in violation of Plaintiffs' non-competition clause at set forth in Paragraph 7 of their Employment Agreements, which states:

7.    **AGREEMENT NOT TO COMPETE.** While employed by the Company, and for one year after termination of such employment, Employee shall not directly or indirectly, within the Business Area, engage in any activities **the same as Employee's Job Duties for any Competing Business.** (Emphasis added.)

The term "Business Area" is defined in Paragraph 1.2 of the Employment Agreement as follows:

1.2    The "Business Area" means the primary broadcast area covered by the Company's radio stations in the Canton, OH broadcast market to include stations within a 60 mile radius from the facilities located on Smyth Ave. NE

3

EX 3

Case 1:16-cv-11220-TLL-PTM  ECF No. 13-6, PageID.270  Filed 04/29/16  Page 4 of 13
Case 3:23-cv-01746-S  Document 19  Filed 08/15/23  Page 68 of 77  PageID 367
Apr. 24. 2012 11:34AM    Stark County Common Pleas Court          No. 6256  P. 5/14

Alliance OH, the print and direct mail business located in Canton, OH and the print and bulk mail business located in the Youngstown, OH market. Employee and the Company agree that Employee has carried out or will carry out the Company Business throughout the Business Area by broadcasting programming and advertising heard throughout the Business Area, by soliciting sponsors/customers from throughout the Business Area, and/or by organizing or conducting promotional events throughout the Business Area. (Emphasis added.)

The term "Competing Business" is defined in Paragraph 1.3 of the Employment Agreement as follows:

1.3      "Competing Business" means "any person (including Employee) or entity carrying on a business that is the same or **essentially the same as the Company Business**. (Emphasis added.)

The term "Company's Business" is defined in Paragraph 1.1 of the Employment Agreement as follows:

1.1      The "Company's Business" means "the operation, promotion, and marketing of **commercial radio stations**, print and direct mail operations, and bulk mail facilities. (Emphasis added.)

Defendant also claims that Plaintiffs have solicited Q92's sponsors/customers in relation to the webcast of The DeLuca Show in violation of Paragraph 8 of the Employment Agreement, which states:

8.      **AGREEMENT NOT TO SOLICIT SPONSORS/CUSTOMERS.** During Employee's employment by the Company, and for one year after termination of such employment, **Employee shall not, directly or indirectly, within the Business Area, for any Competing Business, solicit, for the purpose of selling radio advertising time, printing or bulk mail, any sponsors/customer of the Company whom Employee contacted on the Company's behalf during the two years preceding Employee's termination of Employment.** For the purpose of this paragraph, 8, "contact" means any interaction between

4

EX 3

Case 1:16-cv-11220-TLL-PTM ECF No. 13-6, PageID.271 Filed 04/29/16 Page 5 of 13
Case 3:23-cv-01746-S Document 19 Filed 08/15/23 Page 69 of 77 PageID 868
Apr. 24. 2012 TY:54AM Stark County Common Pleas Court No. 8256 P. 5/14

Employee and sponsor/customer that took place in an effort to establish or further the business relationship between the Company and the sponsor/customer. (Emphasis added.)

Defendant further claims that any use by the Plaintiffs of confidential information obtained while employed by Q92 is a violation of Paragraph 1.4 of the Employment Agreement, which states:

> 1.4 "Confidential Information" means all information that: (i) the Company tries to keep secret and (ii) has commercial value to the Company or is of such a nature that its unauthorized disclosure would be detrimental to the Company's interest, **including, for instance, the Company's information concerning price and discount arrangements with sponsors/customers,** information concerning sponsors'/customers' particular needs, preferences, and interests (and how the Company uses such information to maintain a competitive advantage), marketing plans, business strategies, promotion plans, financial information, forecasts, and personal information. Confidential Information does not include information that (i) is in or enters the public domain other than breach [sic] of this Agreement or (ii) is known or becomes known to Employee from a source other than the Company provided that the source does not make the information known to the Employee in violation of a contractual or other legal duty owed to the Company. (Emphasis added).

Defendant does not allege any violations in regard to printing and/or direct mail and/or bulk mail.

Based upon the above allegations, Defendant moves the Court for a Preliminary Injunction.

