IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SUSQUEHANNA RADIO LLC | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION NO. 3:23-CV-01746-S |
| | ) |
| vs. | ) |
| | ) |
| JACOB KEMP and DANIEL MCDOWELL | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSES
IN OPPOSITION TO INJUNCTIVE RELIEF**

Plaintiff Susquehanna Radio LLC ("Susquehanna") files this Reply to Defendant's Responses in Opposition to Injunctive Relief (ECF Nos. 11-13, the "Original Response" and ECF No. 19, the "Second Response"), showing the Court as follows:

**I.      INTRODUCTION**

Defendants freely admit that they have been publishing The Dumb Zone in a matter accessible in the Dallas market since leaving their employment with Susquehanna.[1] The Dumb Zone is a continuation and attempted usurpation of The Hang Zone – a show which Susquehanna produced for over three years with Kemp and McDowell as hosts, which still remains available online in podcast form. Defendants' continued publication of this show is a direct violation of the reasonable non-competition clauses in Defendants' Agreements with Susquehanna. As shown by the virtually identical name, content, format, and re-branded social media formerly used to promote The Hang Zone, Defendants are attempting to entirely move The Hang Zone's audience from under Susquehanna's roof, to their own. Accordingly, Susquehanna is entitled to a

---

[1] As used herein, defined terms have the meaning ascribed to them in Susquehanna's Renewed Emergency Application for Temporary Restraining Order and Request for Preliminary Injunction (the "Motion") (ECF No. 9).

preliminary injunction prohibiting Defendants from further breaching their employment contracts or converting Susquehanna's social media following.

In response, Defendants raise a number of defenses, all which fail as a matter of law and fact. Initially, The Hang Zone was never a terrestrial radio program. Indeed, Defendants are on over 2000 Susquehanna podcasts related to The Hang Zone, and were involved in various other original podcasts and YouTube presentations during the same time frame. Thus, Defendants' current infringing activities are identical to their Job Duties as Susquehanna employees. Each argument Defendants raise to avoid this conclusion, including that the NLRB has sole and exclusive jurisdiction, is in direct contradiction of well settled law. Thus, the Court should grant Susquehanna's requested injunction.

## II.     ARGUMENT AND CITATION TO AUTHORITY

A. SUSQUEHANNA IS LIKELY TO SUCCEED ON THE MERITS

### a. Defendants are Violating their Agreements

Defendants' do not deny that The Dumb Zone is essentially the same show as The Hang Zone, but rather falsely argue that they are not competing with Susquehanna because The Ticket is only engaged in "live terrestrial radio" whereas Defendants are engaged in "subscription-based on-demand internet podcasts." (Second Response, 1.) This arbitrary distinction is factually wrong, as podcasting and internet streaming are a major component of The Ticket's listener base and are specifically identified in the Agreements of both Kemp and McDowell. Moreover, it does not accurately address the competition at issue. The unlawful competition at issue is competition for <u>listeners to audio programing</u>, and regardless of the medium for engaging with and competing for those listeners, whether it be AM/FM radio, internet streaming, talk show, podcasting, satellite radio, or YouTube videos, the sole intent of these endeavors is to compete for <u>listeners</u>.

Indeed, both of Defendants Agreements state that Defendants "shall not, directly or indirectly, engage in any activities the same or essentially the same as Employee's Job Duties for any Competing Business."[2] (Agreements, 7). The Agreements expressly define Defendants' Job Duties to include "working on show preparation and production" and working to "**create podcasts of Employee's on-air shifts and/or to visually record or stream such air shifts for distribution**." (Agreements, Section 1.5) (emphasis added).[3] Accordingly, by "working on show preparation and production" in creating podcasts of The Dumb Zone for distribution, Defendants are engaging "in the same or essentially the same" Job Duties as they did for Susquehanna.

