**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SUSQUEHANNA RADIO LLC<br><br>Plaintiff,<br><br>vs.<br><br>JACOB KEMP and DANIEL MCDOWELL<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION NO. 3:23-CV-01746-S** |

# PLAINTIFF'S FACTUAL UPDATE AND SUPPLEMENTAL BENCH BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION HEARING

So it may aid the Court, Plaintiff Susquehanna Radio LLC ("Susquehanna") submits this factual update and supplemental bench brief in aid of the Court's September 15, 2023 hearing (the "Hearing") on Susquehanna's Motion for Preliminary Injunction (the "Motion").

Defendant's counsel publicly admits that the seventeen-day delay to the Hearing on Susquehanna's Motion was pretext to thwart this Court of jurisdiction, believing "the NLRB is going to take this thing over and hand [Defendants] kind of a big win" – a win which would result in Defendants "holding the severed head" of Susquehanna. Notwithstanding, Defendants' reliance on NLRB intervention are both substantively and procedurally unfounded.

Plaintiff submits this supplemental brief focused the laws of the State of Texas and the jurisdiction of the United States District Court for the Northern District of Texas. Specifically, this brief discusses podcasting and its role as part of a modern commercial radio station, the enforceability of Defendants' Non-Competition Agreements, the two types of irreparable harm present (incalculable monetary damages and damaged goodwill) which justify the imposition of preliminary relief, and should the Court deem the Non-Competition Agreements as overbroad, the necessity of reformation at this stage of the litigation.

**Table of Contents**

A. Factual Update on Mediation, NLRB Proceedings, and Defendants' Conduct .................. 1

B. Podcasting and its Role as Part of a Commercial Radio Station ........................................ 4

C. Defendants' Non-Competition Agreements Are Enforceable to Protect Susquehanna's Goodwill ........................................................................................................................ 5

D. Defendants' Breaches Constitute Irreparable Harm under Texas Law ............................... 7

E. Any Reformation the Court Deems Necessary Should be Made at this Preliminary Injunction Stage ......................................................................................................... 10

# TABLE OF AUTHORITIES

## Cases

*Accruent, LLC v. Short*,
No. 1:17-CV-858-RP, 2018 WL 297614 (W.D. Tex. Jan. 4, 2018) .......... 12

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*,
209 S.W.3d 644 (Tex. 2006) .......... 6

*Bertotti v. C.E. Sheperd Co.*,
752 S.W.2d 648 (Tex. App.—Houston [14th Dist.] 1988, no pet.) .......... 11

*Burke v. Cumulus Media, Inc.*,
No. 16-CV-11220, 2016 WL 3855181 (E.D. Mich. July 15, 2016) .......... 4

*Calhoun v. Jack Doheny Cos.*,
969 F.3d 232 (5th Cir. 2020), *vacated*, 973 F.3d 343 (5th Cir. 2020) .......... 12

*Cardinal Health Staffing Network, Inc. v. Bowen*,
106 S.W.3d 230 (Tex. App.— Houston [1st Dist.] 2003, no pet.) .......... 9

*Cobb v. Caye Publ'g Grp., Inc.*,
322 S.W.3d 780 (Tex. App.—Fort Worth 2010, no pet.) .......... 11

*Dondi Properties Corp. v. Com. Sav. & Loan Ass'n*,
121 F.R.D. 284 (N.D. Tex. 1988) .......... 2

*Elliott v. Tilton*,
64 F.3d 213 (5th Cir. 1995) .......... 2

*Gallagher v. Philipps*,
563 F. Supp. 3d 1048 (S.D. Cal. 2021) .......... 4

*ICEE Distribs., Inc. v. J&J Snack Foods Corp.*,
325 F.3d 586 (5th Cir. 2003) .......... 8

*Insight Direct USA, Inc. v. Kelleher*,
No. 1:17-CV-252-RP, 2017 WL 1371252 (W.D. Tex. Apr. 10, 2017) .......... 11

*Marsh USA Inc. v. Cook*,
354 S.W.3d 764 (Tex. 2011) .......... 6, 7, 10

*McKissock, LLC v. Martin*,
267 F. Supp. 3d 841 (W.D. Tex. 2016) .......... 8, 10, 12

*Miller Paper Co. v. Roberts Paper Co.*,
901 S.W.2d 593 (Tex. App.—Amarillo 1995) .......... 8