### Defendant's Motion for Preliminary Injunction

Defendant moves the Court to restrain Plaintiffs from engaging in the following activity

5

EX 3

Case 1:16-cv-11220-TLL-PTM   ECF No. 13-6, PageID.272   Filed 04/29/16   Page 6 of 13
Case 3:23-cv-04746-S   Document 19   Filed 08/15/23   Page 70 of 77   PageID 969
Apr. 24. 2012 9:34AM   Stark County Common Pleas Court   No. 6250   P. 7/69

for a period of one year from the date of the Plaintiffs' last broadcast, transmission, live-stream, webcast, and/or distribution of "The DeLuca Show":

1. Broadcasting, webcasting, transmitting, live-streaming, or otherwise distributing "The DeLuca Show" or any other talk/entertainment show via the internet, PodCasts, and/or the Android application within a 60-mile radius from Q92's Alliance, Ohio location for period of one year;

2. Using and/or benefiting from the use of Q92's Confidential Information regarding Q92's sponsors/customers for a period of one year;

3. Soliciting Q92's sponsors and customers for a period of one year; and

4. Using the past broadcasts of The DeLuca Show.

## Preliminary Injunction Standard

In determining whether to grant injunctive relief, the following factors must be considered: (1) the likelihood of a plaintiff's success on the merits; (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff; (3) what injury to others will be caused by the granting of the injunction, and (4) whether the public interest will be served by the granting of the injunction. *Corbett v. Ohio Bldg. Auth.* (1993), 86 Ohio App.3d 44. The right to a preliminary injunction must be proved by clear and convincing evidence. *S. Ohio Bank v. S. Ohio Savings Assn.* (1976), 51 Ohio App. 2d 67.

## Analysis

1. Broadcasting, webcasting, transmitting, live-streaming, or otherwise distributing "The DeLuca Show" or any other talk/entertainment show via the internet, PodCasts, and/or the Android application within a 60-mile radius from Q92's

6

EX 3

Case 1:16-cv-11220-TLL-PTM  ECF No. 13-6, PageID.273  Filed 04/29/16  Page 7 of 13
Case 3:23-cv-01746-S  Document 19  Filed 08/15/23  Page 71 of 77  PageID 370
Apr. 24. 2012 11:34AM  Stark County Common Pleas Court  No. 6256  P. 6/14

Alliance, Ohio location for period of one year.

Defendant moves the Court to refrain and enjoin Plaintiffs from streaming The DeLuca

Show on the internet arguing that Plaintiffs are in violation of Plaintiffs' non-competition clause

at set forth in Paragraph 7 of their Employment Agreements, which states:

> 7.  **AGREEMENT NOT TO COMPETE.**  While employed by the
> Company, and for one year after termination of such employment,
> Employee shall not directly or indirectly, within the Business Area,
> engage in any activities the same as Employee's Job Duties for any
> Competing Business.

The above provision enjoins Plaintiffs from engaging in any activity that is the same as

their previous job duties for any "Competing Business".  The term "Competing Business" is

defined as any person or entity carrying on a business that is the same or essentially similar as the

"Company Business".  The term "Company Business" means the operation, promotion, and

marketing of commercial radio stations, print and direct mail operations, and bulk mail facilities.

The issue before the Court is whether the Internet webcasting of the DeLuca Show is the

same or similar as a commercial radio station.

More specifically, whether a radio station broadcast program which is subject to FCC

regulations and is simultaneously webcast on the Internet is the same thing as a program which is

not subject to FCC regulations and which is only webcast on the Internet.

The Court finds that an internet webcast is not the same or similar as a commercial radio

station and is differentiated by several factors, including but not limited to the fact that a radio

station is regulated by the Federal Communications Commission (FCC) and the internet is not

regulated by any federal agency.  *Reno v. ACLU* (1997), 521 U.S. 844.

While employed by the Defendant as on-air talent, Plaintiffs were subject to the FCC

7

EX 3

Apr. 24. 2012 11:55AM    Stark County Common Pleas Court    No. 6256    P. 9/14

regulations as highlighted in the Employment Agreement at Paragraph 1.5(i), which states in

pertinent part:

> The job duties consist of: (i) Preparing and delivering a high-energy, content
> driven broadcast within the regulations outlined by the FCC.

As further evidence that the Agreement Not to Compete does not apply to Internet

webcasting is the language in the Employment Agreement limiting the "Business Area" to a 60-

mile radius. The term "Business Area" was defined in Paragraph 1.2 as follows:

> 1.2    The "Business Area" means the primary broadcast area covered
> by the Company's radio stations in the Canton, OH broadcast
> market to include stations in the Canton, OH broadcast market
> to include stations within a 60 mile radius from the facilities
> located on Smyth Ave. NE Alliance, OH ...

The above provision not only refers to "stations" but also seeks to limit the geographic

location to a 60-mile radius, which is impossible where the Internet is concerned.