Defendants have created a Competing Business, as their joint endeavor is "the same or essentially the same as the *operation, promotion, and marketing* of a commercial radio station." (Agreements, 1.1, 1.3) (emphasis added). The Kemp Agreement goes as far to supplement this definition to include "podcasters, Internet/streamed radio and Internet/streamed programs/programming and other current and future audio platforms." (Kemp Agreement, 1.3). The Dumb Zone's operation fully overlaps to that of commercial radio, as it produces audio talk show content. Moreover, commercial radio in the 21st century revolves around the internet,[4] including podcasting, as there are currently over **2000 podcasts** of The Hang Zone featuring

---

[2] While Defendants attempt to characterize the "essentially the same" language as vague by reference to *Stonecoat of Tex., LLC v. Procal Stone Design, LLC*, that case is entirely inapposite. 2019 U.S. Dist. LEXIS 156005, *21 (E.D. Tex. 2019). There, the noncompetition agreement prohibited – without other contractual definitions - only "similar" activities to Defendants' employment. Here the Agreements exhaustively describe the exact "Job Duties" that Defendants are prohibited from engaging in with a "Competing Business." Nothing is vague.

[3] Although Defendants cite to Deluca v. Peterson from the Court of Common Pleas in Stark County Ohio containing similar non-competition language, the "Job Duties" from this 2012 case did not include podcasting, and further, there was no allegation that the employer recorded or uploaded podcasts. (Second Response, Ex. 3).

[4] The Ticket has streamed its on-air content over the internet *since the 1990s*, and today the internet audience of The Ticket is equivalent to its AM radio audience. *See* https://www.theticket.com/

Defendants currently available on The Ticket's podcast platforms.[5] This is not to mention the video content featuring Defendants available on The Ticket's YouTube channel, or that just months ago Kemp was recording an original podcast on NFL draft coverage for The Ticket.[6] Furthermore, the promotion and marketing of The Dumb Zone – as shown by the fact that Defendants re-branded the *exact* social media accounts formerly used to promote and market The Hang Zone – is identical to that of a commercial radio station. Accordingly, Defendants' uploading of The Dumb Zone podcast constitutes a Competing Business.

Recognizing this violation to the letter of their Agreements, Defendants attempt to argue the Agreements' restrictions are overbroad.[7] However, the Agreements only prohibit Defendants from competing for those listeners who could consume content from The Ticket from within the DFW area.[8] Indeed, Defendants could easily take measures to geo-restrict access to The Dumb Zone from within the DFW area, but, tellingly, choose not to because the DFW area is precisely where the audience they are competing for is located. Furthermore, the 6-month restriction is reasonable, as it provides a short window for The Ticket to develop a new show from the ground

---

[5] Podcasts, The Ticket.  https://www.theticket.com/2016/06/15/podcasts/

[6] *Id*; The Ticket, YouTube https://www.youtube.com/@theticketdfw9444/streams

[7] Defendants also argue, without legal citation, that because another Susquehanna employee does a charity live stream on Thursday nights and because Kemp was part of an independent podcast predating his Agreement, that Susquehanna has waived the non-competition provisions in the Agreements. This is not the case, as those activities are incredibly distinguishable from the enterprise Defendants are engaging in by producing The Dumb Zone, as such other activities did not involve competition for the same listener base. *See Daniels v. Balcones Woods Club, Inc.,* No. 03-03-00310-CV, 2006 WL 263589, at *6 (Tex. App. Feb. 2, 2006*)* ("In order to carry the burden of demonstrating a waiver of restrictive covenants, a party must prove that the violations then existing were so extensive and material as to reasonably lead to the conclusion that the restrictions had been abandoned.").

[8] While Defendants cite *Wright v. Sport Supply Grp., Inc*., 137 S.W.3d 289, 298 (Tex. App. 2004) for support that this is overly broad, it is not the case. *Wright* dealt with a restrictive covenant that went beyond competing for customers the employee *actually* had contact with during his employment. *Id.*

up. Accordingly, the Agreements' non-competition clauses are reasonable as they encompass only the competitive scope of Defendants' employment. *See New River Media Grp., Inc. v. Knighton*, 429 S.E.2d 25, 26 (Va. 1993)(where radio station had "invested substantial time and money in promoting [disk jockey] as an air personality," the Supreme Court of Virginia granted a preliminary injunction to enforce noncompetition agreement which restricted the disk jockey from competing within a 60-mile area for 12 months, as it was "no greater than is necessary to protect" the radio station's legitimate business interests.). Thus, Defendants are in breach of their Agreements.