*Rapaport v. Barstool Sports, Inc.*,
No. 18 CIV. 8783 (NRB), 2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021), reconsideration denied, No. 18 CIV. 8783 (NRB), 2021 WL 2635821 (S.D.N.Y. June 25, 2021) ..... 5

*Raven v. Molyneux*,
No. 2:14-CV-08288-SVW-JC, 2015 WL 12827760 (C.D. Cal. Jan. 27, 2015) ..... 4

*Safeguard Bus. Sys., Inc. v. Schaffer*,
822 S.W.2d 640 (Tex. App.—Dallas 1991, no pet.) ..... 11

*TransPerfect Translations, Inc. v. Leslie*,
594 F. Supp. 2d 742 (S.D. Tex. 2009) ..... 9

*Tranter, Inc. v. Liss*,
No. 02-13-00167-CV, 2014 WL 1257278 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) ..... 11

*VR Partners I, L.P. v. Midtex Oil, L.P.*,
No. 04-19-00718-CV, 2020 WL 2543306 (Tex. App.—San Antonio May 20, 2020, no pet.) ..... 8, 9, 10

*Webb v. Hartman Newspapers, Inc.*,
793 S.W.2d 302 (Tex. App.—Houston [14th Dist.] 1990, no pet.) ..... 11, 12

*Wright v. Sport Supply Grp., Inc.*,
137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.) ..... 11

**Statutes**

28 U.S.C.A. § 1927 ..... 2

Covenants Not to Compete Act ..... 7

Tex. Bus. & Com.Code Ann § 15.50(a) ..... 6

Tex. Bus. & Com. Code § 15.51(c) ..... 11, 13

Texas Covenants Not to Compete Act ..... 6, 10, 11

**Other Authorities**

29 C.F.R. § 101.4 ..... 3

Fed. R. Civ. P. 16(f)(1)(B) ..... 2

Local Rule 83.8 ..... 2

### A. Factual Update on Mediation, NLRB Proceedings, and Defendants' Conduct

As the Court is aware, Defendants have filed charges (the "Charges") with the National Labor Relations Board asserting claims relating to their Agreements and this litigation. Throughout this litigation, Defendants have asserted that the NLRB should have exclusive jurisdiction over this action, and that accordingly, the NLRB will ultimately take over this matter. This has directly affected the parties' actions in this case to date. On the evening before the August 29, 2023 reset hearing, the parties were presented with a mediator's proposal, which provided that the parties were required to "negotiate in good faith" on additional terms, specifically those addressing withdrawal of Defendants' Charges. Believing these good faith negotiations would result in amicable resolution, Susquehanna agreed to the proposal and retained Mr. Brian M. Jorgensen of Jones Day, an experienced labor and employment attorney, to assist in these additional negotiations and formulate a mutually agreeable procedure for withdrawal of Defendants' NLRB Charges. Mr. Jorgenson made an appearance in this case on August 31, 2023. (ECF No. 38).

By contrast, Defendants apparently agreed to delay the August 29th hearing in an attempt to allow the NLRB to divest this Court of jurisdiction and somehow definitively dispose of this litigation and the proceeding before the NLRB with a ruling in their favor. This is not mere conjecture by Susquehanna, as Defendants' counsel recounted this strategy to the general public in his own podcast on August 31, 2023. On his podcast *Loserville,* after disparaging Susquehanna's counsel by name and publicly disclosing information from the deposition testimony of Susquehanna's expert witness, Mr. Kingston stated:

> Anyway, the reason we're in this situation where we have Dan and Jake broadcasting again and we're waiting another couple of weeks before we have this hearing was**, ostensibly, to give us time to try and settle this thing again, and maybe we will. We're going to do another mediation. But I think part of the**

> **reason we saw it as potentially a decent agreement for us, we think the NLRB is going to take this thing over and hand us kind of a big win.**

(emphasis added).[1]

Mr. Kingston's statements suggest that there was little desire to "negotiate in good faith" for withdrawal of the Charges. Consistent with this, Defendants' first podcast following the mediator's agreement opened with the 'David versus Goliath' halftime speech from the movie *Hoosiers.*[2] Thereafter, Mr. Kingston publicly posted on August 29, 2023 that "People use David and Goliath as a reference to the biblical story to shorthand an unfair fight without remembering that at the end of the story, **the little guy is holding the severed head of the big guy**." [3]

---

[1] Welcome to Loserville, *Loserville Episode 96*, (August 31, 2023), https://open.spotify.com/episode/0CZTz0glEzp6dJvC8JruS3. For the Court's convenience, a transcript of the relevant portions of Mr. Kingston's public remarks is attached hereto as Exhibit A).