The differences between the Defendant's commercial radio station and Plaintiffs' Internet

webcasting were succinctly set forth in Plaintiffs Memorandum Contra at p. 12 as follows:

| Defendant | Plaintiffs |
|---|---|
| **Commercial Radio Station** | **Internet streaming/Webcasting** |
| Radio transmission | No radio transmission |
| Uses the public airwaves | No public airwaves |
| Uses a tower and antenna | No tower or antenna |
| Broadcast limited to 60 miles | No geographic limits–global reach |
| FCC license required | No FCC license |
| Subject to FCC regulations | No FCC regulations |
| Subject to FCC inspections | No FCC inspections |
| Content limited by FCC regulations | Uncensored |
| Listeners have access for free | Listeners must pay Internet provider |
| Listenership measured by Arbitron | Not measured by Arbitron |

Defendant's position is that the term "commercial radio stations" encompasses all

8

EX 3

Case 1:16-cv-11220-TLL-PTM   ECF No. 13-6, PageID.275   Filed 04/29/16   Page 9 of 13
Case 3:23-cv-01746-S   Document 19   Filed 08/15/23   Page 73 of 77   PageID 372
Apr. 24. 2012  11:35AM    Stark County Common Pleas Court              No. 8256   P. 10/14

operations of the radio station, including but not limited to radio wave broadcasting and also includes simultaneous webcasting of the radio wave broadcast. Defendant's position regarding the Agreement not to Compete was clarified at the Hearing with a hypothetical posed by the Court to Defendant's counsel involving Plaintiffs' employment at a television station.

Counsel for the Defendant was asked to assume that Plaintiffs were hired by a television station which was located within a 60-mile radius of Defendant's radio station and appeared on a television program which had the same content as the radio station program that they conducted on Q92, and to further assume that the television program was not only televised but was also simultaneously webcast and/or capable of being received on a satellite radio. As a follow up to that hypothetical, counsel for the Defendant was asked whether that would be a violation of the agreement not to compete. Counsel for the Defendant stated that if the television broadcast was either streamed over a terrestrial satellite or an Internet feed the answer would be, "yes". His further answer was that if the television program appeared purely on a television set that the answer would be, "no".

The Court finds Defendant's argument is not only illogical but also expands the definition of "commercial radio stations" as set forth in the Employment Agreement thereby creating an ambiguity regarding the language contained in the Agreement Not to Compete. Such ambiguity must be construed against the party that prepared the contract, which in this case was the Defendant's Vice President of Operations and General Manager, Donald A. Peterson, III. *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77.

Based upon the above, the Court finds that the Agreement Not to Compete in this matter does not include webcasting over the Internet. Therefore, the Court denies Defendant's motion

9

EX 3

Case 1:16-cv-11220-TLL-PTM ECF No. 13-6, PageID.276 Filed 04/29/16 Page 10 of 13
Case 3:23-cv-01746-S Document 19 Filed 08/15/23 Page 74 of 77 PageID 373
Apr. 24. 2012 YY:59AM    Stark County Common Pleas Court         No. 8256 P. 1/14

for a preliminary injunction restraining or enjoining the Plaintiffs from broadcasting, webcasting, transmitting, live-streaming, or otherwise distributing "The DeLuca Show" or any other talk/entertainment show via the internet, PodCasts, and/or the Android application.

2.      Using and/or benefiting from the use of Q92's Confidential Information regarding Q92's sponsors/customers for a period of one year.

Defendant moves the Court to restrain and enjoin Plaintiffs from using confidential information regarding sponsors/customers that may have been obtained by Plaintiffs while employed by the Defendant. Specifically, Defendant moves the Court to enjoin Plaintiffs from soliciting advertisers by offering a lower rate than what is being offered by Q92 and to enjoin Plaintiffs from using any contact information that may have been obtained while employed by the Defendant. Defendant cites to Paragraph 1.4 of the Employment Agreement, which states:

> 1.4      "Confidential Information" means all information that: (i) the Company tries to keep secret and (ii) has commercial value to the Company or is of such a nature that its unauthorized disclosure would be detrimental to the Company's interest, including, for instance, the Company's information concerning price and discount arrangements with sponsors/customers, information concerning sponsors'/customers' particular needs, preferences, and interests (and how the Company uses such information to maintain a competitive advantage), marketing plans, business strategies, promotion plans, financial information, forecasts, and personal information. Confidential Information does not include information that (i) is in or enters the public domain other than breach [sic] of this Agreement or (ii) is known or becomes known to Employee from a source other than the Company provided that the source does not make the information known to the Employee in violation of a contractual or other legal duty owed to the Company.