In their campaign to compete for The Ticket's audience, Defendants are continuing to contact multiple of Susquehanna's advertisers and disparage Susquehanna in violation of their Agreements.[9] Defendants admit that McDowell has contacted Susquehanna's advertisers, asserting his contact was only "for personal reasons." (Second Response, ¶ 18.) Further, while Defendants state "Dan and Jake have meticulously avoided" disparaging Susquehanna, this is not the case. (*Id.*) Defendants portrayed Susquehanna as 'cheap' by falsely saying Kemp's pay never increased, and mocked Susquehanna's Cease and Desist Letters. Kemp even expressly stated his intent to disparage Susquehanna in the future, stating "I might bag on the company a little bit now that I've been told that that's possibly okay."[10] Indeed, Defendants continue to discuss and make

---

[9] To the extent Defendants claim a litigation privilege, the Texas Court of Appeals has held that the privilege also does not extend "to out-of-court communications by non-attorneys." *Charalambopoulos v. Grammer*, No. 3:14-CV-2424-D, 2017 WL 606639, at *13 (N.D. Tex. Feb. 15, 2017) (citing *HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, 2011 WL 5869608, at *15 (Tex. App. Nov. 23, 2011). Here, Defendants' critique of this litigation to thousands of listeners on The Dumb Zone who have no direct interest in the litigation clearly falls outside of the privilege and does not save Defendant Kemp from the conclusion he is in violation of his non-disparagement obligations.

[10] The Dumb Zone, *The Dumb Zone 8-2-23*, Patreon (August 2, 2023), https://www.patreon.com/posts/dumb-zone-8-2-23-87098488.

light of these legal proceedings on The Dumb Zone.[11] Thus, the evidence shows Defendants' actual and threatened breaches of their contractual obligations are well founded and sufficient to support the grant of a preliminary injunction. *See Xenon Anesthesia of Texas P.L.L.C. v. Xenon Health L.L.C.*, No. 09-12-00553-CV, 2013 WL 1279408, at *3 (Tex. App. Mar. 28, 2013) (finding "[t]hreatened injury to a business's reputation and good will [sic] with customers is frequently the basis for temporary injunctive relief.").

  b. **Defendants have Converted Susquehanna Property**

  In asserting Susquehanna does not own The Hang Zone's social media accounts and website, Defendants focus only on Section 2.4 of their Agreements regarding "Social Media Platforms," which does not establish ownership interests but merely governs content on those accounts. (*Id.*) Instead, Susquehanna's ownership is established by Section 15.1, which states:

> With respect to each and every program, announcement, event and promotion in connection with which Employee renders services hereunder, the titles and content thereof (including every format, idea, theme, script, characteristic, element thereof), and with respect to all materials created or developed by Employee pursuant to this Agreement (whether by Employee acting alone or in conjunction with other persons) (collectively "Material"), **Employee agrees and acknowledges that the Company, its successors and assigns are the sole and exclusive owner of such Material, that all rights, title, and interest in such Material are vested in the Company for all uses and purposes throughout the world.** (emphasis added).

  Here, the website[12] and social media accounts formerly branded for The Hang Zone and used to promote The Hang Zone are formats and platforms created during Defendants'

---

[11] For similar reasons, the grant of an injunction enforcing Defendant Kemp's non-disparagement obligations would not, as Defendants propose, be an impermissible prior restraint. *See Evans v. T-Mobile USA, Inc.*, No. 4:15-CV-00578, 2017 WL 661797, at *2 (E.D. Tex. Feb. 16, 2017) ("The Court's enforcement of a private agreement does not have the same constitutional implications as when the state affirmatively orders action or inaction.")(citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991)).

[12] Defendants' Second Response asserts Susquehanna's conversion claim is impermissibly for intellectual property, which the social media accounts and website are *not*. *See also In re CTLI,*

employment with Susquehanna and pursuant to their Agreements and Job Duties. Moreover, that McDowell may have paid for the website hosting has no effect on this conclusion, as part of McDowell's compensation under his Agreement was a five-figure "promotional budget" for The Hang Zone. Accordingly, the website and social media accounts are property of Susquehanna.