[2] While Defendants have largely refrained from discussing The Ticket or Susquehanna, Defendants have made clear inuendoes to this litigation by playing scenes from movies and tv shows. The Dumb Zone, The Dumb Zone 8-30-23, Patreon (August 30, 2023) https://www.patreon.com/posts/dumb-zone-8-30-88503680. Although Omar Little's retort of "I got the shotgun, you got the briefcase. . . it's all in the game" to the cross-examining attorney in Season 2 Episode 6 of *The Wire* is an otherwise exceptional reference, when used in the context of the Mediator's Agreement, it is emblematic of Defendants' facetious, arrogant attitude towards this Court and this litigation. Moreover, on their first episode after the mediator's agreement, Defendants again mocked the cease-and-desist letters. The Dumb Zone, The Dumb Zone 8-29-23, Patreon (August 29, 2023) https://www.patreon.com/posts/dumb-zone-8-29-88454017.

[3] *See* Exhibit B. Notably, this is not the first time Defendant's counsel has publicly discussed this litigation. Welcome to Loserville, *Loserville Episode 95*, Spotify (August 31, 2023) https://open.spotify.com/episode/5Q8dDcvddZ3fRCgOOtt1R6.

Plaintiff notes that Defendants' disingenuous tactics to obtain a nearly three-week extension on the hearing Susquehanna's PI Motion so that Defendants could resume podcasting and allow time for the NLRB to "take this thing over" are likely prohibited by this court's inherent scheduling authority, the Federal Rules, and federal statutes. *See Elliott v. Tilton,* 64 F.3d 213, 217 (5th Cir. 1995); Fed. R. Civ. P. 16(f)(1)(B); 28 U.S.C.A. § 1927. Further, Mr. Kingston's ad hominem

Given Defendants' continued reference to the NLRB, Susquehanna would like to provide the Court with an update on the NLRB proceedings. In general, once a charge is filed, the Regional Director where the alleged unfair labor practices took place requests the charging parties to submit evidence. 29 C.F.R. § 101.4. The case is also assigned to a member of the Region's field staff to investigate, who gathers evidence pertinent to the charge and interviews representatives of the parties and others who may have knowledge of the charge, as is deemed necessary. *Id.* Ultimately, "the person against whom the charge is filed . . . is asked to submit a statement of position in respect to the allegations." After the investigation concludes, based on the information gathered, the Regional Director decides either to issue a complaint or dismiss the charges. If a complaint is issued, the case is then assigned to an administrative law judge, who eventually holds an evidentiary hearing and subsequently issues a decision and recommended order in the case. *Id.* §§ 101-10-101.11. The parties may file exceptions to the decision, which the NLRB in Washington D.C. will eventually hear. *Id.* § 101.12. There is a further right to appeal any decision by or order from the NLRB to federal court.

To date, Susquehanna has not been contacted by the NLRB for an interview; nor has it been asked by the NLRB to provide any information or submit a position statement. In other words, the NLRB investigation is still in the preliminary stages, contrary to Mr. Kingston's representations to the public suggesting otherwise. This Court's jurisdiction remains intact. There is no indication – or even authority supporting the notion – that the NLRB is somehow going to dispose of this litigation and the proceedings before the Board in short order. In sum, Defendants representations that the NLRB will "take this thing over" and hand them "a big win" are troubling to say the least.

---

attacks are not in line with the standards of conduct required by *Dondi Properties Corp. v. Com. Sav. & Loan Ass'n*, 121 F.R.D. 284 (N.D. Tex. 1988) and Local Rule 83.8.