First, Defendant has not provided the Court with any evidence that any confidential

10

EX 3

Case 1:16-cv-11220-TLL-PTM ECF No. 13-6, PageID.277 Filed 04/29/16 Page 11 of 13
Case 3:23-cv-01746-S Document 19 Filed 08/15/23 Page 75 of 77 PageID 374
Apr. 24. 2012 11:36AM    Stark County Common Pleas Court         No. 8256   P. 12/14

information has been used by the Plaintiffs in this matter. Second, Defendant has not provided the Court with any evidence that the Plaintiffs, who were employed as on-air talent for the Defendant, even had access to any confidential information, including, but not limited to advertising rates.

Since Defendant has not provided the Court with any evidence to support Defendant's motion as it relates to the use of Q92's confidential information regarding sponsors/customers, Defendant's motion for preliminary injunction is denied, however, the motion is granted in regard to prohibiting use of pricing and discounts if any are known by Plaintiffs.

3.    **Soliciting Q92's sponsors and customers for a period of one year.**

Defendant argues that Plaintiffs have solicited Q92's sponsors and customers in violation of Paragraph 8 of the Employment Agreement, which states:

> 8.    AGREEMENT NOT TO SOLICIT SPONSORS/CUSTOMERS.
> During Employee's employment by the Company, and for one year after termination of such employment, **Employee shall not, directly or indirectly**, within the Business Area, for any Competing Business, solicit, **for the purpose of selling radio advertising time, printing or bulk mail, any sponsors/customer of the Company whom Employee contacted on the Company's behalf during the two years preceding Employee's termination of Employment.** For the purpose of this paragraph, 8, "contact" means any interaction between Employee and sponsor/customer that took place in an effort to establish or further the business relationship between the Company and the sponsor/customer.

Pursuant to the above, Plaintiffs are prohibited, for a period of one year after termination, from soliciting any sponsor/customer of the Defendant for the purpose of selling radio advertising time, printing or bulk mail whom the Plaintiffs contacted on the Defendant's behalf during the two years preceding their termination.

11

EX 3

Case 1:16-cv-11220-TLL-PTM ECF No. 13-6, PageID.278 Filed 04/29/16 Page 12 of 13
Case 3:23-cv-01746-S Document 19 Filed 08/15/23 Page 76 of 77 PageID 375
Apr. 24. 2012 11:36AM Stark County Common Pleas Court No. 8256 P. 13/14

Defendant has not provided the Court with any evidence that Plaintiffs, who were hired as on-air talent for the Defendant, have violated the Employment Agreement by soliciting sponsors/customers of the Defendant after their termination for the purpose of selling radio advertising, as no evidence has been provided that the Plaintiffs ever engaged in the activity of selling radio advertising time, printing or bulk mail while employed by the Defendant. Paragraph 8 only applies to those employees who solicit sponsors/customers "whom Employee contacted on the Company's behalf during the two years preceding Employee's termination of Employment."

Since Defendant has not provided the Court with any evidence to support Defendant's motion to enjoin Plaintiffs from soliciting sponsors/customers, Defendant's motion for preliminary injunction is denied.

4. **Defendant's motion to restrain and enjoin Plaintiffs from using the past broadcasts of the DeLuca in the Morning Show.**

Defendant moves the Court to restrain and enjoin Plaintiff's from using any past broadcasts of the DeLuca in the Morning Show which may be in the possession of the Plaintiffs.

During the Hearing in this matter, counsel for the Defendant stipulated that use by the Plaintiffs of these past broadcasts has not yet occurred. Further, Plaintiffs have agreed not to use these past broadcasts in the future.

Based upon the stipulation of counsel for the Defendant and the agreement of the Plaintiffs, the Court finds Defendant's motion for a preliminary injunction as to use of the past broadcast of the DeLuca in the Morning Show moot.

The Court notes counsel for the Defendant's objection to the Court's ruling for the record.

12

EX 3

Case 1:16-cv-11220-TLL-PTM   ECF No. 13-6, PageID.279   Filed 04/29/16   Page 13 of 13
Case 3:23-cv-01746-S   Document 19   Filed 08/15/23   Page 77 of 77   PageID 376
Apr. 24. 2012 11:36AM   Stark County Common Pleas Court                No. 8256   P. 14/14

IT IS SO ORDERED.

_____
Judge Charles E. Brown, Jr.

Copies:      Steven P. Okey, Esq.
             David L. Dingwell, Esq./Amanda M. Paar Conroy, Esq.

13

EX 3