B.  <u>SUSQUEHANNA HAS, AND ABSENT A PRELIMINARY INJUNCTION, WILL CONTINUE TO SUFFER IRREPARABLE HARM</u>

Perhaps most important to Susquehanna, is halting the irreparable harm being incurred due to Defendants' continued breaches of contract and conversion of Susquehanna property. Indeed, under Texas law the "injury resulting from the **<u>breach of non-compete is the epitome of irreparable injury</u>**, so enforcement appears to be the rule rather than the exception." *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 858 (W.D. Tex. 2016) (emphasis added). In addition, "[d]amage that cannot be easily calculated, such as the demise of an existing business, may constitute irreparable injury," and thus the "probable, imminent, and irreparable injury prong may be satisfied with **<u>testimony that the threatened injury to an existing business's clientele, marketing, and goodwill, albeit not impossible to quantify, will be difficult to calculate or monetize</u>**." *VR Partners I, L.P. v. Midtex Oil, L.P.*, No. 04-19-00718-CV, 2020 WL 2543306, at *3 (Tex. App. May 20, 2020) (internal citations omitted) (finding threat of irreparable injury for grant of injunction based on testimony that removal of a sign is an important part of a "marketing strategy for attracting customers.").

---

*LLC,* 528 B.R. 359, 366–67 (Bankr. S.D. Tex. 2015) (finding that "business social media accounts are property interests"); *McGuire-Sobrino v. TX Cannalliance LLC*, No. 05-19-01261-CV, 2020 WL 4581649, at *4 (Tex. App. Aug. 10, 2020) (finding likelihood of success on conversion claim for issuance of TRO, ordering return of commandeered website and social media accounts); *Domain Prot., LLC v. Sea Wasp, LLC*, 426 F. Supp. 3d 355, 389 (E.D. Tex. 2019)(finding domain name is property which may be converted).

Here, Defendants' various breaches of their Agreements will continue to cause irreparable harm in the absence of a preliminary injunction. Defendants' actions and disruptions are significantly impeding the ability for Susquehanna to develop a new show to replace The Hang Zone, as long as Defendants continue to upload The Dumb Zone, listeners are less likely to give Susquehanna's new programming a chance. The Ticket is also receiving what can only be described as "hate mail" from listeners due to Defendants' conduct, resulting in ratings decreases which will be impossible to attribute to simply no longer having The Hang Zone, Defendants' uploading of The Dumb Zone, disparagement of Susquehanna, solicitation of its advertisers, or other external factors. As multiple advertisers have ended their business with The Ticket, the resulting revenue loss in sponsorship dollars will be even more impossible to quantify or place a dollar figure on because it is impossible to know how much revenue that advertiser would have generated and for what length of time in the future. Least of all, no dollar figure can be placed on the long-term impact of The Ticket's customer base due to The Ticket's damaged goodwill. Accordingly, Susquehanna will continue to suffer irreparable harm absent a preliminary injunction.

C.  THE INJURY FACED BY SUSQUEHANNA OUTWEIGHS ANY INJURY TO DEFENDANTS

This case epitomizes the need for a preliminary injunction due to the balance of harms. A primary purpose of Defendants' non-competition obligations is to allow Susquehanna the opportunity to retain its listener base by building up a new show over a six-month period <u>before</u> Defendants begin to again compete for that listener base. If Defendants are allowed to continue to compete for this listener base during the pendency of this lawsuit, even if Susquehanna is ultimately successful on the merits, the purpose of the non-compete will have already been frustrated. In comparison, Defendants' alleged harm is *de minimus* at best, and Defendants acknowledged they are financially capable of honoring their contractual obligations. (Agreements, 7) ("Employee acknowledges that . . . Employee will be able to earn a livelihood without violating

the foregoing restrictions and that Employee's ability to earn a livelihood without violating such restrictions is a material condition to employment with the Company.")  Accordingly, the injury faced by Susquehanna outweighs any injury to Defendants.