## B. PODCASTING AND ITS ROLE AS PART OF A COMMERCIAL RADIO STATION

A podcast is "a program (as of music or talk) made available in digital format for automatic download over the Internet." *Raven v. Molyneux*, No. 2:14-CV-08288-SVW-JC, 2015 WL 12827760, at *1 (C.D. Cal. Jan. 27, 2015). Podcasting has its roots in the early 1990s, and was initially described as "asynchronous radio." *The Computer Chronicles – The Internet (1993)*, The Computer Chronicles, YouTube (https://youtu.be/U_o8gerare0?si=MH_18QNR9C6c4UEr). These efforts led Carl Malamud to launch his podcast "Internet Talk Radio" in 1993. *Cable company is set to plug into Internet,* B1, Carnevale, Mary Lu; Keller, John J., Wall Street Journal, Eastern Edition (August 24, 1993). Thus, from its roots, podcasting was designed and meant as simply a different medium for radio style talk show content. In addition to radio content on podcasts, podcast content is frequently broadcast to radio stations. In *Planet Aid, Inc. v. Reveal, Ctr. for Investigative Reporting*, the District of Maryland considered litigation where the defendant rebroadcast a podcast "to more than 364 radio stations nationwide." No. CV GLR-16-2974, 2017 WL 2778825, at *3 (D. Md. June 26, 2017).

Courts similarly recognize that the forum provided by podcasting and the audience it reaches is "sufficiently similar" to radio. *See Gallagher v. Philipps,* 563 F. Supp. 3d 1048, 1078 (S.D. Cal. 2021); *see also Burke v. Cumulus Media, Inc.*, No. 16-CV-11220, 2016 WL 3855181, at *12 (E.D. Mich. July 15, 2016) (where former radio hosts started a podcast in asserted violation of their non-competition agreements, the court agreed with the radio station's assertion that technical differences "between internet and radio broadcasts are irrelevant for the purpose of considering whether Plaintiffs are carrying on a business that is competitive," and to "hold otherwise would be to elevate form over substance and ignore the economic realities of an industry that is increasingly shifting to the internet medium."). Accordingly, as is the case here, employment

agreements for talk show personalities, especially sports talk show personalities, frequently involve the overlap between radio and podcasting as they target the same audience with the same content. *See Rapaport v. Barstool Sports, Inc.*, No. 18 CIV. 8783 (NRB), 2021 WL 1178240, at *1 (S.D.N.Y. Mar. 29, 2021), reconsideration denied, No. 18 CIV. 8783 (NRB), 2021 WL 2635821 (S.D.N.Y. June 25, 2021) (term sheet "provided that Rapaport would produce his podcast on Barstool's platform" and that "Barstool and Rapaport would work towards developing a daily radio show.").

Podcasting falls squarely within the "operation, promotion, and marketing of commercial radio stations" as defined in Defendants' Agreements. In their employment, Defendants produced *thousands* of podcasts, representing a significant revenue stream for The Ticket. The Ticket's main competitor, The Freak, similarly produces regular podcasts, many of which feature former hosts of The Ticket.[4] Susquehanna's ultimate parent company Cumulus Media lists its "rapidly growing network of original podcasts" in its company overview on the publicly filed 10-K.[5] Moreover, the 10-K specifically identifies podcasting as a primary competitive strength, "generating collectively 70 million downloads, streams and listens per month," and therefore, podcasting is undoubtedly part and parcel to the "operation, promotion, and marketing of commercial radio stations" as defined in Defendants' Agreements.

### C. DEFENDANTS' NON-COMPETITION AGREEMENTS ARE ENFORCEABLE TO PROTECT SUSQUEHANNA'S GOODWILL

In Defendants' Amended Response and again on Mr. Kingston's podcast, Defendants assert that "Plaintiff failed to show that any of its information constitutes truly confidential information

---

[4] https://971thefreak.iheart.com/podcasts/

[5] www.sec.gov/Archives/edgar/data/1058623/000105862320000010/cmls2019123110k.htm

or a trade secret sufficient to constitute consideration for a non-compete covenant." (Defendants' Amended Response, 24). Notwithstanding that the Complaint alleges with particularity the confidential information Susquehanna provided Defendants, the enforceability of Defendants' non-competition clauses are not solely contingent upon this confidential information. Defendants overlook that their employment was predicated upon the development of customer goodwill, giving rise to an independent protectable interest of Susquehanna.

The Texas Covenants Not to Compete Act requires that a covenant not to compete must be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." Tex. Bus. & Com.Code Ann § 15.50(a).[6] While the provision of confidential information can be the basis of the consideration of an employment agreement which a noncompetition agreement is ancillary to, there is no requirement "that the *consideration* for the noncompete must give rise to the interest *in restraining competition with the employer*." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011) (emphasis in original).