D. THE NLRB DOES NOT DETERMINE TEXAS' PUBLIC INTEREST

Finally, Defendants assert that Susquehanna's claims are pre-empted by the NLRB, and therefore any preliminary injunction predicated upon those claims would disserve the public interest.[13]  Defendants' argument is that enforcement of non-competition agreements is contrary to and disserves the public interest solely because of a memorandum ("GC 23-08") published earlier this year by Jennifer A. Abruzzo, one of the General Counsel for the National Labor Relations Board.  (Jennifer A. Abruzzo, *Non-Compete Agreements that Violate the National Labor Relations Act*, Memorandum GC 23-08 (May 30, 2023)).  Contrary to Defendants' argument, however, non-competition agreements have been enforced in this state since at least 1897, *see Gates v. Hooper*, 90 Tex. 563, 564 (1897), and Texas has codified the enforceability of non-competition agreements at Section 15.50(a) of the Texas Business and Commerce Code.  This well-established public policy of Texas confirms that such agreements are enforceable, and an unelected federal attorney in Washington D.C. cannot alter this policy by merely writing a memo.  This is not the law and is repugnant to this Country's federalist system.  Indeed, the "Fifth Circuit and Texas courts regularly uphold restrictive covenants and grant injunctions." *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 706 (W.D. Tex. 2019).

---

[13] While Defendants' Original Response represented its NLRB assertions as negating the public interest element for preliminary injunction, Defendants' second Response presents these assertions "to demonstrate that issuing even temporary injunctive relief here would be improper." (Second Response, 15.)  As it is unclear which element Defendants now present its NLRB assertions, Susquehanna addresses it in the public interest context.

Furthermore, pre-emption is not applicable under the *Garmon* doctrine, as in the 90-year history of the NLRA, no court in this county has ever ruled that non-competition agreements are "arguably subject to § 7 or § 8 of the [NLRA]." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959). Indeed, nothing about Defendants' violation of their non-competition agreements is related in any way to even hypothetical collective bargaining activity. Ms. Abruzzo's memo confirms that it is directed at non-competition provisions "imposed on low-wage or middle-wage workers who lack access to trade secrets or other protectable interests." (GC 23-08, 5). This does not cover Defendants who made well over six figures and received confidential information from Susquehanna, all while Susquehanna invested years of resources promoting Defendants to amass a public audience. Ms. Abruzzo further notes an exception where the former employee seeks an ownership interest in a competing business, which has happened here. (GC 23-08, n. 23.)

Further, the Fifth Circuit has noted, *Garmon* preemption "does not apply to conduct that is a mere 'peripheral concern' of federal labor law or that touches 'deeply rooted' state interests." *Windfield v. Groen Div., Dover Corp.*, 890 F.2d 764, 767(5th Cir. 1989). As demonstrated by the lack of any case law finding violation of the NLRA for non-competition agreements and Texas' enforcement of such agreements, the *Garmon* pre-emption rule is inapplicable.

### III.    CONCLUSION

Susquehanna respectfully requests that a Preliminary Injunction be issued to both enjoin Defendants from continuing to violate their non-competition, non-solicitation, and non-disparagement obligations in their Agreements, and to enjoin Defendants' conversion of Susquehanna's property by returning Susquehanna's property.

Dated: August 17, 2023            Respectfully submitted,

**BAKER & HOSTETLER LLP**

By: */s/ L. David Anderson*

L. David Anderson
State Bar No. 00796126
Kendall Viator
State Bar No. 24131733
2850 North Harwood Street, Suite 1100
Dallas, Texas 75201-2640
Telephone: (214) 210-1200
Facsimile: (214) 210-1201
danderson@bakerlaw.com
kviator@bakerlaw.com

**WARGO, FRENCH & SINGER LLP**
David Pernini (*Pro Hac Vice granted*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1520 (telephone)
(404) 853-1521 (facsimile)
dpernini@wfslaw.com
K. Tyler Dysart (*Pro Hac Vice pending*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1565 (telephone)
(404) 853-1566 (facsimile)
tdysart@wfslaw.com

*ATTORNEYS FOR PLAINTIFF*
*SUSQUEHANNA RADIO LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2023, a true copy of the foregoing was served upon all parties or their attorneys of record via the Court's ECF system in accordance with the Federal Rules of Civil Procedure.

　　　　　　　　　　　　　　　　　　　　　*/s/ L. David Anderson*
　　　　　　　　　　　　　　　　　　　　　 L. David Anderson