In *Marsh*, the Texas Supreme Court reviewed the trial court and court of appeals' holding that "the fact that a company's business goodwill benefits when an employee accepts the offered incentive and continues his employment does not mean that the incentive gives rise to an employer's interest in restraining the employee from competing." *Id.* The Texas Supreme Court reversed, finding such an interpretation "would thwart the Legislature's attempt to enforce reasonable covenants under [§ 15.50(a)]." *Id.* at 776. The Court concluded that because defendant's job was dependent upon customer goodwill and because the employment agreement

[6] Texas Courts have further noted that the enforceability of the covenant should not be decided on "overly technical disputes" of defining whether the covenant is ancillary to an agreement. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006).

containing the non-competition clause incentivized goodwill through stock options, those options were "reasonably related to the protection of this business goodwill," and therefore the non-competition clauses were "ancillary to an otherwise enforceable agreement." *Id.* at 777.

The Covenants Not to Compete Act explicitly identifies goodwill as a protectable interest, and Texas law "has long recognized that goodwill, although intangible, is property and is an integral part of the business just as its physical assets are." *Id.* The *Marsh* court recited the definition of goodwill as:

> the advantage or benefits which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of **the general public patronage and encouragement which it receives from constant and habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence**, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

*Id.* at 777–78 (emphasis added).

Here, Defendants' hosting of The Hang Zone epitomizes intangible goodwill, as it is difficult to imagine a business more dependent upon goodwill than a radio station that relies upon the "constant and habitual customers on account of its local position, or common celebrity." *Id.* (emphasis added). As in *Marsh*, to incentivize the cultivation and perseverance of The Ticket's goodwill, each of Defendants' Agreements provided performance bonuses based on The Hang Zone's ratings. This bonus incentive "linked the interests of a key employee with the company's long-term business interests," thereby establishing the non-competition clauses as "ancillary to an otherwise enforceable agreement." *Id.* Thus, the non-competition clauses are enforceable.

### D. DEFENDANTS' BREACHES CONSTITUTE IRREPARABLE HARM UNDER TEXAS LAW

As a threshold matter, Susquehanna notes to the Court that the need for preliminary injunctive relief remains as strong as when Susquehanna filed its Motion. As demonstrated above, Defendants and their

counsel have continued to mock this litigation on multiple platforms, making personal attacks on Susquehanna and its counsel. That Susquehanna agreed to allow Defendants to podcast during the interim period from the prior hearing was solely in furtherance of "good faith" negotiations to reach settlement, which Defendants admittedly obtained under false pretenses to allow the NLRB to "take this thing over" and hand Defendants a "big win." Therefore, Susquehanna continues to suffer irreparable harm, and the lapse in time or allowance of Defendants to continue podcasting as part of the ongoing mediation and at the suggestion of the Court appointed mediator should not weigh against a finding of irreparable harm.

Under Texas law, "[d]amage that cannot be easily calculated, such as the demise of an existing business, may constitute irreparable injury," and thus the "probable, imminent, and irreparable injury prong may be satisfied with testimony that the threatened injury to an existing business's clientele, marketing, and goodwill, albeit not impossible to quantify, will be difficult to calculate or monetize." *VR Partners I, L.P. v. Midtex Oil, L.P.*, No. 04-19-00718-CV, 2020 WL 2543306, at *3 (Tex. App.—San Antonio May 20, 2020, no pet.) (internal citations omitted). Thus, just because it may be possible, in theory, to calculate damages, where that calculation is difficult, it is such difficulty justifies the grant of injunctive relief. *See Miller Paper Co. v. Roberts Paper Co*., 901 S.W.2d 593, 602 (Tex. App.—Amarillo 1995) (holding testimony that "[w]e can kind of put our hands on what's happening to us now, but we have no way of assessing the damage that this is going to cause" was sufficient to show irreparable injury); *ICEE Distribs., Inc. v. J&J Snack Foods Corp*., 325 F.3d 586, 596-97 (5th Cir. 2003) (upholding grant of injunction where Plaintiff "could potentially prove past lost profits enabling it to recover some measure of damages, it would be considerably more difficult for it to prove the amount of damages" from lost future sales).

Irreparable injury is highlighted in the context of non-competition agreements, as the "injury resulting from the breach of non-compete **<u>is the epitome of irreparable injury</u>**, so enforcement appears to be the rule rather than the exception." *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 858 (W.D. Tex.

2016) (emphasis added). Thus, breach of "a non-competition covenant gives rise to a rebuttable presumption that the applicant is suffering irreparable injury." *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.— Houston [1st Dist.] 2003, no pet.). In *Sunbelt Rentals, Inc. v. Holley*, this district recently found irreparable harm in the context of a non-competition agreement where the testimony showed former customers of the employer had followed the employee to a competitor. No. 3:21-CV-3241-N, 2022 WL 827126, at *7 (N.D. Tex. Mar. 18, 2022). Thus, even "possible loss of customers is sufficient to establish irreparable harm." *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009).

Outside of the non-competition context, in *VR Partners*, VR Partners owned property adjoining Midtex, who had an easement on VR Partners' property to place a sign for advertisement. No. 04-19-00718-CV, 2020 WL 2543306, at *1. When VR Partners attempted to force Midtex to remove the sign, Midtex brought an application for preliminary injunction. *Id.* Midtex's representative testified that the damage to its business from removing the sign "would be very hard to quantify," as the sign was part of Midtex's "marketing strategy for attracting customers." *Id.* at * 4. Since Midtex could "only speculate to what extent removal of the sign [would] impact its business" in the future, the Court affirmed Judge Old's preliminary injunction. *Id.* Similarly, in *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, former employee of Hennessy Motorsports started a competing automotive performance shop offering similar upgrades as Hennessy. 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). Where Hennessy "estimated its gross sales for 1997 would drop from approximately $4 million to about $2 million," and also testified that "the loss of good will was immeasurable," the court upheld the grant of the preliminary injunction, as "the potential damage to appellee's business cannot be easily calculated." *Id.*

Here, as the evidence will show, Defendants' actions are causing continued, irreparable injury both monetarily to Plaintiff and to its customer goodwill – each of which are sufficient for grant of a preliminary

injunction. The monetary harm stems directly from loss of listeners, and the corresponding loss in advertising revenue is a further step removed from any potential damages calculation. Indeed, since Defendants left Plaintiff's employment and began The Dumb Zone, Susquehanna's ratings have fallen significantly. To show monetary damages Susquehanna would be required to prove with reasonable certainty the decrease in these ratings caused directly by Defendants' breach of their contractual obligations (as opposed to simply no longer hosting The Hang Zone), *then* prove what the effect of that decreased listenership had on present and future advertising revenue – all while factoring in normal market forces. As in *VR Partners*, this "would be very hard to quantify." No. 04-19-00718-CV, 2020 WL 2543306, at *4.

Moreover, the loss to Plaintiff's goodwill is immeasurable, as Defendant's recording and uploading The Dumb Zone is a direct attempt to commandeer the "general public patronage and encouragement [Susquehanna] receives from constant and habitual customers on account of its local position, or common celebrity," leading to direct loss in goodwill. *Marsh*, 354 S.W.3d at 777-78. Additionally, false and disparaging public remarks about Susquehanna's pay of employees and monetization of this litigation as content on The Dumb Zone has directly led to loss of goodwill, as listeners now view Susquehanna in a more negative light. This "loss of good will [is] immeasurable," *T-N-T Motorsports, Inc*., 965 S.W.2d at 24, which "money damages would not fully repair." *McKissock,* 267 F. Supp. 3d at 858.

### E. ANY REFORMATION THE COURT DEEMS NECESSARY SHOULD BE MADE AT THE PRELIMINARY INJUNCTION STAGE

Even if the Court finds that the Defendants' restrictive covenants are overbroad (they are not), any reformation deemed necessary by the Court should be done at this preliminary injunction stage and the reformed covenants enforced. This remedy is required by the mandatory language of the Texas Covenants Not to Compete Act and reinforced by the decades-long practice of state and federal courts in Texas and the guidance of the Fifth Circuit.

The Texas Covenants Not to Compete Act provides that "the Court *shall reform* the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promise." Tex. Bus. & Com. Code § 15.51(c) (emphasis added); *see Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298–99 (Tex. App.—Beaumont 2004, no pet.) (stating that a party need not request reformation because § 15.51(c) "*requires* the court to reform a covenant that it finds unreasonable" (emphasis added)). Applying this compulsory language, Texas courts routinely grant interim relief even though certain portions of a restrictive covenant are deemed overbroad. *See, e.g., Webb v. Hartman Newspapers, Inc.*, 793 S.W.2d 302 (Tex. App.—Houston [14th Dist.] 1990, no pet.); *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *7 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (affirming preliminary injunction and stating that reformation "is not only a final remedy" and may be made "as an incident to the granting of injunctive relief"); *Cobb v. Caye Publ'g Grp., Inc.*, 322 S.W.3d 780, 784–86 (Tex. App.—Fort Worth 2010, no pet.) (affirming temporary injunction as modified); *Insight Direct USA, Inc. v. Kelleher*, No. 1:17-CV-252-RP, 2017 WL 1371252, at *2 (W.D. Tex. Apr. 10, 2017) (rejecting argument that reformation was inappropriate remedy for temporary restraining order or preliminary injunction).

Further, that the Court may have a limited factual record is not an impediment to reforming the contract, if necessary, at this stage. *Safeguard Bus. Sys., Inc. v. Schaffer*, 822 S.W.2d 640, 644 (Tex. App.—Dallas 1991, no pet.); *Bertotti v. C.E. Sheperd Co.*, 752 S.W.2d 648, 656 (Tex. App.—Houston [14th Dist.] 1988, no pet.) (affirming preliminary injunction with modifications because order "generally restraining solicitation of customers and not specifically listing the individual customers" was not overbroad). Indeed, the Court retains the authority to modify its injunction at

subsequent stages of litigation after facts have been further developed through discovery or trial. *Accruent, LLC v. Short*, No. 1:17-CV-858-RP, 2018 WL 297614, at *7 (W.D. Tex. Jan. 4, 2018) (noting that a reformation at the preliminary injunction stage is made only "[p]ending dispositive motions or a trial on the merits"); *McKissock,* 267 F. Supp. 3d at 857–58 (W.D. Tex. 2016) (same). As another court has found, where a party in violation of these covenants is "sufficiently familiar with the employer's business and its customers," even a generally worded injunction will suffice to protect the plaintiff's interests. *Schaffer*, 822 S.W.2d at 644.[7]

*Webb* is particularly instructive. 793 S.W.2d 302. In *Webb*, the defendant previously worked as editor and publisher of two "general interest newspapers" covering Fort Bend County, Texas. *Id.* at 303. When the defendant left to open a newspaper "aimed at the Fort Bend legal community and businesses seeking the services of other businesses," the plaintiff obtained a temporary injunction, and the court of appeals affirmed. *Id.* Both the trial and appellate courts found that the covenants were overbroad, but recognizing the defendant's familiarity with the plaintiff's business and customers would "give him an unfair competitive advantage gained at [plaintiff's] expense," both courts enjoined the plaintiff after modifying the covenants' scope, recognizing they had ample authority and a sufficient record to issue a temporary injunction. *Id.* at 304–05.

Accordingly, should the Court find that Defendants' non-competition Agreements are overbroad, the Court should at a minimum reform the restrictive covenants at this stage to reflect

[7] In a vacated opinion, the Fifth Circuit has endorsed this line of authority to require a district court to issue a preliminary injunction, even where there is an admittedly insufficient factual record and impermissibly broad covenant. *See Calhoun v. Jack Doheny Cos.*, 969 F.3d 232, 236 (5th Cir. 2020) (reversing district court denial of preliminary injunction for lack of factual development), *vacated*, 973 F.3d 343 (5th Cir. 2020).

and prohibit the scope of activities that Defendants should not engage in to "protect the goodwill or other business interest of" Susquehanna. Tex. Bus. & Com. Code § 15.51(c). The Court should then issue a preliminary injunction reflecting this refined scope.

Dated: September 13, 2023

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By:*/s/ L. David Anderson*
L. David Anderson
State Bar No. 00796126
Kendall Viator
State Bar No. 24131733
2850 North Harwood Street, Suite 1100
Dallas, Texas 75201-2640
Telephone: (214) 210-1200
Facsimile: (214) 210-1201
danderson@bakerlaw.com
kviator@bakerlaw.com

**WARGO, FRENCH & SINGER LLP**
David Pernini (*Pro Hac Vice granted*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1520 (telephone)
(404) 853-1521 (facsimile)
dpernini@wfslaw.com
K. Tyler Dysart (*Pro Hac Vice granted*)
999 Peachtree Street, N.E., Suite 1120
Atlanta, Georgia 30309
(404) 853-1565 (telephone)
(404) 853-1566 (facsimile)
tdysart@wfslaw.com

***ATTORNEYS FOR PLAINTIFF SUSQUEHANNA RADIO LLC***

**CERTIFCATE OF SERVICE**

Pursuant to Northern District of Texas local rules, I hereby certify that on September 13, 2023, a true and correct copy of the foregoing was served upon all counsel of record via the court's electronic filing system.

*/s/ L. David Anderson*
L. David Anderson